IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA            . CASE NO. 5:10-HC-2151-BO
        Petitioner                  . ELIZABETH CITY, NC
                                    . JULY 11, 2011
V.                                  .
                                    . 18 U.S.C. 4248
WALTER WOODEN                       .
        Respondent.                 .
. . . . . . . . . . . . . . . . .

                TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE TERRENCE W. BOYLE
            JUDGE, UNITED STATES DISTRICT COURT


APPEARANCES:

FOR THE UNITED STATES:     MICHAEL JAMES, ESQUIRE
                           EDWARD GRAY, ESQUIRE
                           ASSISTANT U.S. ATTORNEY
                           800 FEDERAL BUILDING
                           310 NEW BERN AVENUE
                           RALEIGH, NC  27601-1461



FOR THE RESPONDENT:        DEBRA GRAVES, ESQUIRE
                           SONYA ALLEN, ESQUIRE
                           PUBLIC DEFENDER'S OFFICE
                           150 FAYETTEVILLE STREET MALL
                           SUITE 450
                           RALEIGH, NC  27601




COURT REPORTER:        MS. SANDRA A. GRAHAM, CVR

Proceedings recorded by stenomask, transcript produced from
dictation.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

I-N-D-E-X

EXAMINATION OF THE WITNESSES

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **DR. HY MALINEK** | | | | |
| BY MR. JAMES | 6 | | 81 | |
| BY MS. GRAVES | | 64 | | |
| **WALTER WOODEN** | | | | |
| BY MR. GRAY | 85 | | | |
| BY MS. GRAVES | | 158 | | |
| **JOHN TABERSKI** | | | | |
| BY MR. JAMES | 159 | | | |
| BY MR. ALLEN | | 169 | | |
| **DR. HEATHER ROSS** | | | | |
| BY MR. GRAY | 179 | | | |
| BY MS. ALLEN | | 196 | | |
| **DR. TERENCE CAMPBELL** | | | | |
| BY MS. GRAVES | 201 | | 270 | |
| BY MR. JAMES | | 230 | | |
| **REBUTTAL** | | | | |
| **DR. HY MALINEK** | | | | |
| BY MR. JAMES | 272 | | | |
| BY MS. GRAVES | | 283 | | |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| COMPLETE BINDER | | 200 |
| [1] | MALINEK CURRICULUM VITAE | 11 |
| [2] | MALINEK EVALUATION REPORT | 12 |
| [3] | ROSS CURRICULUM VITAE | 180 |
| [4] | ROSS PRE-CERTIFICATION REPORT | 183 |
| [5] | ROSS FINAL EVALUATION | 183 |

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

[7]       CAMPBELL CURRICULUM VITAE          202

[8]       CAMPBELL EVALUATION REPORT         205

[17]      1984 PRESENTENCE REPORT           132

[18]      1975 PRESENTENCE REPORT           121

[29]      POLICE INVESTIGATION REPORT        81

[30]      DR. WEINER'S NOTES                 33

[31]      WOODEN DEPOSITION                  23

[37]      STRUCTURED CLINICAL INTERVIEW     209

[40]      WEINER DECLARATION                201

[41]      RUNNING RECORD                     57

[42]      TIMELINE                           15

[44]      SUPERVISION RECORD - JUNE 2005    176

[51]      SUPERVISION RECORD - MARCH 2003    74

[73]      INFRACTION CHART                  224

[75]      ROSS DEPOSITION TRANSCRIPT        197

[79]      MANN, ET AL STUDY                  66

[80]      BOP RECORD - FCI PETERSBURG       254

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

1    **THE COURT:**  We're ready to start the Wooden case?

2    **MR. JAMES:**  Yes, we are, Your Honor.

3    **THE COURT:**  Okay.  Do you want to make a statement or

4    anything?

5    **MR. JAMES:**  I believe Mr. Gray will address the Court.

6    **THE COURT:**  Okay.

7    **MR. GRAY:**  Thank you, Your Honor.

8    **THE COURT:**  Good morning.

9    **MR. GRAY:**  Good morning.

10    The issue, as you know, before The Court today is

11    whether or not Mr. Walter Wooden, the Respondent, is an

12    individual that is sexually dangerous to others.  And we

13    are going to be talking about him as the individual and how

14    he meets that standard.  The evidence that will be

15    presented before this Court will show that Mr. Wooden is

16    sexually dangerous to others, meaning that Mr. Wooden

17    suffers from serious mental illness, abnormality or

18    disorder and as a result of which he will have serious

19    difficulty refraining from sexually violent conduct or

20    child molestation if he is released.

21    The Government will be presenting evidence as to

22    serious mental illness, abnormality or disorder that Mr.

23    Wooden has through a variety of means of testimony and

24    evidence.  We will be offering the testimony of Dr. Hy

25    Malinek, a forensic psychologist who will testify as to his

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 4 of 286

1  findings with regard to Mr. Wooden.

2      We will also be presenting and offering into evidence

3  Dr. Heather Ross, a forensic psychologist from the Bureau

4  of Prisons who will be offering her findings as to Mr.

5  Wooden's risk of sexual dangerousness.  In addition, we

6  will be presenting the testimony of a probation officer, a

7  Mr. John Taberski, who will testify as to his dealings with

8  Mr. Wooden.  Specifically he will provide insight to the

9  Court with regards to the practicalness that Mr. Wooden

10  will be facing if he is released and will be providing

11  practical evidence as to his risk of reoffense and his

12  ability to -- or his inability to refrain from engaging in

13  serious acts of sexually violent conduct or child

14  molestation if he is released.

15      Finally, we anticipate that you will be hearing from

16  Mr. Wooden himself.  And you will get an opportunity to

17  determine, based on his testimony, whether or not he is

18  going to be a risk or will have serious difficulty

19  refraining from engaging in acts of child molestation or

20  serious difficulty if he is released within the D.C.

21  metropolitan area.

22      All the evidence that will be presented by the

23  Government is geared toward showing this Court that Mr.

24  Wooden, as an individual, meets the criteria set out within

25  18 U.S.C. 4248 and that he will have serious difficulty

1      refraining from engaging in acts of sexual violence or

2      child molestation if he is released.

3           Thank you, Your Honor.

4           **THE COURT:**  Thank you very much.  Do you want to

5      reserve your right to make a statement?

6           **MS. GRAVES:**  Yes, Your Honor, we would like to

7      reserve.

8           **THE COURT:**  All right.  You can call your first

9      witness.

10          **MR. JAMES:**  Thank you, Your Honor.  At this time the

11     United States calls Dr. Hy Malinek.

12               **DR. HY MALINEK, GOVERNMENT'S WITNESS, AFFIRMED**

13          **MS. GRAVES:**  Your Honor, our expert, Dr. Terence

14     Campbell has a hearing difficulty.

15          **THE COURT:**  Do you want him to sit up here?

16          **MS. GRAVES:**  Yes, sir.

17          **THE COURT:**  All right.

18                         <u>DIRECT EXAMINATION</u>

19     **BY MR. JAMES:**

20     Q.   Good morning, Dr. Malinek.

21     A.   Good morning.

22     Q.   Dr. Malinek, I want to begin by going through your

23     qualifications.  Your name is Hy Malinek; is that correct?

24     A.   Correct.

25     Q.   And what is your profession?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 6 of 286

1    A.    I'm a clinical and forensic psychologist.

2    Q.    What is your educational background?

3    A.    I have undergraduate and graduate degrees in

4    psychology.  I have a Bachelor's degree in Psychology from

5    Tel Aviv University.  I have a Master's degree in

6    Psychology -- in Child Clinical Psychology from Tel Aviv

7    University.  I have a Doctor of Psychology degree from Nova

8    Southeastern University.  I completed my internship at USC

9    Medical Center.  I've been licensed in California since

10   1988.

11   Q.    And you did an internship?

12   A.    I did.

13   Q.    And where was that internship?

14   A.    At USC Medical Center in 1984 and 1985.

15   Q.    And you are licensed in -- you were licensed in 1988;

16   is that correct?

17   A.    That is correct.

18   Q.    In what area of psychology do you specialize?

19   A.    I specialize in forensic psychology, have done so for

20   25 years, both in civil and criminal evaluations.

21   Q.    And with regard to the civil evaluations, have you

22   performed evaluations with regard to civil commitment in

23   the State of California?

24   A.    Yes, I have.

25   Q.    Approximately how many?

1  A.   More than 500.

2  Q.   And if you had to put a percentage on your practice,

3  what percent of your practice is devoted to forensic

4  psychology in the area of risk assessment for sexual

5  offenders?

6  A.   I would say from 60 to 70 percent.

7  Q.   Now, have you been called by both sides in the State

8  of California?

9  A.   I have.

10  Q.   Explain that to the Court.

11  A.   I am a member of the Department of Mental Health in

12  California, their Panel of Evaluators for the assessment of

13  sexually -- of candidates for civil commitment as sexually

14  violent predators.  I have done so since 1996.  So in that

15  capacity I have evaluated many individuals just to see if

16  they meet the criteria for civil commitment and have

17  testified thereafter about my opinions.

18     I am also frequently consulted by defense lawyers from

19  various counties in California in cases where there has

20  already been a finding, where the person meets the

21  criteria, and the defense is seeking another independent

22  opinion.  And so I have testified in that context of

23  consulting with defense lawyers as well on quite a few

24  occasions.

25  Q.   Were you involved with the first Adam Walsh test case

1   in L.A.?

2   A.   Yes, I was.

3   Q.   And did both sides, the U.S. Attorney's office and the

4   Federal Public Defender's office agree to use you as the

5   evaluator?

6   A.   Yes.  In January 2007 both sides had stipulated to my

7   credentials when they were seeking a psychologist

8   to conduct an evaluation.  That is correct.

9   Q.   Now, did you find positive or negative?

10  A.   I did not feel the person I was asked to evaluate met

11  the criteria for civil commitment as a sexually dangerous

12  person at the time.  I did not.

13  Q.   So there was no trial in that matter, then?

14  A.   No, there was not.

15  Q.   And if you were asked about the percentage of times in

16  which you find positive, that being that a person qualifies

17  for civil commitment in California as opposed to negative,

18  meaning that they do not, can you tell the Court what would

19  that ratio be?

20  A.   The law in California has changed.  From 1996 to 2007

21  my ratios of positive versus negative opinions was about 38

22  to 62.  I found about 38 of the individuals I evaluated to

23  meet all the criteria and 62 not.  In 2007 Jessica's Law

24  passed in California, and the pool of potential candidates

25  for civil commitment has increased tenfold.  Since then the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 9 of 286

1    ratios of positive versus negative findings in my

2    evaluations has changed to 15 percent positive and 85

3    percent negative.

4    Q.   Now, are you qualified by the Superior Court of Los

5    Angeles in this area?

6    A.   Yes, I am.  I've been a member of the Superior Court

7    Expert Panel since 1993.

8    Q.   Have you given seminars and speeches to criminal

9    defense attorneys?

10   A.   I have, on multiple occasions, yes.

11   Q.   The Federal Public Defender's Office?

12   A.   Yes, I have.  I have been appointed by the Federal

13   Public Defender's Office in Los Angeles on multiple

14   occasions and conduct evaluations for them on a regular

15   basis.

16   Q.   And what about the State Department of Mental Health

17   in California?

18   A.   I have a -- I am a member of their SVP Expert Panel, a

19   panel of doctors who conduct evaluations.  And I also have

20   a separate contract with the Department through California

21   State University, Sacramento, to provide consultation to

22   the department and supervision and mentoring of

23   psychologists who are either new to the panel or would like

24   to bounce a case off or have some doubts about their

25   opinions, whether the person meets criteria or not.  So the

1    Departtment has, I believe, four or five people that have

2    done evaluations for some time and that are asked to serve

3    as consultants or supervisors in that regard.  And I am one

4    of them.

5    Q.   And for the State Department of Mental Health, in

6    regard to sex offender civil commitments, how many

7    evaluations have you done for them?

8    A.   Several hundred.  I estimated having completed more

9    than 500 evaluations overall.  I don't have a detailed

10   breakdown of how many I have done for the Department of

11   Mental Health versus consulted or evaluated for defense

12   lawyers after a positive finding has been made.  I estimate

13   overall more than 500 evaluations since 1996.

14   Q.   And have you testified as an expert witness before?

15   A.   Yes, I have.

16   Q.   Have you ever been denied expert witness status?

17   A.   Never.

18   Q.   Now, before you there is an exhibit book.  If you will

19   turn to Exhibit Number [1], actually.

20   A.   Okay.

21   Q.   Did you provide us a Curriculum Vitae in this case?

22   A.   I did.

23   Q.   And is this your Curriculum Vitae, Exhibit Number [1]?

24   A.   Yes, it is.

25        **MR. JAMES:**  Your Honor, at this time I would offer in

1    evidence Exhibit Number [1].

2         **THE COURT:**  It will be received.

3         **MR. JAMES:**  Your Honor, at this time I would also

4    offer the witness as an expert in the field of sex offender

5    -- forensic psychology sex offender evaluations.

6         **THE COURT:**  All right.  I will accept the witness and

7    allow him to render his opinions in that area.

8    Q.   All right.  Now, Dr. Malinek, were you tasked with

9    examining and preparing a report of your findings

10   pertaining to the Adam Walsh Act as it pertained to Walter

11   Wooden?

12   A.   Yes, I was.

13   Q.   And did you reduce your findings to a report?

14   A.   Yes, I did.

15   Q.   If you would turn to Exhibit Number [2].  Is that, in

16   fact, your report?

17   A.   Yes, it is.

18        **MR. JAMES:**  Your Honor, at this time I offer into

19   evidence Government's Exhibit Number [2].

20        **THE COURT:**  It will be received.

21   Q.   I want you to preview for the Court, before we get

22   specific, what were the issues you were examining?

23   A.   There are three issues.  (A), whether Mr. Wooden was

24   convicted of sexually violent child molestation cases.  The

25   second, whether he suffers from a mental disorder as a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 12 of 286

1    result of which he would have serious difficulty in

2    refraining from similar conduct in the future.  And the

3    third was to conduct a risk assessment delineating and

4    explaining whether there is a -- what the risk is that he

5    would commit additional acts of sexual violence or child

6    molestation in the future.

7    Q.   Would you turn to page 4 of your report and with

8    regard to issue one, whether he had engaged or attempted to

9    engage in sexually violent conduct or child molestation.

10   Is that correct?

11   A.   Yes.

12   Q.   I believe you used the word convicted when you stated

13   testifying, but with regard to Issue Number 1, was that

14   whether he has engaged in or attempted to engage in

15   misconduct?

16   A.   That is correct.  The wording is engaged, not

17   convicted.  That is correct.

18   Q.   And in preparing your findings for the Court,

19   what did you find with regards to Issue Number 1?

20   A.   I found that he has -- the answer is, yes, that he has

21   engaged in or attempted to engage in sexually violent

22   conduct or child molestation on several occasions since the

23   age of 15.

24   Q.   And we will get into the details in a moment.  I just

25   want to preview these findings for the Court.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 13 of 286

1      With regard to the second issue, whether Mr. Wooden is

2      sexually dangerous to others in that he suffers from a

3      serious mental illness, abnormality or disorder,

4      did you so find?

5      A.   Yes, I did.

6      Q.   Just preview for the Court, what were the

7      serious mental disorders you found?

8      A.   I believe he met diagnostic criteria -- has met -- for

9      both pedophilia and antisocial personality disorders.

10     Q.   Now, with regard to the third issue, based on those

11     findings of pedophilia and antisocial personality disorder,

12     whether he would have serious difficulty refraining from,

13     in this particular case, child molestation, how did you

14     find?

15     A.   I found there is a serious and well-founded risk that

16     he will have serious difficulty in refraining from similar

17     conduct in the future and that a research supported risk

18     analysis supports that finding.

19     Q.   Now, let's look at issue number 1.  First of all, how

20     did you make that specific finding?

21     A.   I reviewed substantial discovery, formal discovery,

22     provided by your office pertaining to his criminal history.

23     This included various formal documents, judgment, copies of

24     judgments that have been rendered in his case and copies of

25     presentence investigation reports

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 14 of 286

1    prepared by the probation department that delineated and

2    described a number of sexual offenses and parole violations

3    involving sexual misconduct over the years, beginning at

4    the age of 15.  I viewed a rap sheet and treatment records

5    as well as records of parole and condition of release

6    violations that support that finding.

7    Q.   Now, based on your report, when did this begin, what

8    year?

9    A.   This began at the age of 15, in 1972.

10   Q.   Would a time line of these events assist you in your

11   testimony?

12   A.   It would.

13   Q.   At this time I would like to put up Exhibit [42], a

14   time line.  Let's just start with 1972 to 1974.

15              (Shown on screen)

16   Q.   Dr. Malinek, tell the Court about the conviction in

17   1972, the January 31, 1972 conviction.

18   A.   He suffered a conviction for rectal sodomy of a minor

19   in January of 1972.  And a second conviction for rectal

20   sodomy of a minor three months later on April 28 of 1972.

21   Q.   And with regard to October 16, 1973.

22   A.   He suffered a third conviction.  This was for indecent

23   liberties with a child, rectal sodomy of a minor male in

24   October of 1973.

25   Q.   Now, have you had an opportunity to review the

1    deposition taken from Walter Wooden?

2    A.   Yes, I have.

3    Q.   And with regard to the incidents from 1972 and 1973 --

4    we'll get to '74 in a moment.  But from '72 to '73

5    what was his -- from your reading of the deposition, what

6    did he say happened?

7    A.   He initially stated he does not remember details.  He

8    did acknowledge that he had sex with these children.  He

9    stated that they were willing to have sex with him and that

10   he went with them to the first place that he could find in

11   order to have sex.  He stated that with reference to the

12   1972 victims, both of them.  He had difficulties recalling

13   details in his deposition pertaining to the 1973 conviction

14   that he had sustained.  He did not deny.

15   Q.   With regard to 1972, first of all, January 31, did he

16   state how it came about?

17   A.   He stated that children came to him.

18   Q.   And what happened?

19   A.   And they asked him for money and that he wanted to

20   have sex with them, but they were willing to have sex with

21   him and that he took them to the first place that he could

22   find in order to have sex.

23   Q.   Did he indicate whether these were -- you said

24   children.  Did he indicate whether these children were in

25   elementary school or older?

1   A.    No, he -- when questioned whether these were
2   elementary school children, he stated yes.  He could not
3   remember specific details about their ages.  He stated that
4   they were willing to have sex with him.
5   Q.    Now with regard to the 1974 incident, how old was the
6   child in that incident?
7   A.    It was a four-year-old child.
8   Q.    Okay.  And based on your reading of the deposition,
9   what did he say happened with regard to the four-year-old
10  child?
11  A.    He had difficulty recalling details initially
12  pertaining to the conviction he suffered in 1974.  It was
13  also for indecent liberties with a child.  The child was a
14  four-year-old child that he had attempted to lure by
15  stating that he needed him to help him with some boxes.
16  The child reported that he took him to a fence and
17  threatened that he would stab him if he does not comply.
18        **MS. GRAVES:**  Your Honor, I am going to object to this
19  line of questioning.
20        **THE COURT:**  Overruled.
21  Q.    Doctor, with regard to the four-year-old, was there
22  some discussion about taking someone across the street?
23  A.    Are you asking about the questions in the deposition?
24  Q.    Yes, in the deposition.
25  A.    Yes.  He initially stated that the child asked him to

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 17 of 286

1   take him across the street, that they went to the house of
2   this lady.  And that this lady, according to his statement
3   in the deposition, wanted to take someone to the park.  So
4   he took him across the street.  His response was initially
5   -- did not provide any detail about the sexual crime that
6   took place.
7   Q.   Did there come a time when he stated that he took the
8   child back across the street from Wooden's house?
9   A.   Yes, he did.
10  Q.   And did he indicate how the four-year-old -- how the
11  sexual offense occurred with the four-year-old?
12  A.   Yes.  He claimed that the child laid down on his
13  stomach before he sodomized him, on his own.
14  Q.   Without the Respondent touching the child?
15  A.   Without him forcing him to do so, yes.
16  Q.   Now, with regard to his belief -- now, Walter Wooden
17  was in prison after the 1974 incident, is that correct?
18  A.   Yes, until November of 1980.
19  Q.   For a ten year term; that was the term.
20  A.   Correct.
21  Q.   And then he was paroled; is that correct?
22  A.   Yes.
23  Q.   Now, after he was paroled, they came a time in 1983 in
24  which there were two different incidents involving two
25  different boys.  Is that correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 18 of 286

1    A.    That is correct.

2    Q.    And one boy was eight years old?

3    A.    That is correct.

4    Q.    And the other boy was about 12 years old?

5    A.    Twelve (12) years old.

6    Q.    And the eight-year-old boy, for that offense he was

7    charged with indecent liberties with a minor and sodomy; is

8    that correct?

9    A.    That is correct.

10   Q.    And with the twelve-year-old, with attempting to

11   entice a minor child?

12   A.    Correct.

13   Q.    Based on your review of the reports, the PSRs in those

14   cases, what did it state happen?

15   A.    The eight-year-old was a child he had never met

16   before.  He asked him to help move some boxes, took him to

17   a vacant area where he told him to turn around and face the

18   wall and then to close his eyes.  And then he lowered his

19   pants and sodomized him.

20   Q.    Now with respect to the twelve-year-old, what

21   happened?

22   A.    He attempted to do the same thing, but the twelve-

23   year-old managed to essentially hit him with a stick and

24   flee.

25   Q.    And for that he pled guilty and was sentenced; is that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 19 of 286

1  correct?

2  A.   Correct.  Twenty-five (25) years.

3  Q.   And he was paroled in or about the year 2000?

4  A.   Yes.

5  Q.   Now, when he was paroled in 2000, did there come a

6  time he met with an officer named Eric Mays?

7  A.   Yes.

8  Q.   And you reviewed what they refer to as SMART records;

9  is that correct?

10  A.   Yes.  Field running record, correct.

11  Q.   And in the report in 2000 what did he report to Eric

12  Mays -- tell Eric Mays?

13  A.   Eric Mays stated that Mr. Wooden wrote down that he

14  had offended some 20 times over his life.

15  Q.   And during the course of supervision for Walter

16  Wooden, did the parole in D.C., at the time, did they want

17  him to monitor by GPS?

18  A.   Yes, they did.

19  Q.   Now, he was interviewed by Dr. Hoiles during that

20  time; is that correct?

21  A.   Yes, in 2000, correct.

22  Q.   What did she say about him?

23  A.   She thought he suffered from pedophilia, conducted a

24  psychological evaluation to assess his treatment needs and

25  assist in diagnosis in 2000.  I think it was shortly after

1    he paroled.  And prepared a psychological report in that

2    regard, took history, provided a diagnosis.

3    Q.   Did she reference his feelings towards his victims at

4    the time?

5    A.   What?

6    Q.   His feelings towards his victims, whether or not he

7    was remorseful or not?

8    A.   She did not feel that he was remorseful.

9    Q.   And he also had a Dr. Piquet; is that correct?

10   A.   Yes, around the same time he underwent a second

11   evaluation with Michele Piquet.

12   Q.   What did Dr. Piquet say with regards to him?

13   A.   Are you asking specifically about her findings or the

14   history she obtained?

15   Q.   Yes, her findings.

16   A.   May I have a moment?

17   Q.   Sure.

18   A.   I am unable to locate her report at the moment.  Would

19   you refer me to the appropriate number?

20   Q.   We will continue.  Now, with regard to your findings

21   of pedophilia --

22   A.   Yes.

23   Q.   -- tell the Court -- he was on parole until October of

24   2005; is that correct?

25   A.   Correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 21 of 286

1   Q.   Tell the Court with regards to the incident that led

2        to his parole revocation.

3   A.   He was treated by Dr. Weiner for sex offender

4        treatment, and on June 3rd of 2005 revealed to Dr. Weiner

5        that he had engaged in sexually inappropriate conduct with

6        a child nine months earlier.  He acknowledged that he was

7        hiring himself as a babysitter, had been in the presence of

8        children, that he was developing sexual thoughts and

9        fantasies about a child by the name of James; that James

10       had come to him and spent time with him.  And later on

11       further inquiry by Dr. Weiner revealed that he had

12       acknowledged that he had sexual contact with the child

13       about nine months earlier where they were both in the

14       laundry room of his apartment or apartment building and

15       that the child lowered his pants; that he had exposed

16       himself to him and later that he had poked the child's rear

17       with his penis.  He stated that he then stopped himself and

18       withdrew and did not continue to do so.

19  Q.   Now, let's unpack that a bit.  When he was paroled,

20       did he have a condition that he was not to associate with

21       minors?

22  A.   Yes, he did.

23  Q.   Now, you have reviewed his deposition; is that

24       correct?

25  A.   Yes, I did.

1   Q.  And during the course of his deposition, did he

2   indicate that he knew the boy's father?

3   A.  Yes.  Yes, he did.

4   Q.  And did he indicate during his deposition or state

5   during his deposition that there were times when he would

6   be alone with this boy?

7   A.  I believe he did.  I don't recall his exact statements

8   in this regard.

9        **MR. JAMES:**  May I have a moment, Your Honor?

10   A.  He stated that he was alone with him.

11   Q.  Would you turn to Exhibit Number [31]?

12   A.  Okay.

13   Q.  That would be the deposition of Walter Wooden.

14   A.  What page are you on?

15   Q.  If you would turn to page 112 of that exhibit.

16   A.  Okay.

17   Q.  If you look at -- begin on line number 14 and read

18   from line number 14 -- well, actually, read from line

19   number 13 to line number 22.

20   A.  Yes.

21   Q.  What did he state?

22   A.  He acknowledged that he was having sexual thoughts

23   about children and that he had recalled sharing this with

24   Dr. Weiner at the time of his treatment with the therapist.

25   And that he was -- he told Dr. Weiner that he was thinking

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 23 of 286

1    about young boys.

2    Q.   With regard to line number 14 to 22, what does he

3    state?

4    A.   He stated, "Me and my mother stayed in the same

5    apartment together."

6    Q.   No.

7    A.   I'm sorry.  Are you on page 111?

8    Q.   No.

9        **MR. JAMES:**  May I approach, please, Judge?

10       **THE COURT:**  Yes.

11   Q.   All right.  Turn to page 112.  I'm sorry if you

12   believed it was 111.

13       Did he indicate that he had spent time alone with that

14   boy?

15   A.   He did.

16   Q.   Okay.

17   A.   He stated the child would talk to him, that he knew

18   his father, that they spent time together.  The child

19   looked up to him.

20   Q.   And what did he say?  Read from the transcript,

21   please.

22   A.   Okay.  Is there a specific line you would like for me

23   to read?

24   Q.   Yes.  From line 14.

25   A.   He said, "There ain't nothing but the little boy come

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 24 of 286

1  around -- come around me, and he looks up to me, me and his

2  father was in Lorton together.  Me and his father was in

3  Lorton together.  His mother was a crack head.  He looks up

4  to me, he comes to me to help him out with his homework.

5  Right?  I will give him money to go to the ice-cream truck.

6  I looks up on him because he remind me of me because people

7  around the neighborhood call him the devil, and they used

8  to call me the devil when I was coming up."

9  Q.   All right.  Now, during this time that he was -- one

10 of his conditions was he could not -- Walter Wooden could

11 not associate with minors; is that correct?

12 A.   Correct.

13 Q.   And what does this tell you?

14 A.   He was obviously ignoring, violating his condition of

15 release requirement.  He was associating with young boys

16 and indulging in his fantasies.

17 Q.   Now, he was in treatment with Dr. Weiner during this

18 period of time; is that correct?

19 A.   He was.

20 Q.   Have you had an opportunity to review those notes?

21 A.   Yes, I have.

22 Q.   In those notes did he have an exercise in which he was

23 supposed to avoid -- an avoidance exercise, avoid bad

24 practices?

25 A.   Yes.  Dr. Weiner was trying to teach him different

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 25 of 286

1    strategies to avoid relapse among which were what's called
2    avoidance and escape techniques designed to help him get
3    away from problematic situations and high risk situations.
4    He had him tabulate and write down what the appropriate
5    response would be or to read a story and discuss it and
6    apply it to his own situation of what he should do in order
7    to avoid a problematic situation.
8    Q.   And one of those exercises he was supposed to do he
9    was supposed to list bad practices such as giving children
10   money; is that correct?
11   A.   Correct.
12   Q.   If you turn to the next page, page 113.
13   A.   Okay.
14   Q.   And look at line number 9.  Line number 9 through line
15   number 14, would you read that for the Court, please?
16   A.   Yes.  "So he came -- when he had homework, he'd come
17   to me because his father not around and his mother, no
18   telling what she -- what state of mind she in.  He comes to
19   me.  I helps him out, give him money to go to the store or
20   either to the ice cream truck when it come around, like
21   that."
22   Q.   Now, would you turn to page 157.
23   A.   Okay.
24   Q.   Now, throughout his -- throughout Mr. Wooden's time he
25   had been in treatment; is that correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 26 of 286

1   A.   Yes.

2   Q.   And you described the treatment he had with Dr.

3   Weiner.  He had treatment in the 1970's and in the 1980's;

4   is that correct?

5   A.   That's correct.  He's been in treatment a few times.

6   Q.   Now, during his deposition was he asked, Question:

7   "Now, you had -- you had some of this treatment prior to

8   2005; is that what you're saying?"  And his response was,

9   "Yes."  Is that correct?

10  A.   That's correct.

11  Q.   And line number 10.  Question: "And in any of this

12  treatment, did they tell you that you should avoid

13  children?"  His response was, "Yes."  Is that correct?

14  A.   That's true.

15  Q.   "But you didn't do that?"  (Question)

16          Answer:  "Not really, no."

17          Question: "Do you think the treatment that you

18  got worked?"  His answer was "Yes."

19          Question:  "I'm talking about the treatment

20  before 2004 and 2005.  Do you think it worked?"

21          What was his response?

22  A.   He said, "No, I don't think it worked."

23  Q.   Now, his parole was revoked; is that correct?

24  A.   That is correct.

25  Q.   And in your review of the records, from 2005 when his

1   parole was revoked to the present, is there any indication
2   that he took sex offender therapy while he has been
3   incarcerated in the Bureau of Prisons?
4   A.   No, there is not.
5   Q.   Let's talk specifically about pedophilia.  Can you
6   define what pedophilia is?
7   A.   Pedophilia is one of the paraphilias.  It is a sexual
8   deviation that is typlified by persistent urges, fantasies
9   of behavior which involve sex with children.  It requires
10  evidence of persistent sexual interest or behavior that
11  involves children.  There are pedophiles who are sexually
12  interested in boys.  There are those who are sexually
13  interested in girls.  Some are interested in both.  The
14  diagnosis requires evidence of at least six months
15  persistant of such urges or behavior and evidence that it
16  has caused a significant distress or impairment in the
17  individual.
18  Q.   All right.  Now, do you have evidence of more than six
19  months deviant sexual interest with children?
20  A.   There is evidence of 30 years, more than 30 years.
21  Q.   And in terms of the age ranges of these boys, what was
22  the approximate age range?
23  A.   It varied from four to eight.  In 1974 a victim was
24  four years old.  In 1983 boys were eight and twelve years
25  of age.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 28 of 286

1  Q.   And the boy with regard to the 2005 revocation he was

2  approximately seven; is that correct?

3  A.   Seven years old, James.

4  Q.   Now, how did you arrive at the diagnosis of

5  pedophilia?

6  A.   I considered the actual convictions, the crimes that

7  he had suffered, the description of the crimes, the

8  activities that he was involved in, clearly show evidence

9  of a persistent sexual interest in children.  Sodomy of

10  young children, the luring of children exclusively for the

11  purpose of sexual victimization, to help him move some

12  boxes and so forth.  I considered his own report.  He had

13  never denied that he had sexual arousal to children.  As

14  late as 2005 during a polygraph examination he acknowledges

15  that he has felt sexually aroused in the presence of

16  children during a polygraph examination conducted in 2005.

17  The details of the offenses, their persistance over time,

18  his own statements, statements to the polygrapher in 2005.

19  All of those denote the presence of pedophilia.  Pedophilia

20  is considered a chronic and life-long condition.  He has

21  not denied it.

22  Q.   And has it obviously impaired his life?

23  A.   It obviously has impaired his life.

24  Q.   Now, you're familiar with the Diagnostic and

25  Statistical Manual, the DSM?

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 29 of 286

1  A.   Yes, I am.

2  Q.   And it's currently in its fourth version; is that

3  correct?

4  A.   Yes.

5  Q.   And how did the DSM factor in your formulating your

6  opinion with regard to pedophilia?

7  A.   The criteria I just described for pedophilia are

8  delineated by the DSM-IV.  These are the requirements, the

9  diagnostic criteria before you can diagnose pedophilia.

10 The DSM-IV is the universally accepted manual for

11 diagnosing mental disorders.  It is based on extensive

12 research and the work of multiple committees that review

13 research findings and discuss and put together a manual

14 that is universally accepted.  The DSM-IV is the -- let's

15 say the Bible of diagnosis.  It's used in psychiatric

16 hospitals, in clinics all over.  The diagnosis of

17 pedophilia has been there from the very beginning.

18 Q.   And is the DSM-IV a product of various research

19 groups?

20 A.   Yes.  Each section of the DSM-IV discusses the various

21 different class of mental disorders, and there are specific

22 committees that are appointed by the DSM task --

23 essentially a task force to review, research and

24 presentations, discuss and put together the diagnostic

25 criteria.  There is more than that that goes into this.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 30 of 286

1    Every diagnosis is discussed in terms of core symptoms and

2    so forth, what needs to be present, various studies and

3    findings pertaining to it.  And that is all the work of

4    subcommittees that are appointed to do so.

5         **THE COURT:**  Is this an international standard?

6    A.   It is universally accepted internationally, Your

7    Honor.

8         **THE COURT:**  It cuts across cultures and geography?  It

9    includes the entire experience of the world?

10   A.   It does.  It does.  It recognizes cultural

11   differences.

12   Q.   Now, you said that pedophilia is a paraphilia; is that

13   correct?

14   A.   It's one of the paraphilias.  Paraphilia is a sexual

15   deviation.  It's an umbrella name for a host of sexual

16   deviations.  Pedophilia is one of them.

17   Q.   Now, please tie in for the Court why you believe that

18   with regard to the diagnosis of pedophilia, that based on

19   that diagnosis, that Walter Wooden would have serious

20   difficulty engaging -- refraining from engaging in child

21   molestation.

22   A.   He has shown powerful sexual interest in children.  I

23   suspect that he is an exclusive pedophile, although I am

24   not a hundred percent sure.

25        **MS. GRAVES:**  Objection.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 31 of 286

1          **THE COURT:**  Overruled.

2     A.   He has had no relationships with -- no steady or

3     enduring relationships with women.  He has recidivated four

4     or five times.  By his own statement he had done this many

5     more times that he had been detected.  He has continued to

6     offend against children despite detection and sanction and

7     incarceration.  He has not been able to contain himself

8     despite treatment and most recently recidivated or

9     attempted to recidivate while in treatment.  And despite

10    massive efforts to help him manage his sexual deviation,

11    the condition has persisted.  He has openly acknowledged

12    this for years.  He puts himself in high risk situations.

13    He ignores the requirements of his conditional release

14    officer.  He also harbors what looks like significant

15    cognitive distortions and thinking errors within which he

16    believes that children are appropriate partners for sexual

17    intimacy.  And until today thinks that the victims were

18    willing to have sex with him.  In his deposition of two

19    weeks ago that is what he had verbalized.  They came to me;

20    they were willing to have sex are his statements now.  The

21    way people think often mediates their conduct.  If he

22    thinks that this is appropriate sexual activity or intimacy

23    partner, then that certainly affects his behavior.

24         So all of these are trajectories for the offense.  It

25    looks likes there is a powerful deviant sexuality in place

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 32 of 286

1  that impacts his behavior and has been resistant to

2  extinction.

3  Q.   You mentioned treatment before, and, as you have

4  testified, he was in treatment with Dr. Weiner; is that

5  correct?

6  A.   He was.

7  Q.   I want you to turn to Exhibit Number [30].

8  A.   Okay.

9  Q.   And I want you to turn to -- looking on the lower

10  right-hand corner where it says FPD WOOD.

11  A.   Okay.

12  Q.   Turn to Bates number 3769.

13  A.   Okay.  I have it; thank you.

14  Q.   Now, what you have before you, is that not a Monthly

15  Treatment Progress Report?

16  A.   It is, for June 2005.

17  Q.   All right.  Now, I want you to go to the bottom of

18  that page.  That report is three questions, the first

19  being, "Is client's progress in compliance with projected

20  treatment objectives?"  Is that correct?

21  A.   Correct.

22  Q.   What did Dr. Weiner note?

23  A.   He checked "No".

24  Q.   All right.  Second, "Client's overall attitude,

25  behavior and commitment to refraining from sexually

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 33 of 286

1    offending behavior during this period:"  What did Dr.

2    Weiner note?

3    A.   He checked "Poor".

4    Q.   "Present risk to community:" The third and last one;

5    what did Dr. Weiner note?

6    A.   "High".  The highest option is High.  He put a

7    checkmark under High.

8        **THE COURT:**  Did you do a Static-99?

9    A.   I did, Your Honor.

10       **THE COURT:**  What was his number, his raw number?

11   A.   His score was seven, high risk.

12   Q.   Let's jump to the actuarials you used.  Let's go to

13   that.  With regard to the Static-99R, is that what you

14   used?

15   A.   Yes, it is.

16   Q.   And let's turn in your report to your summary.

17            Are you there?

18   A.   You said turn to my summary?

19   Q.   In your report where you list out the summary --

20   A.   Summary scores for Static-99?

21   Q.   Yes; that's correct.

22   A.   Sure.  Okay.

23   Q.   All right.  The summary scores you have, Static-99R,

24   that is broken down into apparently ten questions; is that

25   correct?

1    A.    There are ten risk factors, correct.

2    Q.    Ten risk factors.  And then you have another column

3    that shows the scores?

4    A.    That is correct, a detail of the scores.

5    Q.    All right.  Is Risk factor number 1, Age at Release,

6    you have him at a negative one?

7    A.    That is correct.

8    Q.    And tell the Court why it would be a negative one.

9    A.    The age item in the Static-99 has recently been

10   revised to account for the inverse relationship between age

11   and recidivism and fully account for the impact of age.

12   Because of his current age he gets a minus one.

13   Q.    Risk factor number 2, "Ever lived with".  That is with

14   regard to whether he ever lived with another person in a

15   relationship; is that correct?

16   A.    That is correct.  In a cohabitation relationship for

17   at least two years.

18   Q.    Why is that considered important with regards to the

19   Static-99R?

20   A.    It goes to the capacity for relationship stability.

21   The ability of an individual, sex offenders, to have had a

22   history of a relationship with a significant other of some

23   duration.  It is seen as important, really, in the sense

24   whether they are able to form and maintain a relationship

25   with an appropriate, intimate partner.  And that is what

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 35 of 286

1  the item looks at, relationship intimacy deficits.

2  Findings have found that people who have not had an

3  enduring relationship of some type with an adult are at a

4  somewhat higher risk to reoffend.  In this case he gets a

5  score of one.  He has never had a relationship with an

6  adult partner that lasted two years or even a relationship

7  at all that he had mentioned.

8  Q.   And with regard to number 3, Index non-sexual

9  violence, any conviction, you put zero?

10  A.   Yes.

11  Q.   And why is that?

12  A.   This item refers to whether the person at the time he

13  was most recently detected and charged with a sexual

14  misconduct, whether there was a conviction for violence,

15  That's separate and apart from sexual misconduct,

16  conviction for assault and so forth.  And that he does not

17  have that.  He gets a score of zero.  This is not present

18  in this case.

19  Q.   Now, prior sex offenses, you have a three.  Why is

20  that?

21  A.   This is essentially the item that looks at prior

22  sexual offenses.  It's the, you could say, the weightiest

23  item in the scale.  It considers charges and convictions

24  and goes from zero to three.  One needs to count the

25  charges and convictions, former charges and convictions,

1  based on rap sheets and former information.  This comes

2  essentially from studies that looked at past behavior.

3  Past history of sexual misconduct is important in assessing

4  future likelihood of similar behavior.  He gets the maximum

5  number here because of his number of convictions.

6  Q.   And prior sentencing dates, you gave him a one.

7  A.   Yes, this has to with risk factors, what's called

8  criminogenic risk factors.  It looks at persistence of

9  criminal behavior, how many times a person has come before

10  a court for sentencing.  It looks more as a measure of

11  one's commitment to a lifestyle of criminality.  So this

12  includes not just sexual convictions, but convictions for

13  other offenses as well.  Inability to learn from

14  experience, coming back to court times and again for one

15  violation or another.  His total record is consistent with

16  a number of sentencing dates that gets him a score of one.

17  You need to have at least four to get a score of one.

18  Q.   Any unrelated victims?

19  A.   Yes.  This is one of the victim pool items here refers

20  to or it comes from studies that try to differentiate more

21  closely the victim pool, who the person essentially

22  victimizes.  Also comes from studies that looked at incest

23  offenders and determined that those who offend within their

24  families are not likely to recidivate once they are

25  apprehended.  Unrelated means unrelated by family, not a

1    relative, to distinguish between those who are incest
2    offenders and those who offend against people that are not
3    related to them through family.
4    Q.   Number nine, stranger victims, you gave him a one.
5    A.   Gave him a one.  This again is one of the victim pool
6    items.  It refers to people who offend against people they
7    do not know, that they target specifically for the purpose
8    of sexual victimization.  Stranger means that the victim is
9    not known to the offender for more than 24 hours before the
10   offense takes place.  Basically enhances the likelihood
11   that -- if one offends against strangers, essentially the
12   pool of potential victims is increased, and that adds to
13   his risk.
14   Q.   All right.  And male victims, you also gave him a one.
15   A.   That comes from referral studies that have shown that
16   those who offend against males had a higher risk of
17   recidivism than those who offend against female victims.
18   He gets a point for that.  And also has been found by meta
19   analytic studies to be a predictor of recidivism.
20   Q.   All right.  Now, you gave him a score of seven.  What
21   does that correspond to with regard to the risk category?
22   A.   It puts him in a high risk category.
23       THE COURT:  Actually, he would be an eight if he
24   didn't get the minus point for his age?
25   A.   He was an eight, Your Honor, yes, before the measure

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 38 of 286

1  was revised and age weights were assigned.

2      **THE COURT:**  Which would put him at the high end?

3  A.   It would be at the high end.  We don't differentiate

4  scores above six because there were not enough people in

5  the original study to compute separate recidivism rates.

6  So six and above is considered high risk.

7  Q.   And the Static-99R, that is generally accepted in the

8  field of forensic psychology?

9  A.   Absolutely.  Absolutely.

10  Q.   Now, you also performed another actuarial test, the

11  2002R; is that correct?

12  A.   Static-2002R; that is correct.

13  Q.   Let's turn to page 31, and that lists five categories.

14  A.   Five domains, that is correct.

15  Q.   And what was his score?

16  A.   He got a score of nine.

17  Q.   And what does that correspond to?

18  A.   It corresponds to a high risk.  Nine and above in the

19  Static-2002 are classified as high risk by the authors.

20  Q.   And that looks at a similar category in terms of age

21  as the Static-99R; is that correct?

22  A.   It is built a little differently, but quite a few

23  items are identical.

24  Q.   Persistence of sexual offending?

25  A.   Correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 39 of 286

1   Q.   Deviant sexual interest, relationship to victim, and
2   general criminality.
3   A.   These are the domains, the five domains of the
4   measure, correct.
5   Q.   You also used another actuarial, MnSOST-R.  What does
6   that mean?
7   A.   Minnesota Sex Offender Screening Tool-Revised.  It is
8   a measure of recidivism developed by Doug Epperson.
9   Q.   And what did he score on that?
10  A.   He got a score of 17.
11  Q.   And what does that correspond to?
12  A.   High risk.  Very high risk, according to Epperson's
13  initial classification.
14  Q.   Now, with the Static-99R, you've broken it down into a
15  number of samples.  There's a routine sample, a preselected
16  for treatment needs sample, the preselected for high-
17  risk/high-needs sample, and a non-routine correctional
18  sample; is that correct?
19  A.   That is correct.
20  Q.   And what is the difference between these samples?
21  A.   The recent studies done by the Hanson and Helmus
22  group, the researchers who put the Static-99 together,
23  indicated that not all sex offenders recidivate at the same
24  rates.  The presentation they gave about this at the
25  Conference of The American Association for Treatment of

1    Sexual Abusers provided new statistical recidivism
2    estimates that is trying to differentiate sex offenders and
3    establish four different types of general reference group
4    or subgroups, if you may, of sex offenders that vary in
5    terms of their recidivism.  They differentiated what they
6    call their routine group, which includes all adjudicated
7    sex offenders, which had lower overall -- relatively lower
8    recidivism rates from other groups of sex offenders that
9    had higher recidivism rates.  And the distinction was based
10   on what the authors described as preselection, meaning that
11   there were additional markers or characteristics of some
12   sex offenders that made them more likely to reoffend.  The
13   treatment needs group, refers to a number of samples of sex
14   offenders that were researched at the time that this study
15   was done of 8,100 sex offenders from multiple countries and
16   multiple samples.  The refer to treatment need was a group
17   of sex offenders who were referred for sex offender
18   treatment during some time of their incarceration, who were
19   seen as needing sex offender treatment and who had a
20   higher, somewhat higher recidivism rate than the routine,
21   all adjudicated sex offenders group.  There was a third
22   group of what the authors -- or the researchers called
23   high-risk/high-needs offenders who showed higher recidivism
24   rates for the same scores.  And these were sex offenders
25   who were found to be high-risk sex offenders, was

1    designated as high-risk sex offenders in the samples that
2    comprised this.  There were a number of different samples
3    from several countries that make the various groups.  And
4    so after one receives the scores to measure, there needs to
5    be some -- needs to assign or look at which of the
6    subgroups, which of the offender groups identified by the
7    studies is most appropriate to compare him to.  And that is
8    the next process.  I believe that the details of this case
9    and the information about the formal supervision and the
10   intensive treatment that he was seen as requiring,
11   certainly in 2005, clearly designated him as a high-
12   risk/high-need offender.  And that's why I thought these
13   were the most appropriate normative data to use when
14   assessing his risk.
15   Q.   Can you have a seven on the Static-99R in the
16   preselected for treatment group in the high-risk/high needs
17   group?
18   A.   Yes, you can.  Yes, you can.
19   Q.   And why is that?  Why is it you have that score from
20   those groups?
21   A.   The score is made of -- you can get to a score of
22   seven in a variety of ways.  There are ten risk factors
23   here.  So the score is just a number.  One needs to look at
24   how one gets to the score.  It could be a very young person
25   who is very violent and gets a score of seven even though

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 42 of 286

1   he doesn't have a history of persistent sexual offending.

2   So there is mix of risk factors that make the scale. It is

3   based on studies that show that sexual deviance and

4   criminal trajectories are pathways to reoffense. So the

5   interplay could vary. And so you can have someone with a

6   high score who does not necessarily show persistent sexual

7   offending. So that is why you need to consider more

8   details pertaining to the sexual aspects, the deviant

9   aspects of the case, if there are any, as you decide on

10  which normative data to use.

11  Q.   With regard to risk percentages for the group; is that

12  correct -- there are risk percentages for these various

13  groups?

14  A.   There are risk estimates associated with different

15  scores; that is correct.

16  Q.   What is the risk estimate associated with the routine

17  sample?

18  A.   The five year recidivism rate for people with a score

19  of seven for the routine group was 18.8 percent, for the

20  routine group.

21  Q.   And with the group that you found him in, the high-

22  risk/high-needs group.

23  A.   Thirty-seven point nine (37.9) percent in five years.

24  Q.   Now, in addition to the actuarials that you testified

25  about, did you look at other factors as well?

1    A.    I did.

2    Q.    And I am going to ask you, what is a dynamic risk

3    factor?

4    A.    Dynamic risk factors refers to variables that could

5    change.  The research here looks at factors like treatment,

6    thinking patterns, sexual controls, cooperation with

7    supervision, peer group impact, overall impulse control as

8    important considerations that can affect the likelihood of

9    reoffense separate and apart from the Static-99 or the

10   static estimates.

11   Q.    And what are the dynamic risk factors in Walter

12   Wooden's case?

13   A.    I considered a number of groups of dynamic risk

14   factors that have been researched, and he has a few.  One

15   of the dynamic risk factors that have been looked at by

16   Hanson and others include peer group, significant social

17   influences.

18   Q.    How is that with regard to Walter Wooden?

19   A.    He does not appear to have a significant positive

20   social support.  His family appears to have tried to help

21   him in the earlier years when he got in trouble when he was

22   15 and previously, and apparently were not successful in so

23   doing.  It certainly did not stop him from reoffending or

24   from the serious failure to comply with the conditions of

25   release requirement in 2005.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 44 of 286

1    A second dynamic risk factor in this case includes
2    what's called, generally called intimacy deficit or
3    essentially discusses capacity for relationship stability,
4    the ability to have a relationship with an appropriate
5    adult.  I certainly think this is a powerful risk factor in
6    this case.  By his own statements over the years he has
7    never had a relationship with an appropriate adult.  He is
8    on the record in a few cases saying that -- implying that
9    he earlier had sex with females.  He has not had
10   girlfriends his same age, never lived with a woman,
11   essentially never had an appropriate relationship with an
12   adult that could mitigate or support him, sustain him.  He
13   has revealed a history of significant inadequacy, feelings
14   of low self-esteem, a sense that he -- his penis was too
15   small, that he could not satisfy a woman and a pervasive
16   sense of inadequacy that probably kept him isolated and
17   steered him in the direction of children.
18   Q.   Emotional identification with children.
19   A.   This risk factor looks at sexual offenders who look at
20   children as their peers.  They think the children could be
21   their friends or in some way are themselves regressed and
22   look to children for intimacy.  I did not interview him,
23   and I was unable to reliably assess this, but I looked at
24   information that he had sent a letter from jail in December
25   of 2005.  After he was essentially detected and arrested

1  for parole violation, he sent a Christmas card, I believe,
2  to James, to the child that he molested or attempted to
3  molest in it would be 2004; he  disclosed it in 2005 --
4  from a special friend.  Clearly inappropriate, and I think
5  would point in the direction that he does identify with
6  children, sees them as his peers, clearly a breakdown of
7  boundaries and is consistent with his thinking that
8  children could be appropriate partners for intimacy,
9  willingly be his sexual partners.
10  Q.   Lifestyle impulsiveness.
11  A.   It is another dynamic risk factor that looks at the
12  history of poor impulse control in individuals as
13  potentially augmenting the risk that they would reoffend.
14  There is clearly a history of significant impulsivity here,
15  sexual and otherwise, from his comments that he took
16  children to the first place that he could find.  This is in
17  reference to 1975.  He has a record high number of
18  institutional rule violations, more than a hundred I
19  believe over his incarceration.  Some for what looks like
20  kind of a passive resistance to rules, some for threats of
21  violence against staff members.  Clearly impulsivity is
22  present in this case.
23  Q.   Poor problem solving skills.
24  A.   That looks essentially at the capacity of sexual
25  offenders to think clearly, to identify appropriate

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 46 of 286

1    solutions to problems, process information.  It's difficult
2    to assess this component, as I noted in my report, without
3    an interview; and he did not wish to interview with me.  I
4    would have doubts about his capacity to do so, given the
5    very information that is available from his treatment about
6    his failure to connect the dots, to apply what he has
7    learned, what the doctors tried to teach him.  Obviously
8    the behavior of violating the conditions of parole,
9    inability to have any connection to what his urges are and
10   what he needs to do to keep himself out of trouble.
11   Q.    Grievance and hostility.
12   A.    There is powerful evidence of hostility here.
13   Multiple evaluators who have seen him over the years
14   describe him as very angry, very hostile.  There are
15   comments -- I think it is evident in quite a few places in
16   the record, a description of him as angry.
17   Q.    Sex drive/sexual preoccupations.
18   A.    This focuses on recurrent sexual preoccupations.  I
19   don't have information about this since 2005.  However,
20   information prior to 2005 seemed to suggest that he was
21   sexually preoccupied.  He made a few comments about this in
22   the past before 2005.  He acknowledges the fantasies about
23   the boy in 2005, makes reference to another boy he had
24   fantasies about previously but he did not act on, in 2004.
25   I don't have current information, have not interviewed him,

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 47 of 286

1    so I wouldn't know specifically as to right now, but the

2    history appears to be consistent with that.

3    Q.   Now, with regard to deviant sexual interests?

4    A.   Part of this is clearly measured in the actuarial

5    measures.  To the extent that we look at male victims,

6    prior sexual offenses, there is clearly an undisputed

7    diagnosis of pedophilia in this case with a deviant

8    interest in children that is persistent.

9    Q.   Resistance to rules and supervision.

10   A.   This is one of the dynamic risk factors that has been

11   identified by Henson in a study of dynamic risk factors and

12   more recently by a meta analytic study by Mann and

13   Thornton, M-A-N-N, that identified -- or looked at whether

14   offenders cooperate with conditions of release requirement

15   or are resistant to it.  And I think it had one of the

16   highest statistical values as a moderate predictor for

17   recidivism, clearly applicable in this case.  He was

18   described on multiple occasions as resistant to rules, was

19   reluctant to provide details, as passive-aggressive, as

20   unwilling to participate.  Obviously quite openly and

21   flagrantly violated specific conditions of his parole.  It

22   clearly applies in this case.

23   Q.   And did you also look at protective risk factors?

24   A.   Yes.

25   Q.   And explain to the Court, what is a protective risk

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 48 of 286

1    factors?

2    A.   A protective risk factor is a low risk factor.  It is

3    a factor that would mitigate against the offense, that

4    would lower the risk of an individual who recidivates.  And

5    there are a number of protective risk factors that have

6    been identified by studies as relevant and must be included

7    in any risk assessment.

8    Q.   With regard to Walter Wooden, what, if any, protective

9    risk factors that you could have considered?

10   A.   There are a few.  One of them is age,  I think this

11   may be a protective risk factor.  It is based on studies

12   that show an inverse relationship between age and

13   recidivism and that finds fewer sex offenders as the

14   individual ages.  Other protective factors include a

15   successful completion of treatment within a cognitive

16   behavior model.  That is a finding that clearly reduces

17   recidivism, often by as much as 40 percent.  When

18   individuals have specific serious functional problems,

19   serious health conditions that would prevent them from

20   acting out on sexually deviant urges, certainly that can be

21   a protective risk factor.  One obviously needs to look at

22   specific idiosyncratic factors that are relevant to every

23   case.  I think the only protective factor here would be

24   age.  He is currently 54 - 55.

25   Q.   With regard to child molesters, do they, for lack of a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 49 of 286

1  better word, age out in terms of offending at the same rate

2  as, say, other sex offenders like rapists?

3  A.   They do not.  They do not.

4  Q.   Do they age out at a slower rate?

5  A.   They age out at a slower rate.  Pedophiles continue to

6  offend way longer than rapists.  Clearly many offend in

7  this 60's and even later.

8  Q.   And how old was Walter Wooden when his parole was

9  revoked?

10  A.   He was 49, I believe.

11       **MR. JAMES:**  Can I have just one moment, Your Honor.

12       **THE COURT:**  Forty-eight.  Was he born in '57?  Is that

13  right?

14  A.   '56, Your Honor.  March 8, '56.

15       **THE COURT:**  Fifty-six.  He's older than I thought.

16  That would make him 55.

17  A.   Yes.  Right now.  He is 55.

18  Q.   With regard to pedophilia, does that go away with age?

19  A.   The condition is considered chronic.  I think it has

20  been chronic here.

21  Q.   In your review of the history with regard to Walter

22  Wooden, his history and also you looked at his deposition,

23  can you indicate whether he is a type of pedophile who

24  looks at child pornography?

25  A.   There is no mention or record of him viewing child

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 50 of 286

1    pornography.

2    Q.   And so he would be a hands-on, for lack of a better

3    word, a hands-on offender?

4    A.   He has been a hands-on, predatory offender targeting

5    strangers for the exclusive purpose of victimization.

6    Q.   Now, you also diagnosed him with antisocial

7    personality disorder; is that correct?

8    A.   I did.

9    Q.   And tell the Court, how did you reach that conclusion?

10   A.   Personality disorder involves a long-term maladaptive

11   pattern of deviant behavior.  It requires evidence that the

12   person had -- in the case of antisocial personality

13   disorder that they had the probability of and suffered from

14   a conduct disorder before the age of 15.  People with

15   antisocial personality disorder often show a pattern of

16   disregard for the laws and for rules, often get into

17   trouble with the law.  In addition they often show evidence

18   of reckless disregard for the safety of themselves and

19   others, deceitfulness, anger problems, irritability,

20   significant difficulty in getting along with others.  I

21   believe that the totality of the data base in this case is

22   consistent with antisocial personality disorder.  The sheer

23   number of behavior problems in custody, the sexual

24   offenses.  He was actually detected for robbery at the age

25   of 12.  There are multiple indications or references in the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 51 of 286

1　　record to him being deceptive and cunning, by various

2　　people who have evaluated him, despite his not being

3　　truthful.  Anger problems are referenced on multiple

4　　occasions throughout the record while in custody and so

5　　forth.  I think he meets all the criteria.  Obviously the

6　　sexual offenses repeatedly spell an utter disregard for the

7　　law and inability to comply with rules, all of which are

8　　consistent with antisocial personality disorder.

9　　Q.　How do you tie in that antisocial personality disorder

10　　as to whether he would have serious difficulty in

11　　refraining from sexually violent conduct or child

12　　molestation?

13　　A.　He has a strong, established record of disregard for

14　　the law and inability to control himself.  But the record

15　　of offenses -- more importantly there is a pattern of

16　　recidivism where he gets caught, apprehended, detected,

17　　sanctioned, gets out, recidivates.  I constructed a time

18　　line of these offenses and saw that he was really never

19　　offense free for more than maybe two and a half or three

20　　years.  If you look at the offenses from the 70's, I think

21　　the first two offenses occurred three months apart.  The

22　　third offense occurred perhaps a few months -- a year

23　　longer between the second and third detection.  After he

24　　gets out from prison in November of 1980, I think, within

25　　two and a half years or so he reoffends with the conviction

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 52 of 286

1   of a reoffense that involved two boys, an eight and a
2   twelve-year-old.  The longest he had lasted it looks like
3   was maybe two and a half to three years, from 2001 until --
4   I think it will be 2000 -- when he was out his parole was
5   violated for something else, so he went back to custody for
6   about a year.  But most recently he was out for about two
7   and a half years, if he had attempted, as he stated, to
8   engage in sodomy or engage or attempted to engage in 2004
9   which would be, by his report, about nine months prior to
10  his eventual disclosure of this.  So you clearly have a
11  pattern of recidivistic behavior that is resistant to
12  extinction.  I think the presence of two conditions like
13  pedophilia in this case and antisocial personality disorder
14  augment the risk that he will reoffend.  He has the
15  thinking patterns -- he has the thinking errors that kids
16  are appropriate for sex.  He has done this against
17  strangers times and again.  He has not benefitted from
18  treatment and massive efforts to supervise him.  There is
19  no history that he can meet his sexual and intimacy needs
20  otherwise.  I don't see any low risk factors in this case.
21  Q.   If you could turn once again to the deposition of Mr.
22  Wooden.  If you could turn to page 31 of that deposition.
23  A.   Page 31.
24  Q.   You were testifying about pedophilia.  I believe you
25  used the words cognitive distortions?

1    A.   Yes, I did.

2    Q.   With regard to his beliefs about children; is that

3    correct?

4    A.   Yes.

5    Q.   If you would look beginning on line number 4, page 31

6    and the Question: "As you sit here now, do you believe that

7    these elementary school age boys wanted to have sex with

8    you?"

9         What was his response?

10   A.   "At the time they did, yes."

11   Q.   Question:  "And you believe that they wanted to have

12   sex with you?"

13        What was his response?

14   A.   "Yeah."

15   Q.   Question:  "Do you still believe that?"

16   A.   He said, "Yeah, I still believe it."

17   Q.   And that was in a deposition taken just a few weeks

18   ago; is that correct?

19   A.   Two weeks ago, two and a half weeks ago.

20        **THE COURT:**  I think we'll have our lunch.  Do you have

21   many more questions on direct?

22        **MR. JAMES:**  Just a few more, Judge.

23        **THE COURT:**  Well, I'll let you go ahead.  Do you think

24   you will --

25        **MR. JAMES:**  I think a lunch recess would be good.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 54 of 286

1      **THE COURT:**  All right.  We'll recess until two.

2            (Lunch recess.)

3      **THE COURT:**  Good afternoon.

4      **MR. JAMES:**  Good afternoon.

5      **THE COURT:**  Are you ready to continue?

6      **MR. JAMES:**  Yes, Your Honor.

7      Q.   Dr. Malinek, before we went to lunch we were talking

8      about the cognitive thinking with respect to the

9      Respondent.

10           If you would turn to Exhibit Number [31], the

11     transcript.

12     A.   Okay.

13     Q.   With respect to whether children agreed to have sex

14     with the Respondent.  Turn to page 94 of the deposition.

15     A.   Okay.

16     Q.   At the bottom of 94, the last line, Question: "So they

17     agreed to have sex with you?"

18     A.   I'm sorry.  I'm on page 3594 at the bottom.  Is that

19     the page you are referring to?

20     Q.   No.  On the top in the upper right-hand side of the

21     deposition.

22     A.   Yes, I have it.

23     Q.   This is in respect to statements he had made to Dr.

24     Hoiles.

25                Question, Line 22:  "Do you remember telling her

1    that?"

2          Answer:  "I don't remember telling her that, but

3    that's -- they they agreed to have sex with me."

4          Question, Line 25:  "So they agreed to have sex

5    with you?"

6          Going on to page 95 in the deposition.  What was

7    his answer?

8       A.   "Yeah, I don't remember telling her that, but

9    they agreed to have sex with me."

10   Q.   If you would turn to page 98 of the deposition, on the

11   top right-hand side.

12   A.   Okay.

13   Q.   Line 24 at the bottom of the page, going into  the

14   next page, if you would read -- what did he say in his

15   deposition?

16   A.   "I had a whole lot of them come up to me.  A whole lot

17   of boys came up to me and wanted me to have sex with them

18   back then.  That's the God honest truth, and my brothers

19   and sisters -- my brothers will tell you that, too.  And

20   certain ones I wouldn't touch, and that so -- so it

21   happened that's the reason why I got involved with these

22   here."

23   Q.   All right.  Turn to page 105.

24   A.   Okay.

25   Q.   Line number 20.  Question: "Have you always felt

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 56 of 286

1  attracted to boys?

2          Would you please read what his answer was?

3  A.   "Yeah, in -- in -- in the past it was -- I wasn't

4  really attracted to them, I just gave them what they

5  wanted."

6  Q.   Question:  "Who wanted the sex more, you or the boys?"

7  A.   Answer on page 106, "Both of us."

8  Q.   Question:  "So, like you're equally responsible for

9  it?"

10  A.   The answer was, "Yes."

11  Q.   Now you testified that you had reviewed SMART notes;

12  is that correct?

13  A.   Yes.

14  Q.   Did there come a time -- turning now to Exhibit Number

15  [41].

16  A.   Okay.  I have it in front of me.

17  Q.   I would like for you to look at the bottom where the

18  Bates stamp is BOP Wood.  I want you to go to 4062.

19  A.   Okay, I have it.

20  Q.   Now, you will see on the left-hand side of that,

21  Notes; is that correct?

22  A.   Yes.

23  Q.   There is a note dated August 31, 2000.

24  A.   Are you on page -- Bates stamp is 4062?

25  Q.   That is correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 57 of 286

1   A.   8/31.  I found it, yes.

2   Q.   And do you see the note that's dated 8/31/2000 that

3   begins, "Mr. Wooden."  It's in all caps type.

4   A.   Okay.  Yes.

5   Q.   It would be the third note down.

6   A.   Okay.

7   Q.   And what does that say with regard to whether Mr.

8   Wooden is to have contact with minors?

9   A.   "Mr. Wooden is to have no contact with minor children

10  nor frequent area where he can obtain access to children."

11  Q.   Okay.  Now, I want you to go to Bates page number

12  4045.

13  A.   Okay.  Okay.

14  Q.   There is a note dated September 16, 2002.

15  A.   Okay.

16  Q.   Beginning with Mr. Wooden admitted --

17  A.   Okay.

18  Q.   Would you read that note for the Court, please?

19  A.   "Mr. Wooden admitted under questioning to frequenting

20  Lincoln Park several blocks from his home.  CSO noted that

21  the offender had failed to mention these visits in the

22  past.  Subject is required to maintain an accurate daily

23  log listing all activities and contact during the course of

24  a 24 hour span.  This officer believes the offender is

25  attempting to deceive or paint a false picture of his

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 58 of 286

1    activities."

2    Q.   Now, how was it -- based on the SMART notes, why did

3    the officer question Mr. Wooden about that?

4    A.   There was an earlier report of a suspect who was

5    walking around Lincoln Park and looking at children.  And

6    there was suspicion that this was Mr. Wooden.  He

7    acknowledged he was there.

8    Q.   Now, you relied in part on the Static-99R.  Is there

9    under reporting with the Static-99R as it pertains to

10   offenses?

11   A.   Well, there is.  The Static-99 is based on detected

12   offenses.  In order to score the test you have to rely on

13   rap sheets, criminal history printouts and detected

14   offenses.  Most sexual offenses are not detected and are

15   not recorded.  So in that way one of the vulnerabilities of

16   the test is that it probably underestimates the actual

17   occurrence of sexual offenses.  And there are offenses that

18   are not reported or in connection with criminal proceedings

19   often charges are pled down to a nonsexual offense and in

20   the process of criminal decision making that changes

21   essentially what could be a sexual charge and a nonsexual

22   conviction in some cases.  So in all likelihood the state

23   underestimates the recidivism rates by having to rely only

24   on detected offenses.  There are studies of criminal

25   justice and other statistics that show that sexual crimes

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 59 of 286

1    occur much more frequently than they are reported.  And
2    there are studies that when sex offenders are given
3    anonymity and are allowed to disclose the true number of
4    their victims, the numbers are way higher than the number
5    of victims that they were actually detected and convicted
6    of.
7    Q.   Now, picking up on your last sentence, relate that to
8    when Walter Wooden was interviewed by Probation Officer
9    Mays with respect to the number of actual victims.
10   A.   He had written down that he offended some 20 times.
11   We know he was detected five or six times.  We know about
12   maybe six victims, I mean when he himself, according to his
13   officer at the time, acknowledged a far higher number of
14   victims.
15   Q.   Have you heard the term going from a victim to a
16   victimizer?  Are you familiar with that term?
17   A.   There is a concept of what's called victim to
18   victimizer cycle, which refers to sexual offenders who
19   themselves have been the victim of a sexual crime and
20   essentially go on and subject children to what they
21   themselves had been victims of.  So many sexual offenders
22   who had been victims themselves and act out what was done
23   to them in an effort to obtain some sense of a mastery or
24   to deal with the original trauma.  And he himself had said
25   this, I think, more than once.

1    Q.    And did you find that here?

2    A.    By his own statements he has revealed a few times that

3    he had been a victim of sexual molestation when he was, I

4    believe, eight or nine years old, by a man who molested

5    him.  And I think he himself had drawn some link between

6    his own history of victimization earlier on and the crimes

7    he had committed.

8    Q.    Tell the Court how do you know this man hasn't

9    changed.  He has been in the Bureau of Prisons now since

10   approximately October of 2005 and to the present moment as

11   he sits here in court today, would you tell the Court how,

12   based on your review, your analysis, your training, your

13   experience, that he is likely to have serious difficulty

14   refraining from child molestation, if the Court were to

15   release him.

16   A.    I don't see evidence that he has changed.  I mean the

17   question is, do I look at what has happened between the

18   ages of 15 and 49, how much weight do I give the fact that

19   he has been in state custody during the last five years.

20   He has a significant history of child molestation and

21   crimes that were resistant to extinction.  He has not had

22   any sex offender treatment.  I think he has had two

23   sessions of treatment within the last six years.  Where is

24   the evidence that he has changed?  There is much more

25   evidence here overall developmentally speaking and

1    historically that speaks to a powerful disturbance with
2    significant volitional impairment to significant
3    difficulties in containing himself sexually, to
4    difficulties in functioning in society, to lack of support
5    that are appropriate, inability to learn from experience.
6    I don't see where is the evidence for change. Studies have
7    looked at two main trajectories for reoffense. If you look
8    at the totality of the literature on sexual offenders
9    recidivism, one being a sexual deviant path, so to speak,
10   and the other being what's called a criminogenic path. And
11   both of these I believe are present in this case.
12   Q.   How so?
13   A.   Well, there is a significant history of sexually
14   motivated crimes against very young children that have not
15   stopped despite detection and incarceration. There is no
16   evidence that he has ever learned from that. He has no
17   other outlet that I see in the totality of the data base
18   for closeness, for intimacy, for meeting his affectional or
19   sexual needs. I think in his case there is other behavior,
20   the evidence of the cycle of victim to victimizer where he,
21   himself, had been a victim of a sexual crime which he keeps
22   reenacting in his life times and again. He has a
23   persistent cognitive distortion, thinking errors that
24   children are appropriate partners for sexual intimacy that
25   is true as of two weeks ago during his deposition, and that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 62 of 286

1     probably has mediated his conduct so that piece certainly

2     has not changed in him from then until now, until two weeks

3     ago.

4     Q.   In that rein, could you turn in his deposition?

5     A.   Can you tell me what page you are on?  Thirty-one,

6     right?

7     Q.   Exhibit Number [31].

8     A.   What page are you on?

9     Q.   Look at page -- again, on the top, page 66.

10    A.   All right.

11    Q.   Question, 21: "Can you explain why, now, today, why

12    you think you did it back then?

13              What was his answer?

14    A.   He said, "I think I did it back then because I was

15    mostly mad at myself, I was mad -- I was mad at myself

16    because similar things happened to me."

17    Q.   Go on to the next page.  Question:  "So that's why you

18    took it out on a four-year-old boy?

19              And what was his answer?

20    A.   "That's why I took it out on just about everyone of

21    them that I had -- had sex with, because the same thing

22    happened to me."

23         **MR. JAMES:**  Thank you.  No further questions.

24         **THE COURT:**  Any cross?

25                        <u>CROSS-EXAMINATION</u>

**BY MS. GRAVES:**

Q.   Dr. Malinek, not every victim of child sex abuse becomes an offender?

A.   That is true.  That is true.

Q.   In fact, statistically it would be hard to even figure out what percentage of child victims -- child sexual abuse victims become offenders, wouldn't it?

A.   That is true.  That is true.

Q.   And I think that you indicated earlier that Mr. Wooden has an apparent lack of insight.  Isn't that true?

A.   Yes, that is true.  Absolutely.

Q.   Yet when it comes to trying to explain why he victimized these children you want to credit what his explanation is?

A.   He gave this statement in response to this  question that was just cited, but in response to many other questions that were asked of him during the deposition and in earlier evaluations, he said he does not know why he did this, does not appear to connect the dots, does not show insight.

Q.   Well, it's also true that a lack of insight does not correlate with an increased risk of recidivism, does it?

A.   That's true.  Stand alone, insight is not a -- hard to measure and it has not tested to be a risk factor for recidivism; that is correct.  Stand alone.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59  Filed 07/27/11  Page 64 of 286

1    Q.    Now, your method for assessing Mr. Wooden involved

2    what you, I believe, described as clinically guided risk

3    assessment?

4    A.    Empirically guided risk assessment.

5    Q.    Empirically guided risk assessment?

6    A.    It's empirically guided clinical assessment.

7    Q.    Oh.  Empirically guided clinical assessment?

8    A.    Yes.

9    Q.    And that means that you looked at both actuarials and

10   at what you considered appropriate dynamic risk factors?

11   A.    That is correct.  And additional protective and

12   specific risk factors; that is correct.

13   Q.    Now, is there any empirical study or peer review

14   articles showing that this method exceeds the accuracy of a

15   risk prediction that's found in the actuarials alone?

16   A.    No.

17   Q.    And you would agree that clinical judgment alone is

18   known to be flawed as a risk predictor?

19   A.    Clinical judgment, the way it was defined in the

20   studies and the way it was utilized in the past, had poor

21   predictive accuracy; that is correct.

22   Q.    And even the actuarials themselves we know are only a

23   moderate utility in predicting recidivism?

24   A.    Correct.  That is correct.

25   Q.    And actuarials tend to focus on groups, not on

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 65 of 286

1  individuals.

2  A.   That is correct.  Absolutely.

3  Q.   So when you are looking at these dynamic risk factors

4  you are trying to come up with a way of improving on the

5  actuarials?  Is that what you were trying to do?

6  A.   I am trying to come up with a way of considering all

7  relevant information in a particular case.

8  Q.   I think that you referred to the Mann, Hanson and

9  Thornton article --

10  A.   I did.

11  Q.   -- as the basis for your selecting the dynamic risk

12  factors that you looked at in this case.

13  A.   That study as well as the Hanson -- or even Harris

14  earlier study about dynamic risk factors for recidivism

15  that served as the basis for the STABLE measure and the

16  assessment of dynamic risk factors.

17  Q.   The Mann, Hanson and Thornton study, that's a fairly

18  recent study, is it not?

19  A.   Absolutely.

20  Q.   2010, I believe.

21  A.   Yes, it was just published.

22  **MS. GRAVES:**  Your Honor, may I approach the witness?

23  **THE COURT:**  All right.

24  Q.   I want to show you what I have marked as Respondent's

25  Exhibit Number [79].  Is that a study that you relied on?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 66 of 286

1    A.    Yes.  Probably, yes.

2    Q.    I want to direct your attention to some aspects of

3    this study.

4    A.    Okay.

5        **MS. GRAVES:**  Your Honor, I will just place these pages

6    on the projector so we can all see them.

7        **MR. JAMES:**  Your Honor, at this time, although I am

8    not objecting to her cross-examining this witness with

9    regard to the study.  But she only had -- counsel has one

10   copy.  The witness doesn't have a copy of that study before

11   him.  I think we should have a copy in case there is

12   information other than what points she is pointing at on

13   the monitor so he can further explain himself, if need be.

14       **THE COURT:**  It's cross-examination.  They can do that.

15   Q.    Dr. Malinek, what I have on the screen here is page

16   199 of this study that you identified as one that you

17   relied on.

18   A.    Okay.

19   Q.    Assessing Risk for Sexual Recidivism by Mann, Hanson

20   and Thornton.

21   A.    Okay.

22   Q.    Published in 2010.  Do you recognize this page of the

23   study as something that you looked at?

24   A.    I can't read from so far.  I trust you are putting the

25   page from the article you just showed me?

1    Q.   Yes, sir.

2    A.   Now, I can see it.

3    Q.   This is a list of psychologically meaningful risk

4    factors.

5    A.   Okay.

6    Q.   Do you recognize these as some of the factors that you

7    listed in your report?

8    A.   Yes, I do.  Absolutely.

9    Q.   Now, what these numbers here show in this mean, B

10   here, is that the correlation between these risk factors

11   and recidivism is less that 1.0; is that correct?

12   A.   No, that's not showing the correlation.  It's a D

13   value.  It's not a correlation.

14   Q.   Well, explain that.

15   A.   It's the power of the predictor.  It's a different

16   statistic.  It's not a correlation.

17   Q.   So would you agree that what this shows is that the

18   correlation is low.

19   A.   Overall, true.  Yes, I would.

20   Q.   For the factors that you listed, which were sexual

21   preoccupation, is that right?

22   A.   Yes.

23   Q.   That's one of the ones.  Any deviant sexual interest,

24   that's one of the ones you cited for Mr. Wooden, also low.

25   Offense-supportive attitudes, low.  Lack of emotionally

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 68 of 286

1    intimate relationships with adults, never married.

2    Conflicts and intimate relationships, also low.

3    A.    I would say it's low to moderate.  Twenty to 40 is

4    considered low, it is true.  If you go further down --

5    Q.    Life style impulsivity, also low.  Poor cognitive

6    problem solving, also low.  Resistance to rules.  That's

7    low, also.  Grievance/hostility.

8    A.    I think you're missing the noncompliance with

9    supervision.

10   Q.    Sorry, thank you.  Noncompliance with supervision,

11   also low.

12   A.    That is not low at all.  Sixty-two is, I think, one of

13   the highest -- that clearly is not a low predictor.

14   Q.    So you say that one is not a low predictor?

15   A.    That is at least a moderate predictor and the same for

16   violation of conditions of release which tested with a D

17   value of 0.50.  Overall these are moderate predictors.

18   They are not low.

19   Q.    Those two you say are moderate?

20   A.    Yes.

21   Q.    Now, what these authors conclude about these

22   predictors -- or about these risk factors, rather, is that

23   these are variables that should be emphasized in treatment;

24   is that correct?

25   A.    That is true.

1    Q.  They do not suggest that these -- that the causal role

2    of such factors in recidivism has been established.  Isn't

3    that true?

4    A.  That is true.

5    Q.  In fact they say that in our view -- our review has

6    established that none of them so far identified

7    psychological risk factors having a strong relationship

8    with sexual proclivity.  Does that sound accurate to you?

9    A.  It is accurate, yes.  They establish it as treatment

10   needs or discuss it as treatment needs and focuses.  It has

11   relevance for recidivism as well.

12   Q.  Say that again; I'm sorry.

13   A.  I believe it has some relevance for recidivism.

14   Q.  But even the authors of this study agree that they

15   have not been shown to have a significant correlation with

16   increased recidivism?

17   A.  Yes.

18   Q.  Nevertheless, you relied on those in developing your

19   assessment of Mr. Wooden?

20   A.  I considered all of those in my assessment.  It's not

21   the only study that looked at dynamic risk factors.  If you

22   look at the original follow-up of Hanson and Harris that

23   followed sex offenders who were in outpatient treatment,

24   like Mr. Wooden, you would find support for similar or

25   almost identical dynamic risk factors there as well.  Not

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 70 of 286

1    as strong as static risk factors but certainly present.

2    Q.    Well, you would concede though this 2010 study is more

3    current?

4    A.    Yes, I would; yes, I would.  There is an earlier study

5    by Hanson that indicated that using dynamic risk factors

6    improved the accuracy of the prediction, improved the area

7    under the curve.

8    Q.    But then again there is still dispute about which

9    dynamic risk factors have been established as being

10   predictive of recidivism, correct?

11   A.    I believe the two risk -- noncompliance with

12   supervision, violation of conditions of release clearly are

13   a moderate predictor.  Both are present in this case and

14   need to be considered.

15   Q.    Well, let's turn to Mr. Wooden's 2005 situation.  I

16   believe you would characterize that as a noncompliance with

17   supervision?

18   A.    Absolutely.  Absolutely.  More than that.

19   Q.    You would characterize this as an example of Mr.

20   Wooden sexually reoffending while on supervision; is that

21   correct?

22   A.    Or attempting to reoffend, yes.

23   Q.    Attempting to.  Now, you did receive the documents

24   from the court services office and from Dr. Weiner's

25   treatment of Mr. Wooden, correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 71 of 286

1  A.   I did.

2  Q.   Now, those documents also included a number of places

3  where Mr. Wooden indicated that he did not sexually assault

4  the young boy, James.  Do you recall that?

5  A.   Yes, of course.

6  Q.   In fact, in a number of places Mr. Wooden indicates

7  that these were only dreams that he was reporting to Dr.

8  Weiner, isn't that true?

9  A.   Yes, that is correct.  He was inconsistent and

10  vascilating about this in the original disclosure and in a

11  subsequent session he had with one of Dr. Weiner's

12  therapists.  But he is on the record saying that these were

13  dreams.

14  Q.   And also that occurred in his conversations with the

15  investigating officer in this case, Detective Knight, I

16  believe.  Is that correct?

17  A.   I don't remember that specific discussion, but he did

18  vascilate about it and stated these were dreams.  I

19  certainly recall that.

20  Q.   In his deposition testimony he did not vascilate at

21  all, did he?  He was quite firm.

22  A.   He totally denied it.

23  Q.   That he said they were dreams or thoughts; is that

24  correct?

25  A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 72 of 286

1   Q.  And also you are aware that a forensic interview was

2   conducted of the alleged victim in that case?

3   A.  I am aware of it.

4   Q.  And during that forensic interview the little boy

5   indicated that there was no sexual contact.  Isn't that

6   correct?

7   A.  He also indicated he was afraid of Mr. Wooden.

8   Q.  But didn't he indicate there was no sexual contact?

9   A.  Yes.

10   Q.  And Mr. Wooden, of course, was not charged with any

11   crime relating to that report, was he?

12   A.  He was not.

13   Q.  Now, you also had the opportunity to review the

14   records of Dr. Weiner who treated Mr. Wooden while he was

15   in the community, correct?

16   A.  Yes, of course.

17   Q.  Do you recall that at one point Dr. Weiner had

18   indicated that Mr. Wooden had successfully completed

19   treatment?

20   A.  I recall that in 2004 he thought Mr. Wooden was doing

21   so well that he was going to move him to a less -- to

22   discharge him or to move him to a less frequent contact,

23   that is correct, about a year earlier.

24   Q.  And do you recall that he was even in the process of

25   being discharged successfully from the program?

1    A.    At the time, that is correct.  Correct.

2    Q.    And that it was Mr. Wooden himself who wanted to

3    continue treatment?

4    A.    Yes, that is correct.

5    Q.    Do you also recall -- I think that a number of times

6    on Direct you indicated that Mr. Wooden was -- he didn't

7    abide by the conditions of his supervision because he had

8    frequent contact with minors.  Is that a fair

9    characterization of your testimony?

10   A.    Yes.  Not just that, but that as well.

11   Q.    Okay.  The fact is the requirement for his supervision

12   was that he was not to have unsupervised contact with

13   minors, wasn't it?  It was not that he was not to have

14   contact with minors at all; isn't that true?

15   A.    That's what he had stated, that he understood that he

16   can have supervised contact with minors.  That was his

17   understanding.

18   Q.    Okay.  Do you have the book in front of you?  I want

19   to direct your attention to Exhibit [51], to Bates number

20   4038.

21   A.    4148?

22   Q.    No, I'm sorry, 4038.

23   A.    Thank you.  I have it.

24   Q.    Okay.  The second note on March 17, 2003 indicates,

25   "The offender reported as instructed.  Urines negative.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 74 of 286

1   Offender reported no changes in his situation.  CSO and

2   officer discussed SO treatment and modifying parole

3   condition to no unsupervised contact with minors."  And he

4   signed the modification request.  Is that accurate?

5   A.   Yes, it is.  Yes.

6   Q.   And in his deposition do you recall that Mr. Wooden

7   was asked about the requirements of his parole?

8   A.   Yes.

9   Q.   And that when questioned about whether he was

10  violating his parole by having contact with minors, Mr.

11  Wooden himself says that his limitation was that he could

12  not have unsupervised contact with minors; is that correct?

13  A.   That's correct.  He also stated that he -- he also

14  acknowledged that he had unsupervised contact with minors

15  in the same deposition.

16      **THE COURT:**  Let's move on to something that is

17  worthwhile.

18      **MS. GRAVES:**  Yes, sir.  Thank you.

19      **THE COURT:**  I mean I've been patient all day today, I

20  think, maybe not, but you know, keep your eye on the ball.

21      **MS. GRAVES:**  Yes, sir.

22      **THE COURT:**  I'm the ball.

23      **MS. GRAVES:**  Yes, sir.  Thank you.

24  Q.   Let's turn to the actuarials, okay?

25  A.   Okay.

1   Q.   Now, there are -- you used three instruments in this

2   case?

3   A.   I did.

4   Q.   Now, would you agree that the instrument that is

5   lowest proven or lowest validated would be the Static-99R?

6   A.   Yes, I would.

7   Q.   Would you also agree that the Static-99R is better at

8   ruling out recidivism than ruling in recidivism?  In other

9   words, you are going to get a better chance of being right

10  if you look at the Static-99R in terms of a percentage of

11  someone not recidivating than at the percentage of them

12  recidivating?

13  A.   Well, if that's all you do, if you make your opinion

14  completely contingent on the Static-99R, that is correct.

15  If you ignore everything else.

16  Q.   And one of the keys to even determining the

17  percentage involved, the percentage of likelihood of

18  recidivating or nonrecidivating, it is to determine which

19  sample group to place Mr. Wooden in?

20  A.   That is correct.

21  Q.   And in determining which sample group to place Mr.

22  Wooden in, that is a subjective determination on the part

23  of the evaluator, isn't it?

24  A.   I wouldn't say so.  It requires a certain judgment and

25  matching.  It requires to look at the features of the case

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 76 of 286

1    and at the samples you want to compare him to.

2    Q.    But there is no manual and there are no instructions

3    concerning how to select which group for comparison?

4    A.    It is true there is no specific manual, but there is

5    quite a bit of discussion and details provided about the

6    four sample groups and how they were put together and who

7    was where.  And so that's not totally subjective.  I

8    considered the samples in the high-risk/high-needs group.

9    I think he is strikingly similar to people who are there,

10   requiring supervision, intensive supervision and treatment,

11   designated as a high risk offender, clearly matching this

12   particular group.  That's not subjective.  It's looking at

13   who was in the group and is he similar or dissimilar.

14   Q.    Well, would you agree that it's more akin to

15   exercising clinical judgment?

16   A.    I would say that this is a professional judgment.  It

17   requires professional judgment, requires looking at the

18   data base that you have and deciding where he fits.  It's

19   not clinical judgment in the way that clinical judgment was

20   studied previously where we looked at denial and whether

21   somebody accepts responsibility for their crime.  That is

22   not what is involved.

23   Q.    Well, I'm not saying that it's necessarily like

24   clinical judgment that has been tested, but I am saying

25   that what you relied on is your clinical judgment in terms

1    of which sample group you believe he should be compared to?

2         **MR. JAMES:**  Objection, argumentative at this point.

3         **THE COURT:**  Overruled.

4    A.   There is professional judgment involved.  I looked at

5    the details of his case and the markers of his case and

6    looked at the four groups that were identified by Henson

7    and Helmus and looked at how they described who were there.

8    I looked at the specific samples that made the high-

9    risk/high-needs group.  I think he is strikingly similar to

10   them.  He has been seen as a high-risk offender.  There are

11   multiple notations that affirm this in the discovery.  He

12   is quite similar to the Bridgewater study, the 2007 study

13   where -- which was a high-risk sample and where the average

14   number of victims the child molesters had, I think, was

15   4.5, he has actually a higher number of victims that that

16   overall.  I think this is the correct match.

17   Q.   One of the criteria that you looked at in selecting

18   the comparison group was the fact that Mr. Wooden had been

19   selected by the Bureau of Prisons; is that correct?

20   A.   I considered it as well.

21        **THE COURT:**  One of the things you always want to avoid

22   when you're dealing with truly an expert witness is

23   allowing your cross to enhance rather than impeach that

24   person's testimony.  Unless you have things that are

25   facially in conflict that the expert is going to have a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 78 of 286

1  gotcha moment with, in an expert trial I always think it is

2  better to rely on the credibility of your expert.  Because

3  he is here, he's committed, the expert for the Government,

4  and the likelihood of you discrediting him is probably

5  remote.  It's not a deposition.

6      **MS. GRAVES:**  Yes, Your Honor.  Thank you.  I'm

7  certainly winding up, Your Honor.

8      **THE COURT:**  That's fine.  And I'm not trying to stop

9  you.  It's just, you know, do you want to really hurt

10  yourself by giving him a chance to corroborate and confirm

11  all the opinions he had initially.  It's like getting the

12  head of surgery at Harvard Medical School up on the stand

13  who testifies that it was below the standard of care and

14  then trying to prove he doesn't know what he's talking

15  about.  You just leave it alone.

16      **MS. GRAVES:**  Yes, sir.

17  Q.   Now, you would agree, Dr. Malinek, that the fact that

18  you were not able to interview Mr. Wooden undercuts your

19  assessment of certain dynamic factors?

20  A.   Maybe somewhat, yes.

21  Q.   And the fact that you have never spoken with Mr.

22  Wooden certainly would make it impossible for you to say

23  how he feels about children today?

24  A.   I don't think so.  I reviewed close to 4,000 pages or

25  discovery very closely.  I have detailed documentation of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 79 of 286

1    his performance and conduct in custody and out of custody.

2    I have reviewed everything that was provided to me that

3    gives a very detailed picture of his dynamics and emotional

4    functioning. I requested an interview with him and was

5    declined. I think the data base that I had and the

6    foundations for my reasoning was more than sufficient for

7    the opinions that I rendered.

8    Q. Yes, I understand that. But the fact is, you really

9    don't know how Mr. Wooden feels about children today, do

10   you?

11   A. I don't know exactly what he thinks about children

12   today as he sits here. I know how he has thought and acted

13   in this regard for decades, however, previously and what he

14   responded to questions about his thinking just two weeks

15   ago in this regard.

16        **THE COURT:** I don't know whether you plan on staying

17   for the duration of the trial and being an observer and

18   being available for rebuttal, but in the event that the

19   detainee was to testify and give evidence on his own, would

20   that be a basis that you would use to re-evaluate your

21   opinion on him?

22   A. I would want to sit in and certainly listen and

23   consider all this, Your Honor. I would, of course.

24        **MS. GRAVES:** That's all I have. Thank you.

25        **THE COURT:** Is there any redirect?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 80 of 286

1          **MR. JAMES:** I just have one question, Your Honor.

2                        <u>REDIRECT EXAMINATION</u>

3      **BY MR. JAMES:**

4      Q.   Doctor, would you please turn to Exhibit Number [29]

5      in your book.

6      A.   Okay.

7      Q.   Go to where it says, USAO WOOD, Bates stamp number

8      4705.

9      A.   Okay.

10     Q.   Go to the second paragraph which begins at 1803 hours.

11     A.   Yes.

12     Q.   Now, this is, in fact, the police report with regard

13     to the seven-year-old who has been referred to as James

14     through the course of this proceeding.  Is that correct?

15     A.   Yes.  Yes, it is.

16     Q.   I would ask that you go through that paragraph when

17     the child was interviewed, during the forensic interview

18     that was mentioned on Cross-Examination by Ms. Graves.  Do

19     you see the sentence which begins, "He stated he was. . ."?

20     A.   Yes, I do.

21     Q.   Read that full sentence for the Court, please.

22     A.   "He stated he was scared of being around him even

23     though Mr. "W" gave him money sometimes for ice cream."

24          **MR. JAMES:** May I approach the witness, Your Honor?

25          **THE COURT:** Yes.

1    Q.   There may be other statements which begin with, "He

2    stated".  Begin there and read that sentence from there.

3    What did the child say with regard to why he was scared?

4    A.   "He stated he was scared because when the police came

5    to his house he thought the man was real mad because he

6    told on him.  When asked why the man would be mad at him,

7    the complainant would not explain.  He stated he was scared

8    of being around him even though Mr. "W" gave him money

9    sometimes for ice cream."

10   Q.   In the next sentence, what did he say?

11   A.   "The complainant stated Mr. "W" is gay but could not

12   describe what he meant by the word.  He stated he told him

13   to come into the building.  The complainant further stated

14   his friend (something is erased here) thinks he is gay and

15   told him not to go around him.  The complainant stated

16   (something is erased here again) his friend is ten years

17   old and lives in Maryland."

18        **MR. JAMES:**  Thank you.  I have no further questions.

19        **THE COURT:**  Any recross?

20        **MS. GRAVES:**  No, sir.

21        **THE COURT:**  All right.  Thank you.  You can step down.

22   Call your next witness.

23        **MR. GRAY:**  Your Honor, at this time the Government

24   would call the Respondent, Mr. Walter Wooden.

25        **MS. GRAVES:**  Your Honor, we would object.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 82 of 286

1          **THE COURT:**  It's a civil trial.  Don't you have the

2     right to --

3          **MR. GRAY:**  Yes, Your Honor.  You do have a right to

4     call him in a civil trial.

5          **THE COURT:**  Okay.  What's your objection.

6          **MS. GRAVES:**  Well, Your Honor, I consider this more of

7     a hybrid than just a civil case and considering the stakes

8     involved, I think Mr. Wooden has the right not to testify.

9          **THE COURT:**  You mean to invoke his Fifth Amendment

10    privilege?

11         **MS. GRAVES:**  Yes, sir.

12         **MR. GRAY:**  Your Honor, seeing as how the Respondent

13    has already testified via deposition, the imposition of the

14    Fifth Amendment privilege, he can assert that at any point

15    in time during any of our questioning.  However, he has

16    already subjected himself to the process.  This is a civil

17    process.  And we do have a right to examine him on the

18    stand.  There is no support --

19         **THE COURT:**  Do what?

20         **MR. GRAY:**  There is no legal support to support Ms.

21    Graves' contention that this is a quote unquote hybrid sort

22    of facility.

23         **THE COURT:**  Right.  I think the Fourth Circuit has, in

24    Comstock, said it's a civil case.

25         **MR. GRAY:**  Yes, Your Honor.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 83 of 286

1     **THE COURT:** I'm just asking parenthetically, has this

2     situation arisen in other 4248 trials, as far as you know?

3     **MR. GRAY:** Not within the District, Your Honor.

4     **THE COURT:** How about in Massachusetts? Just off the

5     top of your head.

6     **MR. GRAY:** Your Honor, one does come to mind, but I

7     apologize. I wouldn't be able to recount the details of

8     the case.

9     **THE COURT:** Okay. Let me take a five minute recess

10    and then we'll resume.

11          (Court recess.)

12    **THE COURT:** I'll allow you to call the Defendant, and

13    if he has privileges against self-incrimination he can

14    exercise those.

15    **MR. GRAY:** Thank you, Your Honor.

16    **MS. GRAVES:** Your Honor, our expert had to go to the

17    restroom. Could we just wait until he gets back?

18    **THE COURT:** Well, we can get the Defendant up here and

19    get him sworn and wait for a minute.

20    **MS. GRAVES:** Thank you.

21          **WALTER WOODEN, RESPONDENT, SWORN**

22          (Dr. Campbell returns to the courtroom.)

23    **THE COURT:** All right. You can go ahead.

24    **MR. GRAY:** Yes, Your Honor.

25          <u>DIRECT EXAMINATION</u>

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 84 of 286

1    **BY MR. GRAY:**

2    Q.   Mr. Wooden, would you please state your name.

3    A.   Walter Wooden.

4    Q.   And, Mr. Wooden, are you the Respondent in this case?

5    A.   Yes, sir.

6    Q.   Mr. Wooden, where are you from?

7    A.   From D.C..

8    Q.   Where did you live when you were in D.C.?

9    A.   115 16th Street, Southeast -- I mean, Northeast.

10   Q.   Did you spend most of your life in D.C.?

11   A.   I spent most of my life in prison.

12   Q.   How long have you spent in prison?

13   A.   Repeat that question.

14   Q.   How much time have you spent in prison?

15   A.   The majority of my life.

16   Q.   How many years, approximately?

17   A.   I don't remember how many years.

18   Q.   Prior to spending some time in prison, did you live in

19   the same neighborhood in D.C. for that time period?

20   A.   No, sir.

21   Q.   Did you move around in D.C.?

22   A.   Yes, sir.

23   Q.   Well, Mr. Wooden, where you lived in these communities

24   in D.C., did you have any relationships with any of the

25   families in any of these neighborhoods?  Did you know them?

1   A.   I had a relationship with all the families in D.C..

2   Q.   By all the families in D.C., do you mean all the

3   families that were in the neighborhood?

4   A.   I knew people all over the neighborhood.

5   Q.   What did people think about you in the neighborhood?

6   A.   People think about -- people trust me.

7        **THE COURT:**  Speak up.

8   A.   People trust me.

9   Q.   You said that they could trust you?

10  A.   Yeah.

11  Q.   Why did they trust you?

12  A.   Because I did a lot of things around the neighborhood.

13  I helped people out in the neighborhood.  I did charity

14  work for people in the neighborhood.

15       **THE COURT:**  Did you ever have a job?

16  A.   Yeah, I had several jobs.

17       **THE COURT:**  Doing what?

18  A.   I had a job at the Safeway.  I had my own badge.

19       **THE COURT:**  Where was the Safeway, on Georgia Avenue?

20  A.   No.

21       **THE COURT:**  Where?

22  A.   The Safeway was on 14th Street, Southeast.

23       **THE COURT:**  Okay.  In the Anacostia area?

24  A.   No.

25       **THE COURT:**  Before you cross the river?

1     A.    No.

2           **THE COURT:**  Where?

3     A.    It was over there southeast by Watkins Elementary

4     School.  Watkins Elementary School.

5           **THE COURT:**  Did you go to school in D.C.?

6     A.    I went to school at Watkins Elementary School; I went

7     to school at John Tyler Elementary School.

8           **THE COURT:**  Did you ever go to high school?

9     A.    No, I never went to high school.  I was in prison.

10          **THE COURT:**  Okay.  How high did you go up in grades,

11    seventh grade?

12    A.    I went to college.

13          **THE COURT:**  Okay.  How about in school, in public

14    school in the District?

15    A.    In public school -- in public school I went to the

16    ninth grade.

17          **THE COURT:**  Ninth grade.  And what school was that; do

18    you remember?

19    A.    Hines Junior High School.

20          **THE COURT:**  Hines.  That's on Pennsylvania Avenue?

21    A.    Yes, sir.

22          **THE COURT:**  Southeast?

23    A.    Yes, sir.

24    **BY MR. GRAY:**

25    Q.    Mr. Wooden, you said that you went to college?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 87 of 286

1  A.  I went to college.

2  Q.  What college did you go to?

3  A.  I was enrolled in Howard University when I was 15

4  years old.  I went to Barr Business School when I came out

5  of prison.  I was in my twenties.

6  Q.  Did you graduate from Howard?

7  A.  I never had a chance, really, to finish but one

8  semester because I went back -- I went to prison.

9      **THE COURT:**  Do you have a mother and father in D.C.?

10 A.  My mother and father are both dead.

11     **THE COURT:**  Okay.  Do you have brothers and sisters in

12 D.C.?

13 A.  Yes, sir.

14     **THE COURT:**  Are they still alive?

15 A.  I guess.

16     **THE COURT:**  Full brothers or half brothers and

17 sisters?

18 A.  Both.

19 **BY MR. GRAY:**

20 Q.  How many brothers and sisters do you have?

21 A.  That are still alive?

22 Q.  That are still alive, yes, sir.

23 A.  I've got two brothers that's -- no, I've got two

24 brothers and one half-brother still alive.

25 Q.  Mr. Wooden, how would you describe your childhood?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 88 of 286

1   A.   I don't know how to describe it.  Well, really I was

2   in prison most of the time, but before prison I would

3   describe my childhood; I had a lot of fun.

4   Q.   Prior to you going to prison you said you had a lot of

5   fun.  Did you spend a lot of time with your family, your

6   mother, your father, your siblings?

7   A.   Yeah.

8   Q.   Mr. Wooden, you've been here present for some of the

9   testimony by Dr. Malinek, right?

10  A.   Yes.

11  Q.   Dr. Malinek testified that you had indicated that  you

12  had been sexually molested as a child.  Do you remember

13  hearing that testimony?

14  A.   Yeah, I heard.

15  Q.   Did that happen?

16  A.   Yes, it had.

17  Q.   How old were you when that took place?

18  A.   Around the age eight and ten.

19  Q.   Was that done by a family member?

20  A.   No, sir.

21  Q.   Were your parents alive at the time this happened?

22  A.   Yes, sir.

23  Q.   Was your father alive at the time this happened?

24  A.   Yes, sir.

25  Q.   Did you tell your parents about this?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 89 of 286

1   A.   No, I didn't.

2   Q.   Why not?

3   A.   Because I know my father would have killed him.

4   Q.   Your father would have killed the person who did this?

5   A.   He would have killed him, and I didn't want him to go

6   to prison.

7   Q.   You didn't want your father to go to prison?

8   A.   That's right.

9   Q.   Now, when did you first go to jail?

10  A.   When I first went to jail.

11  Q.   I'm sorry?

12  A.   I can't recall.

13       **THE COURT:**  Were you were a juvenile or an adult?

14  A.   I was a juvenile.

15       **THE COURT:**  Did you go to a juvenile facility?

16  A.   Yes, sir.

17       **THE COURT:**  In the District of Columbia or in

18  Virginia?

19  A.   In Baltimore.

20       **THE COURT:**  In Baltimore.  That's where the District

21  of Columbia put juvenile offenders?

22  A.   Cedar Knoll.

23       **THE COURT:**  What?

24  A.   It was a place called Cedar Knoll.

25       **THE COURT:**  Cedar Knoll?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 90 of 286

1    A.   Yeah.

2    **THE COURT:**  Because Lorton was the prison, right?

3    A.   Lorton was the prison for older adults.

4    **THE COURT:**  For older adults.  And Cedar Knoll was the

5    prison for juvenile offenders?

6    A.   Yes.

7    **BY MR. GRAY:**

8    Q.   Why were you in Cedar Knoll?

9    A.   Because I committed a crime.

10    Q.   What crime did you commit?

11    A.   The first crime I committed -- the first crime I

12    committed was supposed to have been a robbery.

13    Q.   And --

14    A.   But I never robbed nobody.

15    Q.   Was this a juvenile facility that you were in at the

16    time, Cedar Knoll?

17    A.   Yes.

18    Q.   Now, you said you didn't commit a robbery, but you

19    went to Cedar Knoll.  Were you represented by an attorney?

20    A.   A public defender.

21    Q.   Now, after you spent time in Cedar Knoll for that

22    robbery, when did you next go to prison?

23    A.   When did I next get out of prison?

24    Q.   Well, let's take a step back.  When did you leave

25    Cedar Knoll?  How old were you when you got out of Cedar

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 91 of 286

1 Knoll for that robbery?

2 A. I was around the same age.

3 Q. How old was that?

4 A. I don't remember.

5 Q. Were you in high school or junior high at the time?

6 A. Junior high school.

7 Q. Junior high school?

8 A. Yes.

9 Q. Mr. Wooden, was this prior to the incident in which

10 you were charged in 1972 with engaging in sex acts with a

11 minor on two occasions?

12 A. Not really.  It was for a robbery.

13 Q. I'm sorry.

14 A. It was for a robbery.

15 Q. Was that robbery prior to or did you have that robbery

16 charge and the time spent at Cedar Knoll, was that prior to

17 the events that took place in 1972 where you were charged

18 with sodomy of two minor males?

19 A. In '72 I don't remember being charged with no two

20 charges.  I only remember being charged with one.

21 Q. What do you remember about that?

22 A. I was charged with one.  All I remember I been charged

23 with it.  I don't remember no details.

24 Q. Mr. Wooden, do you remember a couple of weeks ago you

25 were deposed by our office?  Do you remember that?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 92 of 286

1   A.   Yeah, I remember that.

2   Q.   That took place at Butner, do you remember that?

3   A.   Yes.

4   Q.   Ms. Graves and --

5   A.   I remember that.

6   Q.   Okay.  And Ms. Graves was present during that

7   deposition, wasn't she?

8   A.   Yes.

9   Q.   Is that a yes?

10  A.   Yes.

11  Q.   And you were under oath at the time during that

12  deposition, right?

13  A.   I was what?

14  Q.   Under oath?  Swore to tell the truth?

15  A.   Yes.

16  Q.   Now, at the time you weren't under any medications, so

17  you were able to answer the questions clearly, right?

18  A.   I take medications every day.

19  Q.   But you weren't under any medications that were

20  influencing your ability to testify?

21  A.   I take medication every day.

22  Q.   And were those medications impacting your ability to

23  testify?

24  A.   I don't remember.

25  Q.   Did you take medication today?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 93 of 286

1    A.   Yes, sir.

2    Q.   Do you feel like you can answer questions today?

3    A.   I'm going to answer them.

4    Q.   This medication, is it making you to the point that

5    you don't understand my questions?

6    A.   You have to make them real clear to me.

7         **THE COURT:**  What kind of medication is it?

8    A.   I take insulin.  I'm an asthma patient.  I take a pill

9    for my pain medicine, and I'm also a sickle cell patient.

10        **THE COURT:**  Okay.  You take a sickle cell, you take an

11   asthma pill and a pain pill?

12   A.   For the asthma I've got an asthma pump.

13        **THE COURT:**  Okay.

14   Q.   The pain medication, is that a narcotic?

15   A.   You can call it.

16   Q.   What is it?

17   A.   It's something.  I takes it twice a day.

18   Q.   Do you feel like you are clear-headed enough to

19   testify today?

20   A.   Yeah, I can testify.

21   Q.   Did you have lunch today?

22   A.   Yes, sir.

23   Q.   So you don't feel like you're having any diabetic

24   lows?

25   A.   I'll testify.

1    Q.   So you feel you are able to answer questions today?

2    A.   I'm going to try to.

3    Q.   Okay.  I just want to make sure that you're okay

4    answering the questions.

5           Mr. Wooden, that offense in 1972 where you said

6    it was only one child, what happened with that offense;

7    what were you charged with?

8    A.   I plead the Fifth.  I ain't tryin' to go back to that.

9    Q.   Now, Mr. Wooden, you understand that you have already

10   been charged and you served time for that offense?

11   A.   Yeah, but I plead the Fifth.

12   Q.   And you understand that you cannot plead the Fifth for

13   something that you've already been tried and at least

14   served time for?

15   A.   I'm not trying to go back in my past, because I'm

16   trying to forget about my past.

17   Q.   Now, Mr. Wooden, you said you're not trying to go back

18   into your past, but at your deposition you answered

19   questions regarding that offense in 1972.  You remember

20   that, don't you?

21   A.   I know, but I shouldn't have answered them questions.

22   Q.   Why shouldn't you have answered those questions?

23   A.   Because I'm trying to leave my past in the past.  I'm

24   trying to go back to better things than that there.  I'm

25   trying to go back to what I had established out on the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 95 of 286

1    street.

2    Q.    I don't understand what you're saying, sir.

3    A.    I'm trying to go back to what I -- if I was out on the

4    streets right now I probably would have got married.

5    Q.    What does you being out on the streets right now and

6    probably would have been married, what does that have to do

7    with you answering questions regarding those offenses in

8    1972?

9    A.    Because I'm not trying to bring up the past.  I'm

10   trying to forget about the past.

11   Q.    Why are you trying to forget about the past?

12   A.    I'm trying to leave the past in the past.  I'm trying

13   to forget about little boys and stuff like that.  I'm not

14   trying to hurt no little boys.  I'm trying to help them.

15   I'm not trying to hurt them.

16   Q.    How are you trying to help them?

17   A.    I'm trying to help them.  Just like I told you all

18   about James.  I was trying to help James, because James'

19   family is all screwed up.

20   Q.    Who is James?

21   A.    James is the boy that they originally said I did

22   something to him to get me back in here for no reason at

23   all.

24   Q.    So James is the boy that said that you tried to anal

25   penetrate him?

1    A.    James ain't the boy that said nothin'.  James told
2    them I did not do nothin' to him, which I didn't.
3    Q.    So are you saying that James didn't say anything?
4    A.    Right.
5    Q.    And if James didn't say anything, you spent time in
6    2005 for no reason?
7    A.    Right.
8    Q.    So the reason why you were in prison starting in 2005
9    to 2010 was for no reason at all?
10   A.    For no reason at all.
11   Q.    Why do you think you went to jail at that time?
12   A.    I was at jail because the parole board -- the parole
13   officer that came to the parole hearing that I ain't seen
14   but one day, and he don't know nothin' about me -- I ain't
15   seen him but one day -- he came there and spoke on what
16   they told him to speak on.  And the police that interviewed
17   me came to the parole hearing and said -- at first she said
18   I told her that I did something to that boy, but I did not
19   tell her.  I told her it was a dream.  I wanted Dr. Weiner
20   to find out did I really hurt that boy.  But I never
21   touched that boy.  It was a dream.
22   Q.    So you asked Dr. Weiner to find out?
23   A.    Yes.  Because I -- just like I told you all, I tell
24   the truth all the time.  I don't -- I try not to lie.  I
25   don't lie.  I tell the truth.  I was being truthful with

1   Dr. Weiner so I can better myself.  I'm trying -- I'm
2   trying -- I'm trying to forget boys and go on with women,
3   which I never really had a woman in my life.  I'm trying to
4   -- when I went out on the streets I had got -- not one, I
5   had three womens out on the streets.  And I was trying to
6   choose to see which one I wanted to be with.  And when this
7   came up, because I was not thinking about no little boys,
8   no little kids at the time.  I was trying to stay out, be
9   with a woman, possibly, you know, have a child of my own or
10  whatever.  But every time that I bring that up to my parole
11  officer, my parole officer tells me, I cannot be with this
12  person, I cannot be with this person, because they had
13  kids.
14  Q.   Why did he tell you that?
15  A.   They had kids.
16       **THE COURT:**  He's saying, because they had kids.  I
17  didn't know if you heard him.
18       **MR. GRAY:**  Thank you, Your Honor.  I did not hear him.
19  Q.   Why did he say you can't be with them because they
20  have kids.
21  A.   I'm going to go from the beginning when I got out.
22  When I got out, my parole officer told me -- he said, I
23  want you to do this and I want you to do that.  He had a
24  thousand things he wanted me to do.
25  Q.   Like what?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 98 of 286

1    A.   He wanted me to have a piss test most times five times

2    a week.  He wanted me to go see this doctor; he wanted me

3    to be at this group.  I was seeing Dr. Weiner plus I was in

4    another sex group at the time.  I was in another sex group

5    at the time.  Then I was in an alcohol program, which I'm

6    not no alcoholic.  I'm in an alcohol group, plus I got to

7    see him five times a week.  I couldn't keep no job.  My

8    boss kept on asking me why your parole officer keep calling

9    here, why he keeps doing this.  I had to quit that morning

10    job and work at night.  Then in the morning I had to take

11    care of my mother, I had to take care of the man that

12    sleeps downstairs from me.  A lady across the street wanted

13    me to come -- come over across the street and talk with

14    her.  I got to go see Dr. Weiner.  I got to go see Eric

15    Mays.  And by that time it's time for me to go to work.  I

16    don't never have time for myself or even try to get me a

17    woman if I wanted.

18    Q.   Was there a problem with your probation officer asking

19    you to do all these things?

20    A.   To me it was a problem, but I went on and did it

21    because I had to.  In order to stay out I had to do that.

22    Q.   Now, Mr. Wooden, I want to take your attention back to

23    1972, and I hope I get a chance to talk about that a bit.

24    In 1972 you were charged with anally sodomizing a boy on

25    1/31/1972.

1      **MS. GRAVES:** Objection.

2      **THE COURT:** Overruled.

3   Q.  That would be January 31st, 1972. Do you remember

4  that?

5   A.  I told you I ain't trying to go back to all that.

6   Q.  Are you taking the Fifth Amendment at this time?

7   A.  I'm takin the Fifth, I guess.

8   Q.  And the basis for you taking the Fifth is?

9      **THE COURT:** Well, he was convicted of this, right?

10     **MR. GRAY:** Yes, Your Honor.

11     **THE COURT:** Well, answer the questions.

12  Q.  Mr. Wooden, do you remember the incident in 1972?

13  A.  No, I don't remember.

14  Q.  You don't remember it?

15  A.  No.

16  Q.  Mr. Wooden, do you remember the deposition. There is

17  a binder in front of you. Would you mind opening up that

18  binder to a document at Tab 31, please?

19     **THE COURT:** Why don't you help him out here? It will

20  speed things up if you -- well, actually, why don't you

21  just read what you want him to agree to?

22     **MR. GRAY:** Yes, Your Honor.

23  Q.  Mr. Wooden, do you remember that you were charged with

24  rectal sodomy at your deposition, at page 12, at line 9?

25     **THE COURT:** And what does he say?

1    **MR. GRAY:**  He says, "Yes, sir."

2    **THE COURT:**  Okay.  Do you remember that or not?

3    A.   Yeah, I remember.

4    **THE COURT:**  Okay.

5    Q.   And while I've got it on the screen for you, do you

6    also recall that you were asked whether or not you pled

7    guilty at line 12, and you were placed on probation.  Do

8    you recall that?  And your answer was, "Nah, I did time for

9    it, I wasn't placed on no probation."  Do you remember

10   that?

11       **THE COURT:**  Well, regardless whether he remembers it

12   or not, that's what his deposition is, and it is received

13   as evidence.  I will receive all of this as evidence, it

14   being he apparently not being willing to confirm it on

15   adverse examination.

16       **MS. GRAVES:**  Your Honor, note our objection.

17       **THE COURT:**  Yeah, you can object, but the fact is he's

18   an adverse witness; and he won't testify, and he has been

19   deposed about the material questions, and they will be

20   admitted from the deposition.

21   Q.   And, Mr. Wooden, at that deposition you were asked

22   whether or not it was somebody that you knew or whether it

23   was a complete stranger from the community at line 1 and 2;

24   and you said, "It might have been somebody from the

25   neighborhood."  Do you remember that?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 101 of 286

1    A.    Yes.

2    Q.    Was this kid, in fact, somebody from the neighborhood?

3    A.    Yes.

4    Q.    Was this a kid that you were helping out with his

5    homework?

6    A.    No.

7    Q.    I'm sorry, I couldn't hear you.

8    A.    The incident was in '83?

9    Q.    No, in 1972.

10    A.    No.

11    Q.    And the victim in 1972, on January 31st, was that

12    victim a male?

13    A.    Yes.

14    Q.    A young boy?

15    A.    Yes.

16    Q.    That boy was not over the age of high school?

17    A.    No.

18    Q.    Do you remember testifying at the deposition that at

19    the time you knew both of these kids well and that you had

20    sex with this kid on the 31st of January; do you remember

21    that?

22    A.    (No audible response.)

23    Q.    And on page 14 we asked, did these kids come to you?

24    And you said, yes.  And then we asked, they came to you for

25    what purpose?  And you said, they came to me for that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 102 of 286

1  purpose there.  And our question was, to have sex?  And you

2  said, yeah.  They came to you to have sex.  And these kids

3  were not adults; they were minors.  Do you remember that?

4  A.   Yes.

5  Q.   And you remember that they were going to elementary

6  school at the time.  You testified to that, remember that?

7  A.   (No audible response.)

8      **THE COURT:**  It's received if you don't remember it.

9  Q.   Mr. Wooden, with regard to that kid on January 31st,

10 1972, we asked you whether or not that child approached

11 you.  And you said he did approach you and he wanted some

12 money.  Isn't that right?

13 A.   Yes.

14 Q.   And that when he asked you for some money, what did

15 you tell him?  Do you remember telling him that you told

16 him to come with you?

17 A.   Yes.

18 Q.   Do you remember testifying that you took that kid to

19 the first spot you could find?

20 A.   Yes.

21 Q.   And do you remember telling that kid that -- telling

22 us that you had sex with that kid?

23 A.   Yes.

24 Q.   Mr. Wooden, with regard to that kid, did that kid come

25 to you to have sex?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 103 of 286

1   A.   Yes.

2   Q.   Now, did you want to have sex with that kid when you

3   first saw him?

4   A.   No.

5   Q.   Then why did you have sex with him?

6   A.   I just feel that -- at the time I feel that that's

7   what they wanted, but after that I played a role.  It was

8   my fault because I could have walked away from it.

9   Q.   Now, you say at the time you thought that's what they

10   wanted, so you thought the kid wanted to have sex with you?

11   A.   I could have walked away from it.

12   Q.   The question is, did you think that the kid wanted sex

13   with you?

14   A.   At the time I did.

15   Q.   And you're saying now that you could have walked away

16   from it.

17   A.   I said at that time I could have walked away from it.

18   Q.   And after you had sex with this kid you gave him

19   money, right?

20   A.   Yes.

21   Q.   And then you had sex with another child on the 28th of

22   April of 1972; do you remember that?  Mr. Wooden, do you

23   remember that?

24   A.   You keep coming up with these dates.  With these dates

25   I don't really remember what year it was and how old they

1  was or nothing.  You keep on coming up with these dates.

2  Q.  Did you have sex with more than one kid in 1972?

3  A.  No.  You keep coming up with all these dates.  I don't

4  know what kid you're talking about.

5  Q.  And you received a conviction for rectal sodomy of a

6  minor that took place on April 12, 1972.  Do you remember

7  that?

8  A.  Yeah, I remember that.

9  Q.  And you also offered money to that kid, isn't that

10  right?

11  A.  I offered money to one kid.

12  Q.  Oh, the second one you didn't offer money to?

13  A.  I don't know nothing about all them others.

14  Q.  I'm sorry, what did you say?

15  A.  You said '72, then you went to '73, now you're back to

16  '72.

17  Q.  No, we're still talking about 1972.  Did you offer

18  money to that kid in 1972?

19  A.  What kid?

20  Q.  The second kid in 1972 that took place on April 28th?

21  A.  I gave money to all the victims.

22  Q.  Now, these kids that you gave money to, did they want

23  money, or did you just offer them money?

24  A.  They wanted money.

25  Q.  In exchange for giving them money you had sex with

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 105 of 286

1    them?

2    A.   Yes.

3    Q.   And did these kids understand that they would have to

4    have sex with you if they wanted money?

5    A.   Yeah, they understood.

6    Q.   So they were willing to have sex with you in exchange

7    for the money?

8    A.   Yes.

9    Q.   So these kids wanted to have money so bad they even

10   wanted to have sex with you?

11   A.   I do't know if they wanted it so bad.  They was

12   willing to have sex with me.

13   Q.   But they did have sex with you?

14   A.   Yes.

15   Q.   Or rather you had sex with them?

16   A.   Yes.

17   Q.   Did these kids want to engage in sex with you?

18   A.   Yes.

19   Q.   That was a yes?

20   A.   Yes.

21   Q.   These kids were minor children, right?

22   A.   Yes.

23   Q.   Young boys?

24   A.   Yes.

25   Q.   They wanted to have sex with you?

1  A.   Yes.

2  Q.   And by sex with you, that meant you penetrating them

3  anally with your penis, correct?

4  A.   Yes.

5  Q.   Did these boys explain to you how they knew about anal

6  sex with a male?

7  A.   No, they didn't explain it to me.

8  Q.   How did they know that that was sex?

9  A.   Because I knew about it when I was that age.

10  Q.   You said you knew about it when you were that age.

11  How did you learn about it at that age?

12  A.   I learned about -- I've been around a big ole family.

13  Q.   Well, how does that explain how you knew about anal

14  sex at that age?

15  A.   I don't see -- I don't see my sisters and brother.

16  Q.   Are you reflecting about your own -- when you were

17  victimized as a child?

18  A.   No.

19  Q.   So you've seen it in other instances?  You said your

20  brothers and sisters?

21  A.   Yes.

22  Q.   So you've observed your brothers and sisters engaging

23  in sexual acts when you were a small child?

24  A.   Yes.

25  Q.   Did you think this was appropriate?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 107 of 286

1    A.   Yes.

2    Q.   Is it okay for small kids to see people engaging in

3    sex?

4          **MS. GRAVES:**  Objection.

5          **THE COURT:**  Overruled.

6    Q.   Mr. Wooden, is it okay for small kids to see adults

7    engaging in sex?

8    A.   No.

9    Q.   Now, Mr. Wooden, when you engaged in sex with these

10   boys, did you pull their pants down?

11   A.   They pulled their own pants down.

12   Q.   They did it because they wanted to have sex?

13   A.   They pulled their own pants down.

14   Q.   Why would they pull their own pants down?

15   A.   Because we both agreed to have sex.

16   Q.   Did you tell them to pull their pants down?

17   A.   I might have told one of them.

18   Q.   Did you force them to pull their pants down?

19   A.   No, sir.

20   Q.   Did you threaten them with bodily harm if they didn't?

21   A.   No, sir.

22   Q.   So these kids willingly pulled their pants down to

23   engage in sex?

24   A.   Yes.

25   Q.   Now, these were kids that you saw around the

1    neighborhood, isn't that right?

2    A.   Yes.

3    Q.   And you testified earlier that you were well-known in

4    the neighborhood and trusted.  Isn't that right?

5    A.   Yes.

6    Q.   You did work with other people's families in the

7    neighborhood, isn't that right?

8    A.   I plead the Fifth.  I ain't answering no more

9    questions.

10   Q.   So you are pleading the Fifth as to whether or not you

11   knew these kids and their families?

12   A.   I'm not answering no more questions.

13   Q.   You're not answering the question.

14       **THE COURT:**  I think he is saying I'm not answering any

15   more questions, is what he is trying to communicate.

16       **MR. GRAY:**  Thank you, Your Honor.

17       **THE COURT:**  At least that's the way I'm hearing it.

18       **MR. GRAY:**  Well, Your Honor, I intend on continuing

19   asking questions.

20       **THE COURT:**  Yes.

21       **MR. GRAY:**  Thank you.

22   Q.   Now, Mr. Wooden, these kids that you anally sodomized

23   and had sex with in 1972, were they about the same age as

24   James in 2005?

25   A.   I plead the Fifth.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 109 of 286

1  Q.   Is it that you don't know how old these kids are, or

2  were they about the same age as James?

3  A.   I plead the Fifth.  I told you in the interview about

4  these kids.  I told the police and got locked up for it.

5  That's in the past, and I'm not going to answer no more

6  questions.  I'm trying to keep that in the past.

7  Q.   Now, with regard to these kids that you were engaging

8  with in the past, these were kids that were in the

9  neighborhood that you lived in, and they looked up to you.

10  Isn't that right?

11  A.   (No audible response.)

12  Q.   Mr. Wooden, at the deposition you were asked a

13  question on page 19, line 9, you explained to us, "See, in

14  the neighborhood I live in, I was special to a whole lot of

15  people in the neighborhood."

16      The question we asked you was, "You were special, you

17  said?"  And you said, "Yeah."  "To a whole lot -- and what

18  do you mean by 'special'?"

19          And you said, on line 16, "I was special -- a

20  whole lot of them looked up to me."

21          "A whole lot of -- when you say, 'a whole lot of

22  them,' a whole lot of boys looked up to you?"

23          Answer, "Boys, girls, men, they all looked up to

24  me."

25          Question, "Okay.  So they looked up to you?"

1           Answer: "Because I was the type of person that
2       helped everybody in the neighborhood."
3           Question:  Okay.  So what are some of the things
4       you would do to help everybody in the neighborhood?"
5           Answer:  "I ran errands for them, cut their grass,
6       and, you know, painting in their house if they need it
7       painted, painting in the house.  I'd go to the store, you
8       know, do stuff like that, and water their grass and stuff
9       like that."
10          Question:  "So you were very helpful --
11          Go get them -- yeah.
12          -- to people in the neighborhood?
13          Yeah."
14          Question:  "And so are you saying that all of the
15      kids knew you, boys and girls?
16          Yeah.
17          And did you know the mothers and/or fathers of
18      these kids, as well?
19          Yeah.
20          Okay.  So the kid on January 31, that one, you
21      knew that individual's mom?
22          Yes.
23          Did you know that individual's father -- did that
24      individual's father live with that family?
25          Yeah.  On -- on --

1                On January 31st, the first one that you talked
2       about?
3                Oh, yeah, yeah.  Yeah."
4                Question:  "And did you know the boy's father, as
5       well?
6                Yes.
7                Were you friends with the mother and father?
8                I'd usually go around the neighborhood and just,
9       you know, do work for people."
10               Question:  "Do work for people?
11               Yeah.  And then at the same time, I worked at the
12      supermarket, Safeway or whatever you call it.
13               Okay.
14               And I did stuff, take their groceries home and
15      all that."
16          **MS. GRAVES:**  Your Honor, we object.  Is there a
17      question here?
18          **THE COURT:**  Overruled.
19      Q.  Question:  All right.  So with the individual from
20      January 31st, you knew his mother and father, right?
21          Yes.
22          And you did things for his family like what you
23      described here for the rest of the folks in the
24      neighborhood.  Did you do any housework for his family?
25          I did housework for every -- different people

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 112 of 286

1    families."

2    Q.   Now, Mr. Wooden, you were a well-known person in that

3    community, weren't you?

4    A.   Yes.

5    Q.   You knew people's mothers and fathers?

6    A.   Yes.

7    Q.   And you knew the mothers and fathers of these kids

8    that you were molesting, isn't that right?

9    A.   I knew the mothers and fathers of everybody in the

10   neighborhood.

11   Q.   And you were friends with those mothers and fathers,

12   isn't that right?

13   A.   I did -- I did things for them, yeah.

14   Q.   And these families trusted you, isn't that right?

15   A.   I guess so.

16   Q.   So the families trusted you, so when these kids came

17   up and asked you for money, instead of you giving them

18   money you gave them money and had sex with them.  Isn't

19   that right?

20   A.   Not all of them just came up to me for money.

21   Q.   Now, Mr. Wooden, I want to turn your attention to the

22   events of 1973 because you had spent some time in a

23   correctional facility, a youth facility, after those events

24   in 1972.  Is that right?

25   A.   Yes.

1   Q.  While you were in that youth facility, did you receive

2   any treatment for sexual offenders?

3   A.  Yes.

4   Q.  Did you think that treatment worked while you were

5   there?  Mr. Wooden, was that treatment useful?

6   A.  Yes, at the time it was, yes.

7   Q.  At the time it was useful?

8   A.  Yes.

9   Q.  At the time you thought it was -- you thought you

10   understood what they had taught you?

11   A.  Yes.

12   Q.  Did they teach you about triggering mechanisms?

13   A.  Yes.

14   Q.  Did they tell you that it might be inappropriate to

15   offer kids money?

16         Mr. Wooden, did they tell you it would be

17   inappropriate for you to offer kids money?

18   A.  They told me it would be inappropriate to give kids

19   money.  I ain't offered no kids nothing.

20   Q.  So it's inappropriate for you to give kids money?

21   A.  Yeah, without an adult around.

22   Q.  Did that treatment also tell you that it was wrong to

23   have sex with children?

24   A.  Yes.

25   Q.  Did it tell you to reflect on why you were engaging in

1   these sort of activities with children?

2   A.   Yes.

3   Q.   Did you learn what caused you to want to engage in

4   these sort of acts with children?

5   A.   Yes.

6   Q.   And why did you have sex with those two boys back in

7   January and in April of 1972?

8   A.   I don't know why.

9   Q.   Was it something that you planned to do?  Did you plan

10  to have sex with these children?

11  A.   I don't plan to have sex with nobody.

12  Q.   Was it just something that happened spur of the

13  moment?

14  A.   They came to me.  There ain't nothin that happened

15  spur of the moment.  They came to me.

16  Q.   But if they came to you why did you have sex with

17  them.  Did they come to you asking for sex?

18  A.   Yes.

19  Q.   And if they came to you asking for sex and you weren't

20  really planning on having sex with them, why did you have

21  sex with them?

22  A.   It just --

23  Q.   I'm sorry, Mr. Wooden, your answer?

24  A.   It's just like this.  If a little kid tryin' to get

25  some money out of you and want to have sex with you and you

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 115 of 286

1   don't have sex with him, I can go to anybody and say you

2   did something to me and I still get locked up.

3   Q.   I'm sorry.  I don't understand.  Could you explain

4   that?

5   A.   If I'm a little kid and want to have sex with you and

6   you turn me down, I could run and tell somebody you tried

7   to have sex with me and they will lock you up and I'll

8   still get locked up.

9   Q.   Did that happen to you?

10  A.   And I'll still get locked up.

11  Q.   Did some kid come to you, ask for sex and you said no

12  and then they ran off and told somebody that you tried to

13  have sex with them?  Did that happen to you?

14  A.   Yes.

15  Q.   When?

16  A.   It was back then in the '70s.

17  Q.   Back in the '70s.  Looking back at what took place

18  back in the '70s, do you have any reflections as to how you

19  should have reacted?

20  A.   Right then I never looked at it really the way I

21  should have reacted.  Any one of them I should have told --

22  I should have told all of them no.  I should have told all

23  of them no.  And I should have went on -- went on to their

24  parents or whatever and told their parents.

25  Q.   Just so I'm clear, you are telling me today that as

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 116 of 286

1    you look back those kids wanted to have sex with you and

2    that you should have told them no?

3    A.   I should have been the -- because I was the oldest I

4    should have been -- being the oldest, biggest, smartest

5    one, I should have just said no and went on about my

6    business.  It was my fault for having sex with them.  It

7    was my fault.  I could have avoided it, but I didn't.

8    Q.   And you could have avoided it by telling these kids,

9    no, when they asked you for sex?

10   A.   Yeah.  I shouldn't have had sex with them.

11   Q.   Now, let's turn to the -- now, Mr. Wooden, before we

12   turn to the events in 1973, I just want to ask you one more

13   question about those events in 1972.

14   A.   Go ahead to '73.

15   Q.   We will in a moment, sir, but I'm going to ask you one

16   last question about 1972.

17   A.   I'm not answering no more questions -- I ain't

18   answering no more questions about no '72, go to '73.

19   Q.   Now, with regard to those issues in 1972 --

20   A.   I ain't answering no more questions about '72.

21   Q.   I just want to point out to you that we asked you

22   questions regarding those two boys in 1972 as to whether or

23   not -- what triggered -- what caused you to want to have

24   sex with those boys?  Do you remember those questions?

25   A.   I'm not answering.  I plead the Fifth.  I'm not

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 117 of 286

1   answering.

2   Q.   Specifically we asked you about the first boy, the

3   January 31st, 1972 boy, and we asked you at line 19 on page

4   23 of Exhibit Number [31], "What do you think triggered

5   your willingness to have sex with this individual?  And two

6   weeks ago you answered, "Well, it just was the spirit of

7   the moment."  And then the question was after that, "It was

8   just the spirit of the moment?"  And you said, "Yes."

9       And the question was, "So the opportunity presented

10   itself to you?"  And your answer was, "Yeah."

11       The next question was, "I believe you said that when

12   the individual approached you, he didn't say he wanted sex,

13   money for sex; you said he just said he had wanted money,

14   is that correct?"  And you said, "Yes."

15       "And what caused you to say, 'I will give you this

16   money, but I want to have some sex with you'?"

17       And the answer was, "What caused me to say it?"

18       And we said, "Yes."

19       And then your answer was, "I just said, it ain't

20   nothing caused me to say it."

21       Mr. Wooden, was the fact that you had sex with that

22   boy on January 31st, 1972, was that something that you

23   planned?

24   A.   I plead the Fifth.  I'm not trying to answer.

25   Q.   Was that something that just happened at the spur of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 118 of 286

1    the moment?

2    A.   I plead the Fifth.

3    Q.   So you're taking the Fifth as to your previous

4    testimony that it was something that just was the spirit of

5    the moment?

6    A.   I plead the Fifth.

7    Q.   And we asked for clarification at page 31 on Exhibit

8    [31], Question:  "I'm just trying to clarify that.  As you

9    sit here now, do you believe that these elementary school

10   age boys wanted to have sex with you?"

11          And your answer two weeks ago was, "At the time

12   they did, yes."

13          "And you believe that they wanted to have sex

14   with you?"  And your answer was, "Yeah."

15          And the next question was, "Do you still believe

16   that?"  And your answer was, "Yeah, I still believe it."

17       Mr. Wooden, do you still feel that way with regard to

18   those boys, that they wanted to have sex with you?  Those

19   boys in 1972, in April of 1972, in January of 1972?

20   A.   I feel I wanted to have sex with them.

21   Q.   Mr. Wooden, let's turn to 1973.  In 1973 that is the

22   incident where you were asked by a four-year-old boy to

23   walk across the street.  Do you remember that incident?

24   A.   Yeah, I remember.

25   Q.   What happened during that incident?  I'm sorry that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 119 of 286

1    was 1974.

2    A.   I told you I ain't trying to talk about it.

3    Q.   I'm sorry?

4    A.   I ain't trying to bring that up.

5    Q.   You don't want to discuss that?

6    A.   No, I want -- I want to get you to 2005, what I'm in

7    here for.

8    Q.   We certainly will get to that, Mr. Wooden.

9    A.   I'm trying to get to that, what I'm in here for.

10   Because all that is in my past.  I did time for all that.

11   Q.   Now, Mr. Wooden, in that 1974 incident --

12   A.   I did time for all that.  I want to get to the 2005,

13   why I'm in here.  Because I'm not supposed to be in here.

14   Q.   Mr. Wooden, I assure you we will get to the 2005.

15   A.   I'm not trying to talk about them no more.

16   Q.   Well, Mr. Wooden, unfortunately the way the rules of

17   this Court works is that I get to do the questioning.

18   A.   And I'll plead the Fifth.  I'll plead the Fifth for

19   all the rest of it.

20   Q.   Now, Mr. Wooden, with regard to that event in 1974,

21   that is when you were convicted for taking indecent

22   liberties with a minor child.

23   A.   I plead the Fifth.

24   Q.   And you remember that with regard to that conviction

25   you pled guilty to that offense?

1    A.   I plead the Fifth.

2    Q.   As part of that I want to turn your attention to

3    Government Exhibit Number [18], a presentence report

4    regarding that offense.  Do you remember reviewing a

5    presentence report regarding that offense?

6    A.   I plead the Fifth.

7    Q.   Mr. Wooden, do you remember in that offense that that

8    involved a four-year-old boy that while you were walking

9    him across the street you took him to an alley near his

10   home, forced him to stand facing a wooden fence while you

11   inserted your thumb into his rectum and then you forced the

12   boy onto the ground whereupon you attempted to anally

13   penetrate him until you cut your hand on a piece of glass.

14   Do you remember that event?

15   A.   I plead the Fifth.

16   Q.   And that this four-year-old boy reported this incident

17   to his father who then called the police and that's how you

18   were caught in this instance?  Do you remember that?

19   A.   I plead the Fifth.

20   Q.   And do you remember that you were given an opportunity

21   to make a statement and the presentence report states on

22   the second page, which is Bates number 651 on Exhibit [18],

23   that Mr. Wooden read and agreed with the statement of the

24   facts.  Do you remember that?

25   A.   I plead the Fifth.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 121 of 286

1  Q.   And that you were unwilling and unable to give any

2  reasons for your behavior.  Do you remember that?

3  A.   I plead the Fifth.

4  Q.   And that you were very reluctant to discuss this case

5  in detail with the investigator.  Do you remember that?

6  A.   (No response.)

7  Q.   And that during most of the interview you remained

8  almost silent and nonresponsive to the questions, although

9  you had an opportunity to provide input.  Do you remember

10  that?

11  A.   (No response.)

12  Q.   Mr. Wooden, do you remember answering questions

13  regarding that offense during your deposition?

14  A.   I plead the Fifth.

15  Q.   And that we asked you questions regarding this

16  incident and that we asked you that on page 47, line 18,

17  "Do you remember asking him if he wanted to earn a dollar?"

18  And you said, "No."

19       "You took him into the alley.  Do you remember that?"

20  And you had no response.

21       And then on line 24, we ask "You have to -- you have

22  to --" and you answered, "I know what you're talking

23  about."  You said that you don't remember taking him into

24  the alley.  Do you remember that during your deposition?

25  A.   (No response.)

1  Q.   You stated that you don't remember pulling the four-
2  year-old's pants down?  And then you did not respond as to
3  whether or not you placed your thumb into the boy's anus?
4  A.   (No response.)
5  Q.   And then at line 18 we asked you what do you remember.
6  And you stated, "Whatever they got on that paper right
7  there, was none of that wasn't -- none of that wasn't said
8  in the courtroom.  None of that."
9       And we asked you, "What do you remember happening?"
10  And you said, "I was coming -- I was going home, and the
11  little boy asked me to take him across the street."
12       We said, "Okay."
13       You said, "None of that other stuff that they got
14  there -- I don't know how they got that down there."  Do
15  you remember that?
16  A.   (No response.)
17  Q.   And then we responded, Okay.  Then you said, "He asked
18  me to take him across the street, to the lady's house
19  across the street."
20       And then you said on line 7, "And I took him over
21  there."  And then on line 9, "Yeah, we went in the lady's
22  house."  And then line 11, "And then the lady -- the lady
23  gave me something to drink."
24       And then you responded on line 14, "She asked me was I
25  babysitting the little boy?  I told her, no.  I said, I'm

1  not babysitting the little boy.  I said the little boy

2  asked me to take him across the street.  Right?"

3      The lady -- the lady and her daughter, they went

4  somewhere.  I think they were going to some kind of an

5  amusement park and the little boy wanted to go with them,

6  but he couldn't."

7          "Did you know this family?"

8          Answer:  "No, I didn't know them.  I didn't know

9  the family."

10          "Did you know the little boy before he walked up

11 to you?"  "No."

12          "Well, how did you know where to take him?

13          Answer:  "He told me where to take him at."

14          Question:  Okay.  I'm not assuming anything.  So

15 you then -- he told you where to take him and you took him

16 across the street, right?"  You said, "Yeah."

17          "And you thought you're doing a good thing,

18 you're just helping the boy across the street?"  "Yeah."

19          "All right.  So you take the boy to the house,

20 right?"  "Yes."

21          "And you said that you were let inside the

22 house?"  "Yes."

23          "Did you recognize the house before you got there

24 with the little boy?"  "I know every -- I know all -- all

25 the neighborhoods in there, just about, in D.C."

1          "Okay.  All right.  So were you familiar with the
2      house then?"  You replied, "Yeah."
3          Question:  "Okay.  And when the -- who opened the
4      door, was it the mother or the daughter?  And you answered,
5      "The mother."
6          "Okay.  So the mother opened the door; did you
7      recognize the mother?"  "No, not really."
8          "Okay.  All right.  And what did you say to the
9      mother when she opened the door and she saw you holding her
10     four-year-old son?"
11         "Holding -- the dude lived across the street,"
12     was your answer.
13         "Huh?"  "That wasn't her son."
14         "Oh, okay, I'm sorry.  All right.  So the four-
15     year-old took you to a house, not his own house?"
16         "No."
17         "Okay.  All right.  What did she say to you
18     then?"  "I just told you, she asked me was I babysitting
19     the little boy?  I told her, no."
20         "Okay.  And what happened at that point?"
21         "I told -- I told her she -- he told me to take
22     him across the street to this house.  And she asked me in."
23         "So you came inside?"  "Yeah."
24         "You said you got something to drink; is that
25     correct?"  You replied, "Yes."

1          "What did she give you, water, Kool-Aid?"  Your

2     answer two weeks ago was, "I think it was tea, some tea."

3          "Okay.  And this was July, so I'm assuming it was

4     sweet tea or cold iced tea?"  Your reply, "Iced tea."

5          "And after you had the iced tea, what happened?"

6     The answer was, "The lady -- the lady and her daughter left

7     -- and we left out the house and the lady and her daughter

8     left, you know, they was going on out, and the little boy

9     wanted to go with them, and I think they were going to an

10    amusement park, and the little boy wanted to go with them -

11    -

12          So what happened?

13          -- and she couldn't -- she couldn't take him.

14          She couldn't take him.  So what did you then do?

15          I took him back across the street.

16          And where did you take him when you took him back

17    across the street?"  Your answer, "No where.

18          You know, you go to the house, you come out the

19    house, the woman and the daughter, they come out the house,

20    and they go to the amusement park, right?

21          Yes.

22          Okay.  So they're going their way, you take --

23    and he's four years old, so I assume you're holding his

24    hand as you walked him across the street?"

25          You replied, "Yes."

1     "Okay. So you are holding his hand and you walk

2     him across the street and you get to the sidewalk, right?

3     And where do you go from there?

4         Where did I go from there?

5         Yeah.

6         Home.

7         So you just left him right there on the street?

8         I went home.

9         Did he come with you?

10        No.

11        So what happened when you went home then?

12        When I went home?"

13        Your answer, "Yeah." (sic)

14        Mr. Wooden, you replied, "A whole lot of things

15    happened when I went home."

16        "Well, at some point the police came, right?

17        Yes.

18        Do you know how the police were able to find your

19    home?

20        Every police in around there know where I live

21    at.

22        Okay. And so the police came to your home, and

23    what happened? The cops came to your home, right?

24        Yes.

25        And what happened after the cops came to your

1    home?

2              I got arrested?

3              Okay.  According to the official records, you

4    told the police -- you told the police your version of the

5    events, right?"

6              You replied, "Yes."

7              "You told the police that with regard to the

8    lady, she asked you if you wanted to come into her house

9    and see her pets.  Were there pets in the woman's house?"

10             You replied, "Were there pets?  No."

11             Further down we asked you, "Okay.  All right.

12   You went outside her house and you told the officers that

13   the boy told you to take him across the street?"  You said,

14   "Yes."

15             "Okay.  You told the officers you went into the

16   alley.  Do you remember that?"  You said, "No."

17             "Did you have a cut hand?  Because you went to

18   the hospital because your hand was cut?

19             On one occasion, I don't think it was that one

20   there.

21             Well, this is the occasion we're talking about.

22   Do you recall going into the alley and you told the police

23   that you fell down and you cut your hand . . ."

24   Q.   Do you remember those events as you told them to us,

25   Mr. Wooden?  Mr. Wooden?  Mr. Wooden, do you remember

1   telling us those events?

2   A.   I remember you screwing it up and telling me about two

3   different things at the same time and had me confused about

4   that.   Then later on I told you what happened.

5   Q.   Well, Mr. Wooden, what happened?

6   A.   Naw, you screwed it up.   You asked me about two

7   different things at one time.   Then I had to straighten it

8   up to you.

9   Q.   Well, straighten it up for me now, Mr. Wooden.

10  A.   I'm not going to try to go through it right now.   You

11  was asking me about two or three things at the same time

12  trying to get me confused so I can mess up.

13  Q.   Well, Mr. Wooden --

14  A.   That's what you was doing.

15  Q.   Mr. Wooden, why don't you explain --

16  A.   So I can mess up.

17  Q.   Well, Mr. Wooden, why don't you explain to us what

18  happened with the four-year-old.

19  A.   That's what -- that's what -- that's what you were

20  doing.   You were trying to get me confused, so I can mess

21  up.   You asked me about two or three things at the same

22  time, and you know I can't answer no two or three things at

23  the same time.

24  Q.   Mr. Wooden --

25  A.   Trying to get me confused.

1  Q.  Mr. Wooden, I'm going to ask you just one question

2  now.  With regard to that four-year-old that you were in

3  the alley with, what happened?

4  A.  (No response.)

5  **THE COURT:** He's an adverse witness.  You can cross-

6  examine him.  Is it not a fact, if you want.

7  **MR. GRAY:** Yes, Your Honor.  Thank you.

8  Q.  Mr. Wooden, is it not a fact that you did try to

9  anally sodomize that four-year-old?

10  A.  I plead the Fifth Amendment to it.

11  **THE COURT:** You plead the Fifth, is that what you

12  said?

13  A.  Yes.

14  **MR. GRAY:** Do you plead the Fifth, Mr. Wooden?

15  A.  Yes.

16  Q.  Mr. Wooden, is it not a fact that that four-year- old

17  was a boy that only asked for help across the street?

18       Your answer, Mr. Wooden?

19  A.  I plead the Fifth.

20  Q.  Mr. Wooden, is it not a fact that this boy -- as your

21  testimony during the deposition was he laid down on the

22  ground by himself, or at least that was your testimony at

23  the deposition?  Is that not a fact?

24  A.  (No response.)

25  Q.  Mr. Wooden, is it not a fact that you testified that

1  he laid down on his own stomach?  And is it not a fact that

2  when we asked you, did you tell him to lay down on his

3  stomach.  And your answer was, he knew.  I guess he knew

4  that's what I wanted.

5  A.   I plead the Fifth.

6  Q.   Is it not a fact that we asked you, did you touch him

7  on the shoulder and guide him down on his stomach.  And you

8  said, "No."

9  A.   I plead the Fifth.

10 Q.   And is not a fact that you testified that this four-

11 year-old boy once he got his pants down, I guess he knew --

12 he knew that's what I wanted.

13 A.   I plead the Fifth.

14 Q.   And is it not a fact that this was your testimony

15 regarding these events two weeks ago?

16 A.   I plead the Fifth.

17 Q.   Now, Mr. Wooden, after that conviction regarding the

18 four-year-old boy, you spent some time in jail.  Isn't that

19 right?  You were sentenced to ten years, isn't that

20 correct?

21 A.   (No response.)

22 Q.   Mr. Wooden, during that ten year period did you

23 receive any sex offender treatment?

24 A.   I don't remember.

25 Q.   You don't remember if you received any sex offender

1    treatment during that time period?

2    A.   I don't remember.  I've received treatment all my

3    life.

4    Q.   Well, what sort of treatment did you receive while you

5    were incarcerated during that time?

6    A.   I've treated all my life.  I've seen doctors and stuff

7    all my life.

8    Q.   Now, after you were convicted for this event

9    concerning the four-year-old boy, what prison did you go

10   to?  Were you at Lorton?

11   A.   No, I wasn't at Lorton.

12   Q.   Where were you?

13   A.   I don't remember what year it was.  I don't remember.

14   Q.   Yet you remember that you went to this lady's house

15   and you drank tea?

16   A.   I don't remember what year it was.

17   Q.   Now, Mr. Wooden, I want to turn your attention to the

18   events in 1983 when you had the twelve-year-old and the

19   eight-year-old and you asked them to help you with some

20   boxes.  Do you remember that incident?

21   A.   (No response.)

22   Q.   Do you remember prior to that conviction that you were

23   offered an opportunity to take a look at the presentence

24   report that we have previously marked as Government Exhibit

25   Number [17]; do you remember that?

1    A.    (No response.)

2    Q.    Do you remember being charged and pleading guilty to

3    indecent liberties with a minor child and sodomy, enticing

4    a minor child?

5    A.    And what did I say on it?

6    Q.    Do you remember those offenses?

7    A.    What did I say on that, the reason why I did plead

8    guilty.

9    Q.    Well, why did you plead guilty?

10   A.    I plead guilty because my lawyer left town on me.

11   That's why I plead guilty.  He had his son at the trial.

12   His son didn't know nothing about me.  I thought my lawyer

13   was going to get me out.  I thought he was going to get me

14   out, because me and him talked about him getting me out

15   without doing any time.  And that's the reason why I plead

16   guilty.

17   Q.    So you say that your attorney's son was there in court

18   with you?

19   A.    Yes.

20   Q.    He was an attorney, right?

21   A.    Yes.  And he didn't know nothing about the case.

22   Q.    Did you tell this to the judge?

23   A.    He didn't know nothing about the case.  I thought his

24   father had already told him that he was going to get me

25   out.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 133 of 286

1   Q.   So did you tell the judge you wanted more time to talk
2   to your attorney?
3   A.   I didn't have time to talk with my attorney.
4   Q.   Did you tell the judge you wanted more time to talk to
5   your attorney?
6   A.   No, I didn't tell the judge because I didn't have
7   time.  When this idea it was trial time and they was
8   getting ready to sentence me.
9   Q.   What do you mean by, you didn't have time?  When you
10  said you didn't have time to tell the judge, what do you
11  mean you didn't have time to tell the judge?
12  A.   Didn't have time, because I thought he had already had
13  the paperwork from his father and stuff like that and he
14  was going to get me out.  I was looking to get out that
15  day.
16  Q.   So under oath you told a judge that you committed
17  these offenses, but you didn't really do that?
18  A.   Yeah.
19  Q.   So it's your testimony today that that conviction is
20  something that you didn't really do?
21  A.   Yes.
22  Q.   That it is your testimony today that these offenses
23  where you approached one of the boys, told him that you
24  would give him a dollar if the boy would help you move some
25  boxes.  And that this little boy agreed, and then took

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 134 of 286

1    these boxes to an abandoned garage.  You told him to go and
2    get the boxes and then you went in after him, told him to
3    close his eyes, you held his head up against the wall and
4    then you took this boy's pants down and then penetrated his
5    anus with your penis.  And then sodomized this boy orally.
6    And then again sodomized this kid anally by placing your
7    penis in his rectum.  You're saying none of that happened?
8    A.   I plead the Fifth.
9    Q.   You've already pled guilty to this offense.  Are you
10   saying that this didn't happen?
11   A.   I don't care if I plead guilty to it because I did
12   that because my lawyer was supposed to have an agreement
13   for me to walk out the courtroom that day.
14   Q.   So just so we're clear, this child victim never
15   occurred because you're saying that you only pled guilty
16   because you were supposed to --
17   A.   Walk out the courtroom that day.
18   Q.   You were supposed to walk out the courtroom that day?
19   A.   Yes.
20   Q.   Did this occur, this incident involving the boxes and
21   this boy?
22        **THE COURT:**  What's your answer?
23   A.   What happened -- what happened, wasn't nothing about
24   no boxes.  Nothing about no boxes.  It was the same, just
25   like the rest of them from out the neighborhood.  They

1    comes up to me.  They comes up to me.  And if I had any

2    witness right here now today, they would tell you the same

3    thing.  My brother will tell you the same thing.

4    Q.   So as reported within this presentence report,

5    which you pled guilty to, where you took this boy while he

6    was in a garage, placed his head up against a wall, placed

7    your penis into his anus, orally sodomized him and then

8    placed your penis into his anus again, you're saying that

9    this event did not happen?

10   A.   It didn't do what?  What did you just say?

11   Q.   That didn't happen?

12   A.   What did you just say?

13   **THE COURT:**  You heard him.  Answer the question.

14   A.   No, no, I ain't never placed it in nobody's rectum

15   twice.

16   **THE COURT:**  All right.  We'll take a recess and see if

17   we continue today.

18            (Court recess.)

19   **THE COURT:**  This Direct could only be described as

20   mind-numbing, and I'm either going to stop for today or

21   give you a few more minutes and then tomorrow we'll start

22   at 9:30.  This is the third one of these cases that we have

23   tried, and this one is like molasses moving in January.

24   It's just painfully slow and without direction.  So I don't

25   know what to tell you.  We won't get an outcome if that's

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 136 of 286

1   the case.  I have my impressions of the Respondent from

2   watching him testify, but what more are we trying to

3   achieve here?

4       **MR. GRAY:**  Your Honor, at this point in time we are

5   also not only providing testimony to help illuminate the

6   Court as to the Respondent's overall nature --

7       **THE COURT:**  I mean, I think that he is a person of

8   very limited intellectual capacity.  He is a person who has

9   been thoroughly institutionalized for 39 years, and the

10  obvious conclusions can be drawn from that.  It is well

11  established, prong one, that he is a pedophile and has had

12  multiple hands-on child molestations.  I have little

13  question about that.  So, you know, it's a civil trial, and

14  one of the rules -- I can't tell you by memory -- but one

15  of the rules says you can keep making findings as you go

16  along.  When it's a non-jury trial that you can make

17  expressions about the evidence.  And so that's what I'm

18  seeing.  If you keep going with him I'm going to think he's

19  just mentally incompetent and not capable of understanding

20  the nature and extent of his surroundings, but I'm not

21  there yet.  He is making as good a case for that as

22  anything else.

23      **MR. GRAY:**  Yes, Your Honor.

24      **THE COURT:**  Where are we going with this?  Are we

25  going to spend days or weeks in this sort of slow motion,

1  suspended animation direct exam?  I'm not.

2      **MR. GRAY:**  Your Honor, it is not my intention --

3      **THE COURT:**  I'm not trying to be critical.  I'm just,

4  you know, giving you a fair heads up.  He's not going to

5  admit to anything.  We know that.  That's manifest by his

6  presentation and by his response, so all of the things that

7  you are asking him about are readily provable and sort of

8  without dispute, materially.

9      **MR. GRAY:**  Your Honor, it is not the intention to try

10  to drone on and certainly not my intention to try to

11  belabor the first prong.  However, we feel like the answers

12  that we are getting --

13      **THE COURT:**  Go to the third prong.

14      **MR. GRAY:**  Yes, Your Honor.

15      **THE COURT:**  Yeah, I think they do, too.  But having

16  him -- he went through the whole denial in his deposition.

17  It's all admissible as an admission against interest.

18      **MR. GRAY:**  Your Honor, we would not disagree with

19  that.  However, as the Court pointed out earlier, this is

20  actually the first opportunity that Dr. Malinek would have

21  an opportunity to hear some of the questions and responses

22  as well as to observe the demeanor of the Respondent

23  answering these questions.  And it is particularly

24  important because these are questions that, without saying

25  too much about the Government's case, we feel that these

1    are questions that were not adequately asked by the

2    Respondent's expert, Dr. Campbell.  So in response to these

3    questions we feel that his response, his demeanor, how he

4    answers these questions, his denial, his lack of acceptance

5    of responsibility, his testimony with regards to his

6    treatment, his response to the treatment of the kids and

7    his present tense impressions on his past events is

8    extremely relevant in terms of the analysis of Dr. Campbell

9    and then the rebuttal analysis by Dr. Malinek with respect

10   to the third prong, because this goes to the heart of the

11   question of whether or not he is more likely to engage in

12   acts of child molestation.

13          **THE COURT:**  Serious difficulty.

14          **MR. GRAY:**  And, Your Honor, this we feel helps answer

15   the question that has been troubling the Court for the last

16   three cases that we have been dealing with when it comes to

17   4248, the question of serious difficulty, defining the

18   serious aspect.  We feel that although -- and you may agree

19   -- the questioning of the Respondent has been slow,

20   methodical and painful at some point, but we do feel it is

21   necessary for the Government to be able to present its case

22   with regard to the prong and the question of serious

23   difficulty refraining.

24          **THE COURT:**  Yeah.  I mean, I'm not a lawyer, but if I

25   was I would treat him as a hostile and adverse witness.  He

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 139 of 286

1    is adverse by the position in the case.  He's also hostile

2    by his demeanor.  And so I wouldn't let him do anything but

3    say yes or no.  And if he wasn't going to say anything, I'd

4    say, I'll take that as a no.  And here's my next question.

5    And I'll take that as a no.  And if he just stonewalls it,

6    you'll be out of here in 15 minutes.  But I may not be any

7    good if I was a lawyer.  I maybe wouldn't know how to do

8    it.

9        **MR. GRAY:**  Your Honor, I'm sure that your talents and

10   your abilities to do this far surpass those of us in the

11   courtroom.

12       **THE COURT:**  No, I wouldn't say that.

13       **MR. GRAY:**  However, I would just point out, Your

14   Honor, that although normally when it comes to an adverse

15   witness like this I would be taking that approach, I would

16   take the response as a no.  However, we do feel that he is

17   --

18       **THE COURT:**  But this isn't group therapy.  It's a

19   trial.  I'm not going to sit here and let him agonize

20   through his mind and stonewall it when it is obvious to me

21   in a flash, that he is trying to reconcile profound guilt

22   and sense of confrontation about his own behavior with

23   doing something that detracts from his position.  He is

24   smart enough to know that he would like to get out.  That

25   has come through a few times.  So he is motivated.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 140 of 286

1          **MR. GRAY:** That's right.

2          **THE COURT:** But he is unwilling to be forthcoming

3     because he is trying to assess the danger and the risk

4     involved in being forthcoming. So he is not telling the

5     truth and he is not being candid. I mean, I get all that.

6     I'm not just sitting here like a stuffed pumpkin.

7          **MR. GRAY:** Your Honor, we agree completely and, quite

8     frankly, we appreciate that the Court has acknowledged that

9     fact. However, Your Honor, we are also not only educating

10    you, but we are also educating the two expert witnesses

11    within the courtroom. And these are an opportunity for

12    them to -- everytime he stonewalls on an answer, that gives

13    them a little bit of insight as to whether or not he is

14    actually --

15         **THE COURT:** Yeah, but my opinion counts more than

16    their opinion.

17         **MR. GRAY:** Your Honor, I would agree completely. I

18    would agree completely. However, we do have the

19    responsibility of building the record. And it is one of

20    the things that we want to make sure that we are at least

21    providing adequate information for those experts.

22         **THE COURT:** Well, you're not going to have a trial in

23    Richmond. They are going to have to take whether or not

24    there was substantial evidence to establish what the

25    nonjury trier decided.

1    **MR. GRAY:** We would agree completely, Your Honor.

2    **THE COURT:** So what do you want to do? Do you want to

3    ask him questions until five?

4    **MR. GRAY:** Your Honor, we have a few more questions

5    that we would like to ask him.

6    **THE COURT:** You've got 15 minutes to continue asking

7    questions unless you want to wrap it up.

8    **MR. GRAY:** Your Honor, we would like to take full

9    advantage of the 15 minutes. We have one line of questions

10   we would like to finish.

11   **THE COURT:** Sure.

12   **MR. GRAY:** Thank you, Your Honor.

13   Q.   Mr. Wooden, prior to the break we were asking

14   questions regarding the conviction in 1984 regarding the

15   sodomy of two minor males. This event that we were just

16   talking about where you encouraged this boy to walk into

17   the garage to help you with boxes, that child was eight

18   years old, wasn't he?

19   A.   Yes.

20   Q.   And Mr. Wooden, isn't it true that you informed Dr.

21   Weiner during some of your testimony that at the age of

22   eight years old you were sodomized by a male who asked you

23   and a friend to go into a garage to help with boxes. Isn't

24   that true?

25   A.   No, not in no garage. I was sodomized, but it wasn't

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 142 of 286

1    never in no garage.

2    Q.   Did that man invite you to come in and help with

3    boxes?

4    A.   No.  I was sodomized, but it wasn't in no garage.  I

5    went to the man's house.

6    Q.   And this man asked you to help with boxes?

7    A.   No.  No.  I went to the man's house to help him do his

8    floor.  He was putting some kind of whatever you call that

9    stuff you put on a floor, and I was helping him with his

10   floor.  I was at a Safeway.  Me and a friend of mine was at

11   the Safeway.  And he picked me to come with him.  I went

12   with him.  It was on Christmas Eve.  I went with him to his

13   house, and the man had me to help him with his floors.  So

14   we got in the shower.  He got in the shower and he asked me

15   to get in the shower with him.  So we came out of the

16   shower and the man gave me a blow job.  And he tried to get

17   me to give him a blow job, and I refused.  So we went in

18   the living room where the Christmas tree was at.  We laid

19   on the bed and the man didn't really do nothing to me.  He

20   had me insert my penis in him.  And he wouldn't let me go

21   nowhere until he got satisfied.  Then after that he let me

22   out the door.  Because he had locked the door and

23   everything.  After that he gave me some money and then let

24   me out the door.

25        **MR. GRAY:**  Your Honor, at this time we think that

1    concludes our questions for the day?

2         **THE COURT:**  All right.  Do you have any cross?

3         **MR. GRAY:**  Your Honor, I'm sorry.  I meant --

4         **THE COURT:**  Oh, for the day?

5         **MR. GRAY:**  For the day.

6         **THE COURT:**  Okay.  We'll take a recess until 9:30

7    tomorrow.  You want him on the stand tomorrow morning?

8         **MR. GRAY:**  Yes, Your Honor.

9         **THE COURT:**  All right.  We'll recess.

10              (Court recess at 4:55 p.m.)

11              (Court resumed at 9:30 a.m., July 12, 2011.)

12        **THE COURT:**  Good morning.

13        **RESPONSE:**  Good morning, Your Honor.

14        **THE COURT:**  Are you ready to continue?

15        **MR. GRAY:**  Yes, Your Honor, we are.

16              (Mr. Wooden resumes the stand.)

17   **BY MR. GRAY:**

18   Q.   Good morning, Mr. Wooden.

19   A.   Good morning.

20   Q.   We were doing your testimony yesterday.  We were

21   discussing your convictions in 1984 regarding indecent

22   liberties and enticing a minor.  Do you remember that

23   testimony?

24   A.   Yes.

25   Q.   Isn't it a fact that when you pled guilty to those

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 144 of 286

1    offenses in 1984 you were, in fact, receiving therapy when
2    you committed those acts?
3    A.   In '84, yes.  Yes, I was.
4    Q.   In fact, you were receiving sex offender treatment
5    during that time period?
6    A.   Yes, sir.
7    Q.   In fact, you were receiving sex offender treatment
8    from personnel over at Johns Hopkins University; isn't that
9    correct?
10   A.   Yes, sir.
11   Q.   And isn't it also a fact that you were being
12   supervised under probation when you engaged in these acts
13   with these minor males?
14   A.   Yes, sir.
15   Q.   As part of your probation one of the things that you
16   were supposed to do was to not engage in any contact or
17   interactions with any unsupervised children.  Isn't that
18   correct?
19   A.   Yes, sir.
20   Q.   And yet in 2005 your parole was terminated for two
21   charges.  Isn't that correct?
22   A.   Yes, sir.
23   Q.   The first charge that led to the termination of your
24   parole was that you placed your penis onto the bare
25   buttocks of a seven-year-old boy.  Isn't that correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 145 of 286

1    A.    No, sir.

2    Q.    And then the second charge was that you had violated

3    the special conditions of your parole which involved no

4    association with minors.  Isn't that correct?

5    A.    Yes, sir.

6    Q.    And you say you did not place your penis on the bare

7    buttocks of a seven-year-old boy?

8    A.    Yes, sir.

9    Q.    What happened?

10   A.    I told him it was a dream.  I told Dr. Weiner that I

11   had this dream.  I had this dream about James, and I told

12   Dr. Weiner, I said, I want him to find out was it a dream

13   or not, because sometimes I have blackout spells.  I wanted

14   him to find out was it a dream or not because I didn't want

15   to hurt the boy.  So the next thing I know he had me to go

16   see -- had me to go see the police investigator, had me to

17   go see the investigator.  I talked to the investigator, and

18   the investigator asked me the same questions.  I told the

19   investigator the same thing.  I said, I didn't want to hurt

20   the boy.  I wanted them to find out was it a dream or not,

21   because I didn't know.  And then all of a sudden down the

22   line they had me -- they had me arrested.

23   Q.    So it is your testimony today that you did not place

24   your penis onto the bare buttocks of a seven-year-old boy?

25   A.    Yes, sir.

1  Q.  It is your testimony today that that entire sequence

2  of events where you took a seven-year-old boy who was in

3  the laundromat, pulled down his pants, placed your penis up

4  against his buttocks but did not penetrate, that was all a

5  dream?

6  A.  That was my testimony from day one.

7  Q.  And when you were first confronted with this, you

8  didn't say it was a dream?

9  A.  Yes, I did.  I said it was a dream, from day one.

10  Q.  And isn't it a fact that when you engaged in this

11  conduct of associating with minors, violating your parole

12  conditions and placing your penis on the buttocks of this

13  seven-year-old boy, you were in treatment with Dr. Weiner?

14  A.  I was in treatment with Dr. Weiner.

15  Q.  And while you were in treatment with Dr. Weiner he

16  walked with you through a number of strategies so that you

17  could avoid being around children.  Isn't that right?

18  A.  Yes.

19  Q.  He walked you through exercises and tests and things

20  that you could do in order to avoid being around minors,

21  isn't that right?

22  A.  Yes, sir.

23  Q.  You understood being around children, especially young

24  boys, was a bad thing for you.  Isn't that right?

25  A.  Yes, sir.

1  Q.  Yet in spite of all this treatment and discussions

2  with Dr. Weiner, you still hung around areas where there

3  were children.  Isn't that right?

4  A.  In areas where I live at, there are children

5  everywhere, children everywhere.  It's about over a hundred

6  or some children on the same block that I live on.  So I

7  can't never get away from them.

8  Q.  And isn't it a fact that those children frequently

9  frequented your home, yet you didn't take any steps to

10  avoid these children?

11  A.  At the time when the children were in my home, I'm

12  working.  I'm at work.  I don't know if they in my home or

13  not.  I'm at work.  I be working while they are at home.

14  And when they're there when I'm at home, if there's any

15  children there, there would be two or three adults be

16  around.

17  Q.  And you complied with your probation officer making

18  sure that these adults were chaperones that they had talked

19  with, isn't that right?

20  A.  Yes.

21  Q.  And you informed your probation officer that these

22  people understood that you had been a child sex offender?

23  Isn't that right?

24  A.  Yes.

25  Q.  And in spite of going through these strategies and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 148 of 286

1  going through this treatment with Dr. Weiner, you still

2  hung around where there was little kids, isn't that right?

3  A.  I didn't have no where else to go.  I had to stay

4  there.

5  Q.  Isn't it a fact that you went to Lincoln Park, and you

6  were observed by children lurking around there watching

7  their behavior and their activities?

8  A.  I go through Lincoln Park.  I don't never stay at

9  Lincoln Park.  I go through Lincoln Park.

10  Q.  And isn't it a fact that while you were going through

11  this treatment with Dr. Weiner he explained to you that it

12  was very important that you were honest with him with

13  regard to your activities with chidren?

14  A.  Yes.

15  Q.  And isn't it a fact that when you were going through

16  this treatment with Dr. Weiner he explained to you how it

17  was very important for you to be honest with yourself in

18  terms of your overall activities with children?

19  A.  Yes, sir.

20  Q.  And in spite of the fact that you were going through

21  this treatment you still associated with children and had

22  your parole revoked because you had placed your penis up

23  against the buttocks of a seven-year-old boy?

24  A.  I never placed my penis up to no boy.

25  Q.  And isn't it also a fact that you were tutoring and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 149 of 286

1   helping this James child with his homework?

2   A.   Yes, I was helping him with his homework.  Yes, sir,

3   that's true.

4   Q.   And you were helping him with his homework in spite of

5   the fact that Dr. Weiner explained to you that you

6   shouldn't be associated with children?

7   A.   He explained to me I ain't supposed to be associated

8   with no children without an adult around, somebody over 18

9   around.

10  Q.   And you were helping James with his homework in spite

11  of the fact that your probation officer informed you that

12  you shouldn't be around children?

13  A.   He said -- he said without an adult around.

14  Q.   And you were helping James out with his homework, and

15  this is the same James that is the victim that led to your

16  revocation of parole wherein you placed your penis up

17  against his buttocks?

18  A.   I never placed my penis up to his buttocks, but it is

19  the same James.

20  Q.   And it's the same James that you sent, after you were

21  placed in confinement for parole revocation, a Christmas

22  card explaining to him that you were just wanting to be

23  friends.  Isn't that right?

24  A.   No.  I explained to him -- I sent a Christmas card to

25  him -- to him because he was my friend.

1   Q.   So you were in jail after parole revocation for
2   associating with minors and placing your penis up against
3   the bare buttocks of James, and you sent him a Christmas
4   card?
5   A.   I sent him a Christmas card, but I ain't never placed
6   by penis up to his buttocks.
7   Q.   But you sent a Christmas card to James?
8   A.   Yes, I sent him a Christmas card.
9   Q.   And one of the strategies that you've learned from all
10  your therapy is that you shouldn't try to associate
11  yourself and be friends with children, isn't that right?
12  A.   Yes.
13  Q.   Yet in spite of being placed back in custody for a
14  parole revocation, you thought it was appropriate to send a
15  Christmas card to one of your former victims?
16  A.   I sent a Christmas card to him.  He wasn't no former
17  victim.
18  Q.   And you felt that James was your friend?
19  A.   Yes.
20  Q.   And James was a seven-year-old boy?
21  A.   Yes.
22  Q.   And a seven year-old-boy needed to be friends with a
23  convicted sex offender that had a history of molestinig
24  young boys?
25  A.   Yes.

1    Q.   Mr. Wooden, you have just testified that you don't

2    believe that the incident of you placing your penis up

3    against James' buttocks happened.  You said that that was a

4    dream.  So is it your testimony today that your 25 year

5    sentence that you were serving was inappropriate?

6         **MS. GRAVES:**  Objection.

7         **THE COURT:**  Overruled.

8    A.   Yeah, it was appropriate.  I did that.  A 25 year

9    sentence, I actually did that.  Wasn't no dream that; I did

10   that.

11   Q.   So you were aware that was a 25 year sentence?

12   A.   Yes.

13   Q.   It wasn't a 20 year sentence?

14   A.   It was a 20 sentence -- it was a 20 sentence, and I

15   think it was a five year sentence.  It was three different

16   sentences.  Two of them were together and one of them was

17   separate.

18   Q.   Mr. Wooden, I want to turn your attention now to --

19   hold on, please.

20        Mr. Wooden, with regard to your probation

21   supervision that you were revoked for, one of the

22   conditions that you had to follow was you needed to

23   maintain a journal.  Isn't that correct?

24   A.   Maintain a what?

25   Q.   While you were on probation prior to 2005 you needed

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 152 of 286

1    to maintain a journal.  Isn't that right?

2    A.   Yes, sir.

3    Q.   As part of this journal you were supposed to explain

4    the activities that you were engaging in?

5    A.   Yes, sir.

6    Q.   And you would give this daily journal to your court

7    supervisor -- community supervisor officer or your

8    probation officer?

9    A.   Yes, sir.

10   Q.   And part of what you were supposed to do was explain

11   what you would do every day?

12   A.   Yes, sir.

13   Q.   But you didn't write down that you were hanging out at

14   Lincoln Park in any of your diary journals, did you?

15   A.   I wrote down that I was coming through Lincoln Park.

16   I never, never hung out in Lincoln Park.

17   Q.   Mr. Wooden, with regard to your current certification

18   that you are in right now, it is your understanding that

19   you were certified by the Bureau of Prisons to be a

20   sexually dangerous person, on July 15, 2010?

21   A.   Yes.

22   Q.   And isn't it also your understanding or isn't it a

23   fact that Judge Boyle appointed counsel to represent you in

24   this matter around November 4th of 2010?

25   A.   I understand that now.

1  Q.   And you also understand that your attorney has filed a

2  motion to dismiss this case on your behalf.  Isn't that

3  right?

4  A.   Yes.

5  Q.   And that this motion to dismiss was recently resolved

6  by or at least adjudicated by Judge Boyle in May -- May 27,

7  2011.  Isn't that correct?

8  A.   Yes, sir.

9  Q.   Mr. Wooden, it is also a fact that your attorneys

10  discussed with you that you were going to be having a

11  hearing with regard to your sexual dangerousness that was

12  going to be starting in July.  Isn't that right?

13  A.   Yes.

14  Q.   So roughly from the date that your motion to dismiss

15  this case until today, until you started this trial, you

16  roughly had about 60 days.  Isn't that right?

17  A.   Yes.

18  Q.   And roughly there was less than 30 days from when your

19  motion was dismissed to when the Court ordered a hearing on

20  this matter.  Isn't that right?

21  A.   Yes, sir.

22  Q.   Now, Mr. Wooden, with regard to this hearing, one of

23  the big issues is whether or not you've changed.  Do you

24  feel like you have changed, as a person?

25  A.   Yes, sir.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 154 of 286

1    Q.   How so?

2    A.   I feel like I've changed because one of the reasons I

3 don't think about boys no more.  And another reason, I feel

4 that every time with these kids I feel that I did hurt

5 these kids and it was totally -- really, it was totally my

6 fault, because I didn't have to take the kids to where I

7 took them at and did this and did that to them.  I didn't

8 have -- I didn't have to do that.  It was something that I

9 really -- that I wanted.  Once before I was thinking that

10 they wanted it, but it was something that I really wanted

11 myself.  I wanted that.  I wanted to have sex with them

12 kids.

13    Q.   So your testimony yesterday where you said that the

14 kids wanted to have sex, you're saying that that has

15 changed?

16    A.   And I had nightmares all night.  I couldn't sleep.  I

17 couldn't sleep.  I couldn't sleep.  I kept tossing and

18 turning and tossing and turning and tossing and turning.  I

19 couldn't sleep.  It kept on coming up to me.  In my mind it

20 kept coming up to me that it was my fault.  I couldn't

21 sleep.  I didn't get no sleep.  I couldn't sleep.

22    **THE COURT:**  Are you saying this because you want to

23 get out?

24    A.   No.

25    **THE COURT:**  Or are you saying this because you

1    actually have a conscience now that you didn't have before.
2    Everybody on earth has a conscience.  Some people's
3    conscience is deadened; they cloud it over.  Do you have a
4    conscience?
5    A.   Yes.
6         **THE COURT:**  What?
7    A.   Yes, sir.
8         **THE COURT:**  Do you know what that means?
9    A.   Yes.
10        **THE COURT:**  What does it mean?
11   A.   It means I'm thinking clearly now.  Before I wasn't
12   thinking clear.
13        **THE COURT:**  It means how you tell right and wrong;
14   that's what your conscience is.  Did you know that?
15   A.   Yes.
16        **THE COURT:**  Is that what you're thinking about or not?
17   A.   Yes.
18        **THE COURT:**  Well, explain yourself.
19   A.   Before I didn't want -- I didn't want -- see, I didn't
20   want to really answer them questions, because everytime --
21   everytime when I hear about these boys my heart get to
22   pounding.  I get scared and it hurts.  My heart pounds all
23   the time when I hear about them boys.  I was trying not to
24   hear about them no more.  I'm trying to do something
25   positive.  That's why I didn't want to answer his questions

1    because I didn't want to be up here on the stand crying,

2    because it hurts.

3        **THE COURT:** Crying because you think you have a

4    conscience now and you know the wrong that you did?

5    A.   Yeah, I know the wrong that I did.

6        **THE COURT:** Is that what you're saying?

7    A.   Yes.

8        **THE COURT:** Explain yourself.

9    A.   I know -- I know that I shouldn't have never did -- I

10   shouldn't have never did this to these boys.

11       **THE COURT:** What did you do?

12   A.   I molested them boys.

13       **THE COURT:** Go ahead.

14   **BY MR. GRAY:**

15   Q.   Mr. Wooden, you've had an opportunity to hear the

16   Judge's comments about your demeanor and your testimony in

17   court.  Isn't that right?

18   A.   Yes, sir.

19   Q.   Yet today your overall opinion has changed in terms of

20   your desire to answer those questions about the past?

21   A.   Yes, sir.

22   Q.   And you are telling us today that this is all because

23   overnight you've had a chance to reflect on it and you

24   couldn't sleep, so now you want to be forthcoming?

25   A.   Yes, sir.

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 157 of 286

1  Q.   And it isn't because you just want to get out, but it
2  is because you are truly a changed person?
3  A.   I'm a truly changed person.
4  Q.   And has accepted the responsibility for what you have
5  done to those boys in the past?
6  A.   Yes, sir.
7       **MR. GRAY:**  Those are the questions, Your Honor.
8       **THE COURT:**  All right.  Any cross?
9       **MS. GRAVES:**  Your Honor, just a couple.
10      **THE COURT:**  You can call him later if you want.  Do
11 you want to ask him any questions.  If not, that's fine.
12      **MS. GRAVES:**  I can ask him a couple, Your Honor.
13      **THE COURT:**  Well, you don't have to.  I mean, cross is
14 an elective thing.  There's no obligation to ever ask a
15 single question in court.
16      **MS. GRAVES:**  Yes, sir.
17                     CROSS-EXAMINATION
18 **BY MS. GRAVES:**
19 Q.   Mr. Wooden, do you have any desire to have sex with
20 young boys now?
21 A.   No, ma'am.
22 Q.   If a little boy walks up to you and asks you for
23 money, do you believe he wants to have sex with you?
24 A.   No, ma'am, I don't think he do.
25 Q.   Do you believe that grown men should have sex with

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 158 of 286

1    young boys?

2    A.   No, ma'am.

3         **MS. GRAVES:**  That's all I have.

4         **THE COURT:**  All right.  Thank you.  You can step down.

5    Does the Government have any other witnesses?

6         **MR. JAMES:**  Yes, Your Honor, very briefly.  At this

7    time the Government calls John Taberski.

8         **JOHN TABERSKI, GOVERNMENT'S WITNESS, SWORN**

9                      DIRECT EXAMINATION

10   **BY MR. JAMES:**

11   Q.   Good morning, Officer Taberski?

12   A.   Good morning.

13   Q.   Officer Taberski, I want to just go very quickly over

14   a couple of things with you.  You are a U.S. Probation

15   Officer.  Isn't that correct?

16   A.   That's correct.

17   Q.   And out of which court do you work?

18   A.   Greenbelt, Maryland.

19   Q.   And prior to being a U.S. Probation Officer, you were

20   employed by the Court Services Offender Supervision Agency?

21   A.   Correct.

22   Q.   And we have been using various terms here today

23   referencing parole officer or probation officer, but your

24   title back then was Community Supervision Officer.  Is that

25   correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 159 of 286

1    A.    That's correct.

2    Q.    And the Court Services and the Federal Supervision

3    Agency came about with the Capital Revitalization Act of

4    1997 when you merged with -- probation and parole were

5    merged.

6    A.    That's right.

7    Q.    Now, you were with -- what's the acronym for that,

8    CSOSA?

9    A.    That's right.

10   Q.    You were with CSOSA from what year to what year?

11   A.    From 2000 to 2005.

12   Q.    And in June of 2005 -- well, in May of 2005 was Walter

13   Wooden transferred to your case load?

14   A.    He was.

15   Q.    And what date was that, do you recall?

16   A.    It was mid May.  I don't know the exact date he was

17   actually transferred, but I believe I first spoke to him on

18   May 16th.

19       **THE COURT:**  Was he on release then?  Was he in the

20   community?

21   A.    Yes, Your Honor.

22   Q.    And tell the Court what happened about the first phone

23   call when you called Walter Wooden to inform him that you

24   were now going to be his Community Supervision Officer?

25   A.    Well, I called Mr. Wooden and introduced myself,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 160 of 286

1  explained to him that he had been transferred to my case

2  load for me to supervise him. And I noted in reviewing the

3  notes that were given to me by the previous officer that he

4  was in treatment with Dr. Weiner and that he had an

5  upcoming maintenance polygraph exam, so I informed Mr.

6  Wooden that he was going to be scheduled to take the exam.

7  And he told me that he was going to refuse to take it.

8  Q.   On what basis did he say he was going to refuse to

9  take the polygraph?

10  A.   He didn't explain a basis. He just repeatedly told me

11  that he wasn't willing to take it. And to me that was a

12  red flag.

13  Q.   What did you then do after he told you that he was not

14  going to take the polygraph examination?

15  A.   Just encouraged him to discuss any apprehensions that

16  he had about taking the exam with Dr. Weiner to try to help

17  him, I guess, get over whatever it was that he was

18  apprehensive about?

19  Q.   Now, did there come a time that you called Dr. Weiner

20  after that? Is that correct?

21  A.   I believe I did.

22  Q.   And do you recall a time when you did a field visit to

23  Walter Wooden's apartment?

24  A.   Yes.

25  Q.   And what day was that? Do you recall?

1    A.    I don't recall the date.  Shortly after our initial

2    phone contacts.

3    Q.    When an offender -- is that what they're called,

4    offenders or clients -- is that what he was called?

5    A.    The terms are pretty much used interchangeably, yes.

6    Q.    Okay.  When an offender refuses to take a polygraph,

7    does that raise red flags?

8    A.    Yes.

9    Q.    And what kind of red flag did that raise to you?

10   A.    Well, in my experience supervising sex offenders when

11   they are working with a therapist like Dr. Weiner, they do

12   a lot of work in therapy leading up to a polygraph exam

13   that essentially they have nothing to hide.  And it is not

14   uncommon, in my experience, even to encounter an offender

15   who is eager to take the polygraph exam just to show they

16   have nothing to hide and that they are doing well.  So when

17   someone says they won't take it or they are worried about

18   taking it, to me that suggests there is something they

19   don't want to come out in the polygraph exam.

20   Q.    All right.  Now, your supervisor's name was Paul

21   Brennan, is that correct?

22   A.    That's right.

23   Q.    And did there come a time on or about May 31, 2005 in

24   which Paul Brennan made a visit to Walter Wooden's

25   residence, and Walter Wooden admitted that he had been

1  around children?

2  A.   Actually, I think that was Mr. Wooden visiting our

3  office and speaking to my supervisor, Mr. Brennan.

4  Q.   Now, based upon that, did you call Dr. Weiner on or

5  about June 1st, 2005?

6  A.   Yes.

7  Q.   What did you tell Dr. Weiner?

8  A.   I told Dr. Weiner that Mr. Wooden had admitted to both

9  me and my supervisor that he had had contact with minors in

10  the community, that we wanted Dr. Weiner to address that

11  further.

12  Q.   I would like to direct your attention to June 30,

13  2005.  Did there come a time when you made a home visit to

14  where Walter Wooden was staying?

15  A.   Yes.

16  Q.   Tell the Court what happened during the course of that

17  home visit.

18  A.   I visited Mr. Wooden at the apartment where he was

19  living where I believe his mother was the director or the

20  owner of the apartment.  And I did our usual walk around

21  the apartment to see if there was any overt sign of cause

22  for concern.  I didn't see anything, didn't see any

23  children's items or toys, anything obvious like that.  But

24  then I began talking to Mr. Wooden about his activities in

25  the community, and he told me that children would come to

1    his apartment, that relatives and/or friends, I guess,
2    would bring children over and that he had no where to go
3    when they were there.
4    Q.   What was his attitude, though?
5    A.   Agitated.  Once I started asking him follow-up
6    questions about, you know, what he did in response to that
7    to see if he was following the types of plans that Dr.
8    Weiner would help him with or the tools that he was
9    supposed to be obtaining in sex offender treatment.  I
10   guess I wanted to hear from him whether or not he was
11   removing himself from the situation, and he became angry
12   and said, "What do you expect me to do; there's no where
13   for me to go."  He told me that he wouldn't leave the
14   apartment when children came over, that he didn't in the
15   past and that he wouldn't in the future because, in his
16   words, there was no where to go.
17   Q.   And did you continue talking to him in the apartment?
18   A.   For a little bit, but I did cut the visit short
19   because of the escalation of his behavior and his attitude.
20   Whenever there is a situation like that that is escalating,
21   as a probation officer it just becomes a safety risk.  And
22   I just wanted to deescalate and get out of there safely at
23   that point.
24   Q.   Now, after you left the apartment, did there come a
25   time when you called Dr. Weiner?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 164 of 286

1    A.    Yes, immediately upon leaving.

2    Q.    And what did you tell Dr. Weiner?

3    A.    I told Dr. Weiner that Mr. Wooden had admitted to

4    being around minors, not only in the community, but in his

5    own residence.

6         **THE COURT:**  What was the address that you met him at?

7    What was his residence address?

8    A.    I don't know off the top of my head, Your Honor.  I

9    know it was in Northeast D.C..  I know I noted what his

10   exact address was, but I just don't know today.

11        **THE COURT:**  Whereabouts?

12   A.    I think it was 16th Street, Northeast.

13        **THE COURT:**  Okay.  And what kind of building was it?

14   A.    Basically a typical apartment building like you would

15   see.

16        **THE COURT:**  With an elevator or stairs or what?

17   A.    I don't recall, Your Honor.

18        **THE COURT:**  Was it upstairs or on the first floor?

19   A.    I don't recall that, Your Honor.

20        **THE COURT:**  How many bedrooms, were there?  Was it

21   just he and his mother?

22   A.    I'm sorry, Your Honor?

23        **THE COURT:**  Just he and his mother?

24   A.    I believe that's what he told me, although he said

25   that his mother had been hospitalized for a month, so it

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 165 of 286

1    was my understanding that it was just him.

2        **THE COURT:**  Was he doing any work at the time?

3    A.    What he described as odd jobs around the neighborhood,

4    but noting substantial.

5        **THE COURT:**  What kind of neighborhood was it, a

6    residential neighborhood?

7    A.    Yes.

8    **BY MR. JAMES:**

9    Q.    So after you called Dr. Weiner and discussed this with

10   Dr. Weiner, did there come a time on June 3rd, that very

11   same date, which you received a call from Dr. Weiner?

12   A.    Yes, later that day.

13   Q.    Tell the Court what happened?

14   A.    Well, a lot happened.  Dr. Weiner called to tell me

15   that he opened up the conversation with Mr. Wooden during

16   his therapy session about his contact with minors.  And it

17   started out as Mr. Wooden admitting to being alone with

18   minors with no supervision whatsoever, that he was

19   babysitting children, that he was having deviant thoughts

20   about the children and that he was becoming sexually

21   aroused when in the presence of children and that it led to

22   Mr. Wooden admitting to actual sexual contact with a seven-

23   year-old boy in the laundry room of his apartment building.

24   That he and the boy walked into the laundry room.  Mr.

25   Wooden pulled down his pants; the boy pulled down his pants

1    and that Mr. Wooden took his penis and placed it against

2    the boy's buttocks and then in his words that he poked the

3    boy three times in the buttocks with his penis but that he

4    did not penetrate.  That was essentially it.

5    Q.   And what action did you take after Dr. Weiner told you

6    about that?

7    A.   Well, Dr. Weiner asked us to come in for an emergency

8    staffing because of the seriousness of it.  It was my

9    understanding that Dr. Weiner was concerned from a public

10   safety perspective that he had this very serious

11   information and admission from Mr. Wooden but that he

12   didn't have the identity of the boy or the location, so he

13   wasn't in a position to report it to child protective

14   services, and he wanted to consult with us about what to do

15   about that.  So the next course of action was us, myself

16   and my supervisor, Mr. Brennan, going into Dr. Weiner's

17   office and having an emergency staffing.

18   Q.   And was Walter Wooden there?

19   A.   Yes.

20   Q.   Did you ask Walter Wooden, what is the identity of the

21   boy?

22   A.   From what I remember in that initial emergency

23   staffing, it was more Dr. Weiner explaining to us in Mr.

24   Wooden's presence what he had admitted to.  He was agreeing

25   to it.  And I don't think we really pushed him at that

1    point for the identity of the boy.

2    Q.    Okay.  During that initial call when you went to meet

3    with -- I've been saying Weener; it's Weiner.

4    A.    Right.

5    Q.    With Dr. Weiner -- at any point did this man mention

6    that I dreamed up the whole thing?

7    A.    No.

8    Q.    Now, after that meeting, did there come a time in

9    which you called Walter Wooden and asked for the identity

10    of the boy?

11    A.    Yes.  And just to back up a little bit, at the end of

12    the session when we met with Dr. Weiner, not in Mr.

13    Wooden's presence, Dr. Weiner and my supervisor stressed

14    the importance of identifying the victim and opening up

15    that dialog with Mr. Wooden, so I did call him to follow up

16    and ask him that.

17    Q.    Now, you were his Community Supervision Officer?

18    A.    Correct.

19    Q.    And he was supposed to follow your instructions?

20    A.    Correct.

21    Q.    And directives?

22    A.    Yes.

23    Q.    Now, when you asked him for the identity of the boy

24    when you spoke with him afterwards, did he give you the

25    identity of the boy?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 168 of 286

1    A.    No.

2    Q.    Did he say why he wasn't going to give you the

3    identity of the boy?

4    A.    He did.

5    Q.    What did he say?

6    A.    He was afraid of the repercussions, both legally and

7    safety wise in the community.  He explained to me that he

8    knew what was going to happen, I believe were his words,

9    and that he was afraid of what was going to happen to him

10   when the boy's father found out.

11   Q.    Did he say anything about a dream?

12   A.    No.

13   Q.    You've worked with Dr. Weiner during the years that

14   you were a Community Supervision Officer, is that right?

15   A.    That's right.

16   Q.    Was he the type of person that would just fly off the

17   handle and give you a call the moment that an offender

18   thought of something?

19   A.    No.

20        **MR. JAMES:**  I have no further questions, Your Honor.

21        **THE COURT:**  Any cross?

22        **MS. ALLEN:**  Yes, Your Honor.

23                        CROSS-EXAMINATION

24   **BY MS. ALLEN:**

25   Q.    Mr. Taberski, you were assigned to supervise Mr.

1    Wooden in May of 2005, correct?

2    A.   That's correct.

3    Q.   You said you had one contact with him in May, and that

4    was May 17th.  Is that right?

5    A.   I believe I spoke to him on the 16th and then I

6    actually met with him in person on the 17th.

7    Q.   Aside from that time that you met with him, had you

8    ever had conversations with -- on the 17th -- had you ever

9    had conversations with him or done any supervision or been

10   involved in this case at all?

11   A.   Not that I recall.  It wouldn't be uncommon for us to

12   encounter each other.  We have a small office -- or had a

13   small office at the time, and I may have seen him, but I

14   don't remember any one on one interactions.

15   Q.   So it would be fair to say you had a very limited

16   history -- limited information about his history on

17   probation when you met him?

18   A.   That would be inaccurate, because I knew everything in

19   his file and was able to read his entire history, but

20   personally I would agree that there was limited interaction

21   between he and I in the same room.

22   Q.   So the only knowledge you had was what someone else

23   had entered into his record?

24   A.   What numerous people had reported about him.

25   Q.   You said you reviewed his entire running record whie

1     he was on supervision?

2     A.   That would be the normal course of action.  I probably

3     did.

4     Q.   So then you would have seen that he had had countless

5     unannounced visits to his home and there was never any

6     contraband or anything inappropriate found in his home.  Is

7     that right?

8     A.   That's right.

9     Q.   And no one ever found Mr. Wooden with children in his

10    home?

11    A.   Not that I am aware of.

12    Q.   Or toys in his home?

13    A.   No.

14    Q.   Or drugs in his home?

15    A.   No.

16    Q.   Or child porn or anything like that?

17    A.   No.

18    Q.   And over the period of his supervision there were many

19    notes in his running record -- there are several of them

20    that sort of repeat the same thing.  Would you agree that

21    there were many entries that said he was in compliance with

22    his supervision obligations?

23    A.   Yes.

24    Q.   Now, you talked about him refusing to take a polygraph

25    test on that first conversation you had with him.  He had

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 171 of 286

1  never had a polygraph test before, had he?

2  A.   I'm not aware of whether he had or not, to tell you

3  the truth.

4  Q.   And you had that conversation with him in May of 2005,

5  prior to him telling Dr. Weiner about his dream, right?

6       **MR. JAMES:**  Objection.

7       **THE COURT:**  Overruled.  You mean, dream?

8       **MR. JAMES:**  Yes.

9       **THE COURT:**  I'll take that into account.

10  A.   Can you repeat the question?

11      **THE COURT:**  He didn't tell Dr. Weiner about a dream,

12  did he?

13  A.   Not that I'm aware of, Your Honor.

14      **THE COURT:**  Okay.  So the answer is no.

15  Q.   You had a conversation with Walter Wooden on May 16th

16  or 17th.  At that time you told him he should take a

17  polygraph, test, right?

18  A.   That he would be scheduled for a polygraph exam,

19  correct?

20  Q.   Now, he had never had one before?

21  A.   I'll take your word for it and if there's no note for

22  it.  Just off the top of my head I don't know.

23  Q.   When you told him that he had to take a test, at that

24  time you were not aware of any allegations that he may have

25  molested a little boy?

1  A.  No.

2  Q.  And at that time he had been on probation three years

3  and had not had a polygraph test?

4  A.  Like I said, I'll take your word for it.

5  Q.  Also in the running record there are notes that when

6  probation officers -- and it looks like he had a few.  Eric

7  Mays was a probation officer, right?

8  A.  That's right.

9  Q.  It looks like Eric Olson was also a probation officer?

10  A.  I believe he was transferred to Mr. Olson after I

11  transitioned into my current employment.

12  Q.  And, in fact, Mr. Wooden was transferred to you

13  because his address changed.  Correct?

14  A.  I believe that's right.

15  Q.  And the address changed because he was asked to move

16  because he lived too close to a high school.  Do you

17  remember that?

18  A.  That sounds accurate.

19  Q.  Do you remember that he was given about six months to

20  move, and he moved within about two months?

21  A.  That's right.

22  Q.  Again, compliant with the request?

23  A.  Absolutely.

24  Q.  There was nothing in the record that showed that Mr.

25  Wooden ever refused to do anything else that the probation

1  office asked him, is there?

2  A.  No, I wouldn't say so.

3  Q.  So it would be your testimony that Mr. Wooden was

4  compliant with the requests of the probation officers --

5  office?

6  A.  I think I would have to characterize that further,

7  really.

8  Q.  Let's talk about, there was an entry in the record

9  that said -- I think it was Officer Mays.  And I think you

10  may remember this.  He mentioned that when he visited the

11  apartment complex there were several children playing

12  outside, and he was concerned about that?

13  A.  That's right.

14  Q.  Did you see the same thing when you visited him?

15  A.  Like Mr. Wooden said, he lived in an area where it

16  wasn't uncommon to see children in the surrounding areas.

17  Q.  So he lived in an area with lots of children.  In the

18  running record it states that there was complaints about

19  someone that fit the description of Mr. Wooden going to

20  Lincoln Park.  Do you remember that?

21  A.  I remember reading that.

22  Q.  Also in the record there was an entry which said the

23  PO had gone to Lincoln Park and saw someone who had a

24  similar build to Walter Wooden there.  Do you recall that

25  in the running record?

1    A.   I don't recall that, but if it's there, I trust that
2    that was accurate information.
3    Q.   But that would make sense that if there was a
4    complaint that the officer would have gone to follow up.
5    So it makes sense that there would have been some
6    investigation on it?
7    A.   Yeah, that does make sense.
8    Q.   And when Mr. Wooden was questioned about being in
9    Lincoln Park, he said he had been through there, right?
10   A.   I believe that's right.
11   Q.   Now, Mr. Wooden was employed in different jobs
12   throughout the course of his supervision, correct?
13   A.   Correct.
14   Q.   And Mr. Wooden did not have his own car?
15   A.   Not that I'm aware of.
16   Q.   So he relied on public transportation?
17   A.   Right.
18   Q.   So he would have had to either hoof it to get to work
19   or possibly ride a bus?
20   A.   Right.
21   Q.   So it is possible that he walked through Lincoln Park
22   on his way to some other destination?
23   A.   Right.
24   Q.   Subsequent to your request for Mr. Wooden to take a
25   polygraph test or that you were scheduling him for a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 175 of 286

1    polygraph test on May 17th, Mr. Wooden, in fact, submitted

2    -- attempted to take two polygraph tests, one of which he

3    showed up at the wrong location.  Do you recall that?

4    A.   I don't.

5    Q.   From your reveiw of the record?

6    A.   I don't recall that, no.

7    Q.   I have an exhibit for you, that I think I can show

8    you.  This is in the exhibit book.  On June 9, 2005, that

9    would be about three days after his meeting with Dr. Weiner

10   where he explained his dream, "Detective Douglas with

11   Fairfax County Police indicated that the offender showed up

12   there for a polygraph exam.  Determined that the offender

13   reported to the wrong location."

14         At that time the probation officer listed is Paul

15   Brennan, but I believe he had been transferred to you on

16   May 9th.  And this is entered on June 9th.  Do you remember

17   that?

18   A.   Yes.  Well, I remember reading this.

19   Q.   Okay.

20   A.   Paul Brennan was my supervisor, and I was

21   transitioning to my current position, so we were both

22   working together with Mr. Wooden.

23      **MS. ALLEN:**  That would be Exhibit [44], for the

24   record.

25      **THE COURT:**  All right.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 176 of 286

1    Q.   So on June 9th, Mr. Wooden showed up for a polygraph

2    test.  Also on June 28th Mr. Wooden also showed up for a

3    polygraph test that day, didn't he?

4    A.   At that point I am no longer working at that agency,

5    but I believe that is what is noted, correct.

6    Q.   So you were not involved in the polygraph test that

7    day?

8    A.   No.

9    Q.   Did you see it noted in his record where he had taken

10   a polygraph test on June 28th, in your supervision records?

11   A.   After the fact, yes.  Recently.

12   Q.   Oh, okay.  You recently saw he had taken a polygraph

13   test, but you were not aware of it at the time; is that

14   your answer?

15   A.   Just to clarify a little bit, on June 13th I began

16   working for U.S. Probation, no longer had any business with

17   Mr. Wooden whatsoever.  So anything after June 13th would

18   just be me reading about this long after the fact.

19   Q.   Okay.  Your job changed, so you were done with that

20   case.  Is that accurate?

21   A.   Until very recently, yes.

22   Q.   You testified that when you met with Mr. Wooden in his

23   home he became agitated with you?

24   A.   Right.

25   Q.   But that's not unusual for a person on probation to be

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 177 of 286

1    agitated when the probation officer comes for a visit now,

2    is it?

3    A.   Well, unusual, it just depends on your definition of

4    unusual, I guess.

5    Q.   Well, in fact, you talked about why you were getting

6    out of there, because for safety reasons probation officers

7    don't hang around.  And so that was because sometimes

8    probationers get a little agitated, right?

9    A.   Well, I would have to say the vast majority of

10   contacts don't go that way.  That's why it is so imperative

11   to remove yourself from the situation when it does happen

12   that way.  So it does stand out in your mind I guess would

13   be a good way to say it.

14   Q.   So most probationers are happy to see their probation

15   officer at their house, is that your testimony?

16        **MR. JAMES:**  Objection.

17        **THE COURT:**  Sustained.  I think I understand that.

18   I've had a few cases.

19   Q.   You testified that Mr. Wooden lived with his mother.

20   I just want to refresh your memory.  Do you recall that his

21   sister, Angie, also lived there as well?

22   A.   That could be correct, but, again, I think this

23   requires further explanation.

24   Q.   Okay.  No.  No, thank you.

25   A.   Okay.

1    **THE COURT:**  We don't need to waste valuable time in

2    this case.  Is there anything else that is going to help?

3        **MS. ALLEN:**  Well, Your Honor, I do have one question

4    that I think may answer a question that you asked of the

5    witness about the way the building was laid out.  It's in

6    the running record.

7        **THE COURT:**  I don't really care about that.  I was

8    trying to get a visual of the scene.  I mean, that was my

9    initiative.  It's not going to be in the order, I can tell

10   you that.

11       **MS. ALLEN:**  Thank you, Your Honor.

12       **THE COURT:**  All right.  Thank you.  You can step down.

13   We'll take a recess and be ready with your next witness.

14              (Court recess at 10:29 a.m.)

15       **THE COURT:**  Are you ready with your next witness?

16       **MR. GRAY:**  Yes, Your Honor.  At this time the

17   Government would like to call Dr. Heather Ross.

18        **DR. HEATHER ROSS, GOVERNMENT'S WITNESS, SWORN**

19                  <u>DIRECT EXAMINATION</u>

20   **BY MR. GRAY:**

21   Q.   Dr. Ross, would you please state your name?

22   A.   Dr. Heather Ross.

23   Q.   And you work at Butner Federal Correctional Institute?

24   A.   I do.

25   Q.   What do you do there?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 179 of 286

1   A.   I am a sex offender forensic psychologist.

2   Q.   I would like to turn your attention to what has been

3   previously marked as Government Exhibit Number [3], that

4   third tab in that binder in front of you.  Would you mind

5   turning to that, please?

6   A.   Sure.

7   Q.   Dr. Ross, is that your CV?

8   A.   It is.

9   Q.   And according to your CV you have a Ph.D. in Clinical

10  Psychology; is that correct?

11  A.   That's correct.  It's clinical psychology with a

12  forensic emphasis, yes.

13  Q.   And you also have a Masters in Experimental

14  Psychology?

15  A.   I do.

16  Q.   And you have a Bachelors in Psychology?

17  A.   I do.

18  Q.   And prior to working at Butner, you worked at North

19  Carolina Central Regional Hospital.  Isn't that correct?

20  A.   It is.

21  Q.   What did you do there?

22  A.   I was a forensic psychologist there.

23  Q.   And as a forensic psychologist there, what were some

24  of your duties?

25  A.   Generally, I did evaluations for competency to stand

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 180 of 286

1    trial and criminal responsibility at the state level.

2    Q.   And prior to working at North Carolina Central

3    Regional Hospital, you worked in South Carolina for the

4    Department of Juvenile Justice?

5    A.   I did.

6    Q.   What were your duties there?

7    A.   There I worked with pre and post-adjudicated juveniles

8    regarding placement issues, evaluation of mental health

9    issues.  I did juvenile sex offender evaluations, so it was

10   kind of a variety, mostly to inform the judges on placement

11   issues and whether to commit a child or to have him in a

12   group home or released on probabtion.

13   Q.   And that's not your only time working with the

14   Department of Justice -- you were already aware of the

15   Department of Justice there in South Carolina; you were a

16   Psychology Supervisor?

17   A.   Correct

18   Q.   And a contract supervisor as well?

19   A.   After I left when I moved to North Carolina, I

20   continued to supervise reports for them, for the Department

21   of Juvenile Justice in South Carolina.

22   Q.   Other than Butner and at the Department of Justice in

23   South Carolina, have you had any experience working with

24   prisoners?

25   A.   Yes.  I have worked at the Wyoming State Hospital.  I

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 181 of 286

1    did evaluations of compentency and sanity on criminal

2    defendants there, as well as working in -- when I was in

3    school in Texas, I worked in two placements in the prison

4    system in Texas.

5    Q.    While you were in Texas did you work with sex

6    offenders?

7    A.    I did, yes.

8    Q.    And your current duties at Butner, does that include

9    the evaluation of sex offenders that are at Butner?

10   A.    It does, yes.

11   Q.    And do you perform forensic evaluations on those sex

12   offenders?

13   A.    I do.

14   **THE COURT:**  What schools did you get your degrees

15   from?

16   A.    My Ph.D. is from Sam Houston State University in

17   Huntsville, Texas.  And my masters and bachelors are both

18   from Hollins College in Roanoke, Virginia.

19   **MR. GRAY:**  Your Honor, at this time we would like to

20   tender the CV of Dr. Ross for your consideration.  And at

21   this time we would like to offer her, for the sake of

22   moving things along, as an expert in the field of Forensic

23   Examination of Sex Offenders and Psychology.

24   **THE COURT:**  I will accept the witness as an expert in

25   that field and allow her to express her opinions.

1      **MR. GRAY:**  Thank you, Your Honor.

2  Q.   Dr. Ross, would you turn to tab 4 in the binder,

3  what's been previously marked as Exhibit [4].  Is that your

4  rorensic evaluation, Pre-Certification Evaluation on Mr.

5  Wooden?

6  A.   It is.

7  Q.   And you performed the Pre-Certification Evaluation on

8  Mr. Wooden?

9  A.   I did.

10  Q.   And as part of that Pre-certification Evaluation, did

11  you make a diagnosis as to Mr. Wooden?

12  A.   I did, yes.

13  Q.   What have you diagnosed him with?

14  A.   At that time -- at the Pre-Certification Evaluation I

15  diagnosed him with pedophilia, sexually attracted to males.

16  Q.   I would like to turn your attention to tab number 5,

17  Government Exhibit Number [5].  Is that the follow-up

18  Forensic Evaluation you did on Mr. Wooden?

19  A.   Yes, that's the most recent.

20  Q.   And in that Forensic Evaluation I note that on the

21  second page of that report and on the third page it has a

22  list of documents that you reviewed.  Were all those the

23  documents that you reviewed?

24  A.   Yes, for that evaluation.

25  Q.   And as a result of that evaluation, did you come to a

1   conclusion as to the risk of sexual dangerousness regarding

2   Mr. Wooden?

3   A.   I did, yes.

4   Q.   And what was your conclusion?

5   A.   That he should be considered a sexually dangerous

6   person because of the serious mental illness, abnormality

7   or disorder as a result of which he would have serious

8   difficulty refraining from child molestation

9   Q.   And this evaluation was performed as a result of his

10   certification under the Adam Walsh Act, 18 U.S.C. 4248?

11   A.   Yes, it was.

12   Q.   And you did this evaluation for the purposes of making

13   a determination as to whether or not he fit the criteria of

14   the Adam Walsh Act, 18 U.S.C. 4248?

15   A.   Correct.

16   Q.   Dr. Ross, I want to turn your attention to page 14 of

17   your evaluation. One of the key issues within your report

18   and within this case is the determination as to Mr.

19   Wooden's sexual behaviors, more specifically how do you

20   determine whether or not he is going to have serious

21   difficulty refraining from sexually violent conduct and

22   child molestation. You made a diagnosis as to Mr. Wooden

23   in terms of whether or not he suffered from serious mental

24   illness, abnormality or disorder, correct?

25   A.   I did.

1 Q.   What was that diagnosis?

2 A.   In the final forensic report I wrote, I diagnosed him

3 with pedophilia, sexually attracted to males, nonexclusive

4 type and antisocial personality disorder.

5 Q.   Now, you said nonexclusive type.  What do you mean by

6 that?

7 A.   Nonexclusive type refers to having an attraction to

8 adults as well as children.  And in some of the reports

9 that I have reviewed Mr. Wooden has expressed that he has

10 sexual interest in adult women, so I felt that that was

11 appropriate in this case.

12 Q.   And you made a finding of antisocial personality

13 disorder in this report?

14 A.   I did.

15 Q.   But you did not find that in the pre-certification

16 report?

17 A.   That's correct.

18 Q.   Why did you make that finding this time?

19 A.   I had a lot more information available to me for the

20 second report, including three evaluations that had

21 previously been unavailable to me, two from 2000 and then

22 Dr. Weiner's report from 2002, all of which provided more

23 information about Mr. Wooden's antisocial behaviors and

24 personality characteristics that helped me make that

25 diagnosis.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 185 of 286

1   Q.   In the course of coming to your forensic evaluation,

2   did you perform any actuarial test or exams?

3   A.   I did.  I used the Static-99R.

4   Q.   And as a result of the Static-99R did you determine a

5   score?

6   A.   I did.  His score was seven (7).

7   Q.   Now, Dr. Ross, with regard to the ultimate question

8   that you came to, which is that Mr. Wooden would have

9   serious difficulty refraining from engaging in sexually

10  violent conduct, specifically for Mr. Wooden, child

11  molestation, within the report you cite that you used the

12  Federal Register that helped you in coming to that

13  conclusion.  Is that correct?

14  A.   That's correct.

15  Q.   Why did you use the Federal Register?

16  A.   That was provided to me as a guideline that was

17  developed for the BOP clinicians to use to help determine

18  serious difficulty refraining from sexually violent

19  behavior or child molestation.

20  Q.   So as a result of your analysis and your examination

21  of Mr. Wooden, did you have to consider what serious

22  difficulty meant?

23  A.   Absolutely.

24  Q.   Now, in coming to your conclusions did you get an

25  opportunity to interview Mr. Wooden?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 186 of 286

1    A.    I did not.

2    Q.    Why not?

3    A.    During my first Pre-Certification Evaluation he

4    refused to interview, and during the forensic evaluation

5    his attorneys did not give us permission to speak with him.

6    Q.    Do you feel that your report is at a disadvantage

7    because you did not get a chance to interview Mr. Wooden?

8    A.    I don't believe so.  An interview is always nice, but

9    with the extent of information available to me, I believe

10   that I could offer a professional judgment well without his

11   interview.

12   Q.    With regard to your use of the Federal Register and

13   these guidelines that you referenced earlier, do you -- how

14   did you get these guidelines?

15   A.    They were provided to me when I began work at the

16   Bureau of Prisons.

17   Q.    And, if you could, walk just briefly through these

18   guidelines.  These guidelines are they, I guess, for lack

19   of a better word, are they consistent with the literature

20   that you've had to use in the past with the evaluation of

21   sex offenders?

22   A.    In some aspects, yes, and in some aspects, no.

23   Q.    What do you mean by some aspects, yes?

24   A.    Some of the information that is given as a guideline

25   to consider is supported in the literature that those are

1    risk factors that would increase an individual's risk for

2    sexual reoffense.

3    Q.   And you said in some instances, no?

4    A.   Yes.  Some of them they are not necessarily supported

5    in the literature.  They may be more idiographic, meaning

6    that they might be a risk factor more for an individual

7    person, but in general that particular piece of information

8    has not been shown statistically to stand by itself as a

9    specific risk factor.

10   Q.   Now, why would you use something that hasn't

11   specifically been shown by itself to stand as a risk

12   factor?  Why would you use something that hasn't been

13   scrutinized by the literature?

14   A.   It's not that it hasn't been scrutinized by the

15   literature.  It just hasn't necessarily been demonstrated

16   to stand by itself, and, again, it is kind of the more

17   idiographic approach where it is individualized to that

18   person so that something that may be specific in one case

19   and be a very strong risk factor for that individual

20   person, in general might not be found to stand alone in the

21   overall review of sex offenders.

22   Q.   So the guidelines within the Federal Register, did you

23   use them as hard and fast rules?

24   A.   No, they were just used as guidelines.

25   Q.   In addition to the Federal Register did you use other

1    texts and treatises like the DSM-IV?

2    A.    I did.

3    Q.    Other peer review literature?

4    A.    I did.

5    Q.    And did you consider all those things when making your

6    determination with regard to Mr. Wooden's risk for sexual

7    dangerousness?

8    A.    I did.

9    Q.    With regard to these guidelines that you used, respond

10   about the first guideline.  What was the first guideline

11   that was recommended for you to consider?

12   A.    The first guideline is the person's repeated contact,

13   or attempted contact, with one or more victims of sexually

14   violent conduct or child molestation.

15   Q.    Now, what information did you use when considering

16   that guideline?

17   A.    I used Mr. Wooden's criminal history that is

18   reflective of adjudications or convictions on six separate

19   sexual acts involving children and then the one attempted

20   sexual act involving a child.

21   Q.    Now, how did you use that information in your finding

22   that Mr. Wooden, as an individual, would have serious

23   difficulty refraining from child molestation?

24   A.    The repeated acts over a thirty-year period suggest

25   that despite the interventions he has had through the legal

1    system and the mental health system, he is still engaging

2    in the behavior, so that suggests a difficulty in

3    refraining from the behavior.

4    Q.   Now, what is the second guideline that you used?

5    A.   The second guideline from the Federal Register is the

6    person's denial of or inability to appreciate the

7    wrongfulness, harmfulness, or likely consequences of

8    engaging or attempting to engage in sexually violent

9    conduct or child molestation.

10   Q.   So what information from his record did you use in

11   order to make that consideration?

12   A.   That was more based on Mr. Wooden's description of the

13   children engaging and soliciting the sexual contact, that

14   he does not appear to see it as wrong when he is saying

15   that the children are, in fact, soliciting the contact.

16   Q.   Now, with regard to that guideline, how did you use

17   that information that you discovered in making a

18   determination that Mr. Wooden was going to have serious

19   difficulty refraining from child molestation?

20   A.   That inability to appreciate that wrongness or the

21   harmfulness of those behaviors, again, suggests that

22   despite having treatment he has not internalized that

23   understanding of the wrongfulness and that that is

24   suggestive that he will have difficulty refraining from the

25   behavior again.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 190 of 286

1    Q.   Now, at the time you wrote your report you only had

2    access to the materials that are reflected on pages two and

3    three of your report.  Is that correct?

4    A.   That is correct.

5    Q.   Have you since had an opportunity to review the

6    deposition transcript of Mr. Wooden when he was deposed by

7    the Government?

8    A.   I have.

9    Q.   Using that information, in considering that now, does

10   that change or detract from your overall conclusion that

11   you made with regard to that second criteria?

12   A.   No, it actually strengthens it.

13   Q.   Why is that?

14   A.   Because, again, even in deposition he was discussing

15   how the children had approached him and sought him out for

16   sexual contact.

17   Q.   Now, the third guideline that you used, what was that?

18   A.   The third one is interviewing, testing or other risk

19   assessment tools that are relied upon by mental health

20   professionals?

21   Q.   Now, how did you use this -- what are the measurements

22   you used in this consideration?

23   A.   I used both the testing that I perform myself with the

24   Static-99R.  And in the forensic recertification I had also

25   done an SVR-20, as well as the results of the testing or

1  the actuarials that were used by the other individuals in

2  the two 2000 reports and then the 2002 report, all of which

3  were reflective of high or very high risk of sexual

4  reoffense.

5  Q.  Now, after reviewing all of those risk assessment

6  tools, how did that lead you to your conclusion that Mr.

7  Wooden was going to have serious difficulty in refraining

8  from child molestation?

9  A.  Once again it shows not just recently in the past two

10  years, but for at least ten years now that he has scored in

11  the high range of sexual reoffense possibility and that

12  that again reflects that he has serious difficulty

13  refraining from child molestation.

14  Q.  What is the fourth criteria that you looked at under

15  the guidelines?

16  A.  The fourth is an inability to control conduct, which

17  can be displayed such as offending while under supervision

18  or when likely to get caught or making statements of intent

19  to reoffend, or an actual admission of inability to control

20  behavior.

21  Q.  What information did you look at within the record to

22  help you with that consideration?

23  A.  I looked at both Mr. Wooden's history of offending

24  while on supervision, as well as his offending against

25  children in the neighborhood that may very well be aware of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 192 of 286

1    who he is without trying to in any way protect his

2    identity, suggesting that that is a higher risk of being

3    caught.

4    Q.   And using all those references, how does that help

5    answer the question that Mr. Wooden is going to have

6    serious difficulty refraining from child molestation?

7    A.   Again, especially the reoffending while on

8    supervision, that is definitely a very strong risk factor,

9    as well as the offending with a stronger chance of getting

10    caught.  Both of those speak to his sexual dangerousness,

11    that he will have difficulty refraining because he did not

12    refrain while he was under supervision in the past or did

13    not seek out victims that would not be able to identify

14    him.

15    Q.   Now, you have had an opportunity to read the

16    deposition that Mr. Wooden had?

17    A.   I did.

18    Q.   With that in mind, how did that change, if at all,

19    your conclusions under that fourth criteria?

20    A.   It doesn't change.  I believe he spoke that he knew

21    all of his victims from the neighborhood.  So, again, that

22    was a high likely chance that he would get caught if he was

23    offending against children in the neighborhood that he

24    knew.

25    Q.   Now, there was one last criteria, a fifth criteria,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 193 of 286

1   what was that?

2   A.   That is a successful completion or failure to

3   successfully complete a sex offender treatment program.

4   Q.   And what information did you use to consider that

5   guideline?

6   A.   I used the information that, although he was in

7   treatment with Dr. Weiner while he was on supervision this

8   last time, he did not successfully complete it, because he

9   was revoked due to another contact offense.  And the fact

10  that he has not participated in sex offender treatment, to

11  my knowledge, in the Bureau of Prisons since he has been

12  back in the BOP.

13  Q.   And you mentioned that he hasn't engaged in any sex

14  offender treatment since he has been in the BOP.  Did you

15  review his Bureau of Prison records?

16  A.   I did.  I reviewed all the mental health records that

17  were available, which at the writing of the report, I think

18  I had the records back to the early '90s.  And then I know

19  in the other information it went back into the '70s as

20  well.

21  Q.   And since he has been at Butner, has he engaged in any

22  sex offender treatment?

23  A.   No.  No sex offender treatment that I am aware of.

24  Q.   And since he has been at Butner, is there any record

25  of him completing any sort of sex offender treatment

1   program, voluntarily or involuntarily?

2   A.   No.

3   Q.   Now, how does this factor, this successful completion,

4   help you come to the conclusion that he is going to have

5   serious difficulty refraining from child molestation if he

6   is released?

7   A.   This is one of those factors that is not necessarily

8   completely supported in the literature, that successful

9   completion of -- or, yeah, that successful completion of

10  sex offender treatment reduces or mitigates risk in some

11  way.  But treatment failure or noncompliance certainly does

12  raise that risk of reoffense and shows that, again, even

13  though he has participated in it, he appears to continue to

14  utilize some of the same thinking errors and justifications

15  for his behavior, such as saying that the children are

16  asking for the sexual contact.  So, therefore, that to me

17  suggests again that he is going to have serious difficulty

18  refraining from this behavior if he is released again.

19  Q.   Dr. Ross, you had an opportunity to review the report

20  of Dr. Terence Campbell, correct?

21  A.   I did.

22  Q.   After reviewing his report, did you find the need to

23  change any of the conclusions or any of the findings within

24  your report?

25  A.   I did not.

1  Q.   You had an opportunity to review the report of Dr. Hy

2  Malinek, right?

3  A.   I did.

4  Q.   Did you find anything that caused you to change or

5  correct anything within your report, after reviewing Dr.

6  Malinek's report?

7  A.   I did not.

8  Q.   With regard to the question of serious difficulty,

9  refraining, you found that he had a serious mental

10  abnormality disorder or mental illness.  In terms of

11  serious difficulty refraining, do you feel as if he will

12  have serious difficulty refraining from engaging in child

13  molestation if he were released by this Court?

14  A.   I do.

15  Q.   Thank you.

16      **MR. GRAY:**  No further questions, Your Honor.

17      **THE COURT:**  Any cross?

18                    CROSS-EXAMINATION

19  **BY MS. ALLEN:**

20  Q.   Dr. Ross, you are aware that on June 28, 2005, Mr.

21  Wooden made a videotaped statement to investigators

22  regarding his dream about James and the incident that

23  eventually got him violated?

24  A.   I'm aware he's given statements.  I'm not sure

25  specifically about the videotaping or the dream aspect.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 196 of 286

1    I'm not sure about that.

2    Q.    Do you recall -- I know that you testified in your

3    deposition that you reviewed your documents after

4    downloading them from the BOP website?  Do you recall

5    seeing a document from Veronica Buggs from Washington,

6    D.C.?  She was on the Assessment and Certification Review

7    Branch Panel.

8    A.    It's certainly possible.  I can look in there.

9    Q.    If you would turn to Exhibit [75].  I just want to

10   direct your attention to that just to refresh your memory.

11   The last paragraph states that in order for the panel to

12   conduct a thorough diagnostic assessment and

13   classification, we require copies of all supporting

14   documentation used in this case and an opportunity to view

15   Wooden's videotaped statement.  Does that sound familiar to

16   you at all?

17   A.    I'm still getting there.  Yes, I believe I had access

18   to this during my evaluation.

19   Q.    Did you have an opportunity to view Mr. Wooden's

20   videotaped statement before you prepared your own report?

21   A.    No, I did not.

22   Q.    You are aware from your review of this case that it is

23   in dispute whether a confession was made or whether Mr.

24   Wooden, in fact, said it was a dream during his videotaped

25   statement.  You are aware of that conflict?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 197 of 286

1    A.    Yes.

2    Q.    But you were able to resolve that in your own mind

3    without seeing the videotape, to reach the conclusion that

4    you've reached today?

5    A.    Yes.

6    Q.    You talked about the risk factors that you used to

7    reach your conclusion, and you went over several of them.

8    In fact there is no empirical data to support that the risk

9    factor you reviewed increased the predictability of

10   recidivism.  Isn't that correct?

11   A.    Which risk factors are you referencing?

12   Q.    Every risk factor that you stated.  Can you name one

13   risk factor that increases the probability of predicting

14   accurately what his risk of reoffense is?

15   A.    Separate from what I consider on the Static-99R; are

16   you referring to the BOP Federal Register?

17   Q.    Yes.

18   A.    Can I?

19   Q.    Yes.

20   A.    A, on the Federal Register, is the repeated contact or

21   attempted contact with one or more victims of sexually

22   violent conduct or child molestation.  So the fact that

23   there's repeated sexual offenses is a supportive risk

24   factor in the literature; yes.

25   Q.    Is there empirical data that makes a direct

1    correlation between that particular risk factor and someone

2    reoffending at a higher rate than if that risk factor was

3    not present?

4    A.   Could you repeat the question?

5    Q.   You do not have empirical data to support the

6    conclusion that the presence of that risk factor increases

7    the likelihood that Mr. Wooden will reoffend?  Do you have

8    empirical data to that effect?

9    A.   A history of multiple sexual offenses has been shown

10   to elevate an offender's risk for reoffense, sexual

11   reoffense.

12       **THE COURT:**  The fact that he's sending a Christmas

13   card to somebody that he has molested is a pretty strong

14   indication of reoffending; don't you think?

15   A.   I think that speaks to his emotional identification

16   with children, which is a topic that's often considered in

17   these evaluations as well.  That that's -- he sees the

18   children as more peers as opposed to him being in an adult

19   role.  So that to me is very concerning, yes.

20   Q.   You completed the SVR-20.  The SVR-20 is actually more

21   often used to target areas of treatment for offenders,

22   isn't it?

23   A.   That's certainly one use, yes.

24   Q.   It is not frequently used for assessing the risk of

25   recidivism?  Would that be accurate?

1  A.  I don't think that would be accurate, no.

2  Q.  Let's talk about the DSM-IV.  Isn't it true that the

3  DSM-IV while it helps you make diagnoses, it does not make

4  any judgment about the person's ability or inability to

5  control that diagnosis, does it?  I'm speaking about

6  volitional control.  The DSM does not refer to that, does

7  it?

8  A.  No, there's nothing specifically in the diagnoses that

9  I offered.  There's no specific information about

10  volitional control as it is related to those diagnoses, no.

11      **MS. ALLEN:**  No further questions.

12      **THE COURT:**  Any redirect.

13      **MR. GRAY:**  No, Your Honor.

14      **THE COURT:**  Thank you, ma'am.  Any other witnesses?

15      **MR. JAMES:**  Your Honor, prior to resting, which we

16  will do in a moment, we offer into evidence the joint

17  stipulation notebook.

18      **THE COURT:**  That will be received.

19      **MR. JAMES:**  We also ask that The Court draw adverse

20  inference from when the Respondent testified and he refused

21  to answer particular questions.

22      **THE COURT:**  That will be noted in the record.

23      **MR. JAMES:**  And with that, Your Honor, the United

24  States rests.

25      **THE COURT:**  All right.  Are you going to call any

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 200 of 286

1    witnesses?

2         **MS. GRAVES:**  Yes, Your Honor.  We do have a witness to

3    call, Dr. Campbell.  We also wanted to object to one of the

4    exhibits the Government offered into evidence.  Exhibit

5    [40]; it's a Declaration by Dr. Weiner.

6         **THE COURT:**  Overruled.  You want to call Dr. Campbell?

7         **MS. GRAVES:**  Yes, sir.

8         **THE COURT:**  Okay.  He can come up.

9         **MS. GRAVES:**  Your Honor, I would like to note that Dr.

10   Campbell has a hearing deficit, and it might become

11   necessary for me to get closer to him.

12        **THE COURT:**  All right.

13         **DR. TERENCE CAMPBELL, RESPONDENT'S WITNESS, AFFIRMED**

14                      <u>DIRECT EXAMINATION</u>

15   **BY MS. GRAVES:**

16   Q.   Can you hear me, Dr. Campbell?

17   A.   The problem is worse.  My right hearing aid just died.

18   And because of that if Ms. Graves sits at that table and

19   directs questions to me, I will not accurately hear her.

20        **THE COURT:**  Do you want her to sit over there and talk

21   to your left ear?

22   A.   If I sat here and if she were to stand in front of me,

23   that would work.

24        **THE COURT:**  All right.  Whatever works.  You can sit

25   in the jury box if you want or whatever is comfortable.

1      **MS. GRAVES:**    Yes, sir.  Thank you.

2   Q.   Good morning, Dr. Campbell.

3   A.   Good morning, Ms. Graves.

4   Q.   Would you please state your name for the record?

5   A.   Terence Campbell.  Terence is spelled, T-E-R-E-N-C-E.

6   Last name is spelled, C-A-M-P-B-E-L-L.

7   Q.   Dr. Campbell, what is your occupation?

8   A.   I'm self-employed as a psychologist specializing in

9   forensic psychology.

10  Q.   And what is your education and training?

11  A.   I completed my Bachelors Degree in 1965 at Western

12  Michigan University majoring in Psychology and Sociology.

13  I then completed my Doctorate Degree, my Ph.D. Degree in

14  Human Development and Clinical Psychology at the University

15  of Maryland in 1970.

16  Q.   Does your CV, your curriculum vitae, list your

17  educational background?

18  A.   Yes, it does.

19  Q.   I want to direct you to Exhibit Number [7] in that

20  book.

21  A.   Okay, I'm there.

22  Q.   Is that your CV?

23  A.   Yes.  That is my CV.

24  Q.   Can you look through it and see that it's accurate?

25  A.   It's accurate.  It's accurate in terms of

1    publications.  It's not altogether accurate in terms of

2    where I've testified.  I keep a list of every case that

3    I've testified in as a separate document.

4          **THE COURT:**  It's not going to matter.  You just want

5    him to be an expert, right?

6          **MS. GRAVES:**  Yes, sir.

7          **THE COURT:**  I'll accept him as an expert and allow him

8    to express his opinion.

9          **MS. GRAVES:**  Thank you, Your Honor.  We would offer

10    the CV into evidence.

11          **THE COURT:**  Right.

12    Q.  Dr. Campbell, have you ever testified regarding the

13    Adam Walsh Act?

14    A.  Well, only in this case and a pre-trial deposition.

15    And that's it.

16    Q.  Have you testified in other cases involving

17    determination as to whether someone is dangerous or is

18    sexually dangerous?

19    A.  Yes.  I've testified in what are known as sexually

20    violent persons or sexually violent predator cases in a

21    variety of different states, including Florida, Wisconsin,

22    California, Washington, Illinois, and so forth.

23    Q.  And so are you familiar with the sort of instruments

24    that one needs to use or that are typically used?

25    A.  All I heard was instruments.

1  Q.  Are you familiar with the instruments that are

2  typically used in assessing sexual offenders?

3  A.  Yes, I am.  Including the RRASOR, the Static-99, the

4  Static-99R, and the SVR-20; would be examples of

5  instruments used for that kind of a purpose.

6  Q.  And have you used those instruments yourself?

7  A.  I have used some of them to assess risk of

8  reoffending.  I've used others for treatment planning.

9  Q.  Did you perform an evaluation of Mr. Walter Wooden in

10  this case?

11  A.  Yes, I did.

12  Q.  What was the purpose of that evaluation?

13  A.  The purpose of that evaluation was to assess him

14  pursuant to the Adam Walsh Act, and to assess whether or

15  not he exhibited a mental disorder that would make it

16  difficult for him to refrain from child molestation if he

17  were released from confinement.

18  Q.  And you said difficult.  Did you mean seriously,

19  serious difficulty?

20  A.  Serious difficulty, yes.

21  Q.  Okay.  Did you review the statute in connection with

22  the evaluation, the Adam Walsh Act?  Did you review the

23  Adam Walsh Act in connection with the evaluation?

24  A.  Yes.

25  Q.  Okay.  Did you meet with Mr. Wooden in connection with

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 204 of 286

1    the evaluation?

2    A.   Yes, I did.  I met with Mr. Wooden at the Butner

3    Correctional Institution on June 23, 2011.

4    Q.   How long did you meet with him?

5    A.   Approximately three hours.

6    Q.   Did you review some other materials in connection with

7    the evaluation?

8    A.   Yes.  Prior to my meeting with Mr. Wooden I reviewed

9    documents Bates labeled Bureau of Prisons-Wood, for Wooden,

10   Pages 1 through 3253.  And Bureau of Prisons-Wood, attorney

11   eyes only, Bates pages 3254 through 3281.  And U.S.

12   Attorney's Office Bates numbered 3297 through 3337.  I also

13   reviewed records of Mr. Wooden's treatment with Dr. Ronald

14   Weiner between the dates of December 2002 and June 2005.

15   Additionally I reviewed both of Dr. Heather Ross' reports.

16   And I reviewed Dr. Hy Malinek's report dated March 20,

17   2011.

18   Q.   All right.  And are all those things listed in your

19   report?

20   A.   Yes.

21   Q.   You did prepare a report after the evaluation?

22   A.   Yes, I did.

23   Q.   And is that report noted as Exhibit [8] in the

24   notebook?

25   A.   Yes, it is.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 205 of 286

1    **MS. GRAVES:**  Your Honor, we would offer Exhibit [8].

2    **THE COURT:**  It's received.

3    Q.   Dr. Campbell, during your assessment of Mr. Wooden

4    were you able to form an opinion as to whether he meets the

5    criteria of a sexually dangerous person under the Adam

6    Walsh Act?

7    A.   Yes, I did form such an opinion.

8    Q.   And what's your opinion?

9    A.   In my opinion he does not satisfy those criteria.

10   Q.   And did you reach that opinion to a reasonable degree

11   of professional certainty?

12   A.   Yes, I did.

13   Q.   And in your professional opinion, as a result of a

14   mental illness, abnormality, or disorder, would Walter

15   Wooden have serious difficulty refraining from sexually

16   violent conduct or child molestation?

17   A.   In my opinion, considering the objective data, he

18   would not.

19   Q.   Let's turn to that question, in particular.  How did

20   you reach that conclusion that he would not have serious

21   difficulty refraining?

22   A.   First of all, I addressed the whole issue of

23   diagnosis, understanding a psychologist undertaking this

24   kind of work for this kind of proceeding, has to ask

25   himself or herself, okay, how are we going to go about

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 206 of 286

1    diagnosis?  Are we going to focus on what someone thinks?

2    Are we going to focus on what someone feels?  Or are we

3    going to focus on what someone does.  And in a legal

4    proceeding, such as this one, diagnostic considerations

5    dictate that we focus on what the Respondent does.  What is

6    his overt behavior.  So diagnostically I asked myself, at

7    this point in time, here and now, does Mr. Wooden qualify

8    for a diagnosis of a mental disorder.  And my conclusion at

9    the time I evaluated him was no.  I was especially looking

10   for evidence of pedophilia, here and now evidence of

11   pedophilia.  Did he have a collection of pornography?  Has

12   he been collecting pictures of young children in their

13   underwear or scantily clad from magazines such as Time or

14   National Geographic.  With one exception has he attempted

15   regularly to correspond with children outside of the

16   institution.  In all instances the answers are no.  Which

17   is consistent with the relevant diagnostic data if we

18   remember that the vast majority of previously convicted

19   sexual offenders do not reoffend.  Therefore, whatever

20   psychopathology drove the original offending behavior

21   resolves itself with the passage of time.  Karl Hanson, and

22   you've heard his name before for all the research that he

23   does, has pointed out, sooner or later practically all

24   offenders stop offending.  So age becomes a very important

25   consideration, and Mr. Wooden's age of 55 indicates that

1    he's at the point where he is beyond his pedophilia and he

2    is not at a risk to reoffend.  There are other objective

3    data available to me that allow me to answer negatively to

4    that question will he reoffend.  And other data indicate

5    no, he will not reoffend.

6    Q.    What other data are you referring to?  Well

7    specifically let me ask you first did you administer any

8    tests?

9    A.    What other data are you referring to?

10   Q.    Yes.  Specifically I want to ask did you administer

11   any tests?

12   A.    Yes.  Yes.  First of all, I used the Structured

13   Clinical Interview for Personality Disorders.  This is a

14   structured interview developed by the American Psychiatric

15   Association keyed to DSM-IV.  And it is used for the

16   purpose of identifying any personality disorder, including

17   but not limited to, antisocial personality disorder.  Using

18   the structured interview with Mr. Wooden, he does not

19   qualify for the diagnosis of any personality disorder.

20        Secondly, I assessed his impulsiveness using the

21   Barratt Impulsiveness Scale.  The generally accepted cutoff

22   for the Barratt is a score of 74.  And I want to make sure

23   that I get Mr. Wooden's score exact.  It's far below the

24   74.  Mr. Wooden attained a score of 48 on the Barratt

25   Impulsiveness Scale, which is far below the cutoff score of

1  74 for impulsiveness.  So at this point in time if we ask

2  does Mr. Wooden exhibit volitional control or volitional

3  impairment, the answer would be no.  Because impulsiveness

4  is a necessary condition for volitional impairment.

5  Remembering the old distinction of oxygen is necessary for

6  human life but in and of itself it's not sufficient.

7  Impulsiveness is necessary for volitional impairment.  If

8  there's no impulsiveness, there's no volitional impairment.

9  Mr. Wooden does not exhibit evidence of volitional

10  impairment at this point in time.

11  Q.  And you understand that impaired volition would be

12  necessary in order for him to have serious difficulty

13  refraining?

14  A.  That is my understanding, yes.

15  Q.  Have you considered anything in addition to -- well,

16  your structured clinical interview, I believe that's

17  somewhere in this notebook as well.

18  A.  Oh, I see.

19  Q.  Do you know where it is?  Number [37], is that your

20  structured clinical interview?

21  A.  Yes, it is.

22  Q.  Can you describe to The Court what the significance of

23  conducting a structured clinical interview is?

24  A.  What the procedure is?

25  Q.  Yes.

1  A.   There are two parts of the structured clinical

2  interview.  The first part is approximately 119 true and

3  false questions that are identified yes and no.  And the

4  Respondent goes through and takes those questions and

5  indicates whether or not the statements apply to him.  For

6  any statement where an individual indicates yes, the

7  statement applies to him, then there is a follow-up

8  structured interview that I used to clarify.  Tell me more

9  about what you mean when you make this statement that you

10  feel awkward and uncomfortable around people you don't know

11  well.  Tell me more about that.  And what we're looking for

12  is evidence of does this individual satisfy criteria for

13  any personality disorder.  And at the time I evaluated him,

14  Mr. Wooden does not satisfy criteria for any personality

15  disorder, including antisocial personality disorder.

16      **THE COURT:**  So he's psychologically healthy?  Is that

17  what you're saying?

18  A.   No.  What I'm saying is, does he qualify for a

19  diagnosis of a personality disorder?  No.  Does he exhibit

20  volitional impairment?  No.  By virtue of what I saw

21  yesterday could he qualify for a diagnosis of a mood

22  disorder.  Yes.

23      **THE COURT:**  And that would be the only impact on his

24  psychological health?

25  A.   Also there would be questions that would necessitate

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 210 of 286

1    formal testing to assess his intellectual level.

2        **THE COURT:**  Which may be very low?

3    A.   That is my impression.

4        **THE COURT:**  Or else it's being masked.

5    A.   I'm sorry.  We spoke over each other, Your Honor.

6        **THE COURT:**  Or else it's being masked.

7    A.   Yeah, I don't think that's the issue.  I think it's

8    the first alternative that you identified.

9        **THE COURT:**  Do you have an I.Q. test for him?

10   A.   No.

11       **THE COURT:**  Nowhere in his records?

12   A.   Oh, yes.  Yes.

13       **THE COURT:**  What's an I.Q. test that he's had in the

14   past?

15   A.   Previous testing assigned an I.Q. of about 70.

16       **THE COURT:**  Seventy (70).  So he's borderline

17   retarded?

18   A.   Correct.

19       **THE COURT:**  Below 70 would be pronounced mildly

20   retarded?

21   A.   Yes.

22       **THE COURT:**  Okay.

23   Q.   Would you expect someone with an I.Q. of 70 to have

24   difficulty understanding complex questions?

25   A.   You started the question out looking at your notes and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 211 of 286

1    I couldn't hear it.  I'm sorry.

2    Q.   Would you expect that someone with an I.Q. of 70 would

3    have difficulty understanding complex questions?

4    A.   Oh, yes.  What is called a compound question here in

5    this setting would pose a great deal of difficulty for

6    someone with an I.Q. of 70.  And they would -- and they

7    might react in terms of, I'm confused.

8    Q.   What did you observe, if anything, about Mr. Wooden's

9    reactions when he is confused?

10   A.   Everything slows down.  Let me get my own handwritten

11   notes from my June 23 evaluation of Mr. Wooden.  I can't

12   even find my own handwritten notes.  I'll summarize.  The

13   first test that I administered to Mr. Wooden on June 23 was

14   the Barratt Impulsiveness Scale.  The Barratt Impulsiveness

15   Scale includes four options; the person taking the scale

16   indicates that the option never applies to him,

17   occasionally applies, sometimes applies or often applies.

18   Mr. Wooden took the Barratt and studied it very, very

19   carefully, very, very deliberately, reading each and every

20   one of the items.  And then he looked at me and said, this

21   doesn't apply to me.  And I said I think it does.  I want

22   to know what your status is now.  We're focusing on now.

23   And go through and I can clarify any answers for you.  So

24   very slowly, very deliberately, he was able to complete the

25   Barratt.  But it was a very labored effort for him.  Then

1    we went to the structured interview and the schedule of the

2    119 yes and no questions.  You've only got two options.

3    And when we narrowed it down to two options then Mr. Wooden

4    could respond more rapidly.  And he was not as slow, not as

5    deliberate.

6    Q.  Does that tell you anything about Mr. Wooden's ability

7    to refrain from committing child molestation in the future?

8    A.  No.  That information most appropriately comes from my

9    interview of him and from the June 24 deposition.  Where in

10    my interview and in the deposition, on frequent occasions,

11    Mr. Wooden made it evident he knows sexual contact with

12    children is wrong.  He feels guilty about his past sexual

13    conduct with children, and he is determined not to repeat

14    those offenses.

15    Q.  Did you look at Mr. Wooden's criminal history in

16    assessing the likelihood that he would have serious

17    difficulty refraining?

18    A.  Yes, absolutely.  And I did that by using the Static-

19    99R.  If you use the Static-99R you zero in on criminal

20    history.

21    Q.  Okay.  So what did you conclude from the Static-99R?

22    A.  My score for the Static-99R is the same as that of Dr.

23    Ross and Dr. Malinek.  I scored Mr. Wooden a 7 on the

24    Static-99R.  And what becomes exceedingly important is,

25    okay, how do we interpret that score.

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 213 of 286

1   Q.   All right.  Tell the Judge how you view a 7.

2   A.   Tell the Judge how I view?

3   Q.   How you view a score of 7.

4   A.   Okay.  Can we turn to page 38 of my report?  Because

5   it's laid out on that page.

6   Q.   Okay.  Looking at your report, what page did you want

7   us to look at?

8   A.   Page 38.

9   Q.   Now, this is a page that's got a lot of numbers on it?

10   A.   Right.

11   Q.   Maybe it would be helpful if we looked at this on the

12   projector.

13   A.   I think it's mandatory to look at it on the projector.

14   Q.   All right.  We are on page 38 of Dr. Campbell's

15   report.  Now Dr. Campbell --

16   A.   Push it back down so -- there we go.  That's good.  So

17   we can see Routine Sample.

18   Q.   Now can you explain to The Court what these numbers

19   are -- what these headings are, first of all.  What's this?

20   A.   First of all, let's talk about true positive, false

21   positive, true negative, false negative.  Then I can do

22   positive predictive power and negative predictive power,

23   okay?

24   Q.   Okay.

25   A.   When using an actuarial instrument such as the Static-

1   99R there were four possible outcomes.  You can have a true

2   positive outcome.  That outcome corresponds to a situation

3   where the instrument says this person will reoffend and in

4   fact the person does reoffend.  Or we can have a false

5   positive outcome.  For that outcome the instrument predicts

6   the person will reoffend, but he does not reoffend.  We can

7   have a true negative outcome.  The instrument predicts that

8   the individual will not reoffend, and, in fact, the

9   individual does not reoffend.  Finally, we could have a

10  false negative outcome.  The instrument predicts that the

11  individual will not reoffend, but, in fact, he does

12  reoffend.

13       So now we need to ask, okay, how accurately is this

14  actuarial instrument when we rule in recidivism risk, and

15  how accurate is this actuarial instrument when we rule out

16  recidivism risk.  We can look at the routine sample --

17  Q.   What do you mean by routine sample?  Routine sample,

18  what does that mean?

19  A.   Routine sample is a low base rate sample consisting of

20  2,406 previously convicted sex offenders for which we know

21  their outcomes over a five and ten year period of time.

22  Q.   All right.  So is this the sample -- this is one of

23  the four types of samples that people are compared to in

24  assessing where their risk is?

25  A.   Yes.  This becomes one of the four comparison samples.

1  Q.   All right.

2  A.   Using the routine sample as a comparison group for Mr.

3  Wooden, for offenders who score 7 and above on the Static-

4  99R, if we say he's going to reoffend you will be right 27

5  times.  We will be wrong 97 times.  Twenty-seven (27) true

6  positives, 97 false positives.  So 27 plus 97 is 124.  And

7  dividing 124 into 27 gives us .22.  So in other words, if

8  we use a routine sample as a comparison group, and rule in

9  recidivism risk for a score of 7 and above, we will be

10  correct only 22 percent of the time.  We will be wrong 78

11  percent of the time.

12       Now on the other hand, we could adopt the decision

13  making rule of for all individuals scoring 7 and below on

14  the Static-99R we will rule out recidivism risk.  There the

15  outcome is 2,227 true negative classifications, 130 false

16  negative classifications.  So there's a total of 2,357 rule

17  out decisions.  We're correct on 2,227 of those decisions.

18  In other words, if we rule out recidivism risk using the

19  routine sample as a comparison group, we will be correct 94

20  percent of the time.

21  Q.   So what you're saying here, and correct me if I'm

22  wrong, is that based on Mr. Wooden's score of 7 if you look

23  at him as he's not likely to reoffend then you'll be

24  correct 94 percent of the time?

25  A.   Using the routine sample as a comparison group.

1    Q.    Using the routine sample?

2    A.    Yes.

3    Q.    Okay.  But if you went down and used this Pre-Selected

4    for Treatment group, then that percentage goes down?

5    A.    Right.  If you rule out recidivism risk and use the

6    Pre-Selected for Treatment group as a comparison group,

7    you'll be right 91 percent of the time.  If you use the

8    Non-Routine Sample as a comparison group, you'll be right

9    86 percent of the time, ruling out recidivism risk.  And if

10   you rule out recidivism risk using the High Risk Sample as

11   a comparison group, you'll be correct 81 percent of the

12   time.  And the only intellectually honest way to present

13   this data is to present all four comparison groups.

14   Because we do not have well-defined guidance available to

15   us telling us which group to use.  And when you use all

16   four groups then you can say to a trier of fact, this is

17   the range.  If we rule out recidivism risk we'll be

18   correct, relying on the Static-99R, somewhere between 81

19   percent and 94 percent of the time.  If we rule in

20   recidivism risk we'll be correct only somewhere between 22

21   percent of the time and 34 percent of the time.

22   Q.    So what does that -- in your mind, what does that tell

23   us?

24   A.    What that tells us is, using actuarial instruments

25   that everyone acknowledges is the most accurate method of

1    assessment available to us, ruling out recidivism risk for
2    Mr. Wooden is consistently more accurate than ruling in
3    recidivism risk.
4    Q.   In ordinary language are you saying that if you decide
5    that Mr. Wooden is not likely to reoffend you're much more
6    likely to be correct?
7    A.   Yes.
8    Q.   Do the actuarials, do they really address Mr. Wooden
9    as an individual?
10   A.   Yes and no.  Yesterday Dr. Malinek did a very quick
11   definition of risk factors and protective factors.  And he
12   talked about dynamic factors and static factors.  And I
13   agree completely with him.  And he pointed out, dynamic
14   factors change over time.  Static factors do not change.
15   The Static-99R limits itself to static factors which will
16   encourage some people to try to use dynamic factors.  Using
17   the kind of factors identified by the Mann, Hanson,
18   Thornton 2010 study.  But if you try to use -- if you apply
19   those kinds of risk factors to an individual to assess his
20   risk you will commit an unacceptable frequency of false
21   positive errors.  If you try to use those risk factors
22   you'll walk yourself into too often concluding the
23   defenders will reoffend when, in fact, they do not.
24   Q.   Why do you say that?
25   A.   Because in using the risk factors there's a

1  misunderstanding of conditional probability. What I'm
2  getting at is this, can those risk factors, such as the
3  risk factors in the Mann, et al study be used for treatment
4  planning? Oh, yeah. Yeah. Because in treatment planning
5  a treating therapist asks himself or herself if this
6  offender reoffends, will his reoffending be driven by
7  emotional identification with children? Or if he reoffends
8  would his reoffending be driven by poor cognitive problem
9  solving? Now those are legitimate questions for a
10 therapist to pose when treatment planning. But now the
11 other question is, if the individual exhibits one or more
12 risk factors can I conclude that he is at substantial risk
13 for reoffending? The answer is no. No. It's tantamount
14 to saying, if I know you reside in Raleigh I know you
15 reside in North Carolina. But if all I know is that you
16 reside in North Carolina, I cannot automatically conclude
17 that you reside in Raleigh. Now the computations
18 underscoring what I'm talking about are found on, I think
19 it's page 55 of my report. Yes, I'm right.
20 Q.   So are you saying that the presence of these risk
21 factors has not been shown to cause recidivism?
22 A.   Correct. Because as a result of base rate
23 reconsiderations, the risk factors are found more
24 frequently in samples of offenders who do not reoffend
25 compared to the frequency with which the risk factors are

1    found in samples of offenders who do reoffend.
2    Specifically you have to be very careful that we don't walk
3    ourselves into the illogical position of saying, all sexual
4    offenders who reoffend regularly walk, talk, and drink
5    water.  That's true.  Mr. Wooden regularly walks, talks and
6    drinks water; therefore, Mr. Wooden will sexually reoffend.
7    Which of course is obviously illogical because the vast
8    majority of previously convicted sexual offenders who
9    regularly walk, talk, and drink water do not reoffend.  And
10   the vast majority of previously convicted sexual offenders
11   who exhibit the kind of risk factors found in the Mann
12   study also do not reoffend.
13   Q.   Well, what is there available that can assist a trier
14   of fact, in addition to these actuarials, in determining
15   whether someone is likely to reoffend?
16   A.   Treatment response.  If the offender was in treatment,
17   becomes exceedingly important.  And specifically the first
18   question to ask about treatment is, did this individual
19   have a good working alliance, a good working relationship
20   with his therapist.  Specifically, did the offender feel
21   that the therapist understood him; did the offender feel
22   that the therapist accepted him; and did the offender feel
23   that the therapist was being honest and sincere.  And if we
24   can satisfy those conditions, called empathy, congruence
25   and warmth, then treatment can go a long ways in assisting

1     individuals.  And the next treatment related question is

2     one of, did he get it?  Do we have evidence in treatment

3     that this offender responded positively to the treatment

4     goals.

5     Q.   In assessing Mr. Wooden, did you have an opportunity

6     to review treatment records?

7     A.   Yes, I did.

8     Q.   Were those the treatment records of Dr. Weiner?

9     A.   Yes, I did.

10    Q.   What did you note about Mr. Wooden's participation in

11    treatment with Dr. Weiner?

12    A.   One, Dr. Weiner did a very good job of establishing a

13    strong working alliance with Mr. Wooden.  Mr. Wooden would

14    be a challenge for many therapists, but Dr. Weiner did good

15    work with him.  And Dr. Weiner's emphasis is the emphasis

16    of any cognitive therapist doing relapse prevention

17    treatment.  The emphasis was one of, Mr. Wooden, will your

18    sexual urges control you, or will you control your sexual

19    urges?  And then from there what Dr. Weiner did was to

20    identify a whole variety of situations and circumstances

21    that would put Mr. Wooden at risk for reoffending and then

22    he systematically would teach Mr. Wooden, this is how we

23    are going to cope effectively with those situations and

24    circumstances.  And if you read Dr. Weiner's notes it is

25    clear and evident that Mr. Wooden responded very positively

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 221 of 286

1    to Dr. Weiner's input.

2    Q.    Well, how would you characterize, overall, Mr.

3    Wooden's success in treatment with Dr. Weiner?

4    A.    How would I overall assess --

5    Q.    Characterize his treatment.

6    A.    Very positive, very constructive to the point that his

7    treatment experience with Dr. Weiner substantially and

8    significantly decreased his recidivism risk.

9    Q.    Did you also have an opportunity to look at Mr.

10   Wooden's supervision, his performance on supervision?

11   A.    Yes.  There seemed to be some conflicts between Mr.

12   Wooden and his parole officer, as it was evident to me.

13   And I focused more on his treatment with Dr. Weiner.

14   Q.    Okay.

15       **THE COURT:**  You understand that -- can you hear me?

16   Can you hear me now?

17   A.    Yes.

18       **THE COURT:**  You understand that if he is released he

19   will be under no supervision and no control and not

20   involved in any programs?

21   A.    I understand that.

22       **THE COURT:**  Okay.

23       **MS. GRAVES:**  Actually, Your Honor, I think he is not

24   finished yet.  I think that he is --

25       **THE COURT:**  His parole is expired.

1    **MS. GRAVES:**  I think it's not until March of next

2    year.  I'll double check that, but I think it's not until

3    March of next year, but I'll have him check it.

4        **THE COURT:**  His parole would have expired when he was

5    getting ready to be certified.

6        **MS. GRAVES:**  No, sir.  He was reaching his mandatory

7    release date and, yes, I certainly don't have a great

8    understanding of D.C. parole, but I think that they had to

9    parole him again, is how it works.

10   A.   And just to clarify, my understanding was consistent

11   with the Judge's.  So my understanding may need to be

12   corrected.

13       **MS. GRAVES:**  We will clarify that for you, Your Honor.

14   Q.   Do you believe that Mr. Wooden's adjustment to

15   incarceration plays any role in his risk of recidivism?

16   A.   Yes.  What we see is that this man is no longer the

17   acting out antisocial personality disorder that he has been

18   in the past.  He has had no disciplinary reports since he

19   has been at Butner.  And if we look at his incarceration

20   history in the past, especially back into the 1980's and

21   1990's, he was getting one DR after another.  So if we look

22   at the relationship between age or frequency of antisocial

23   personality disorder, you see that the incidents of

24   antisocial personality disorder drops precipitously as

25   individuals become older.  And this is the outcome that we

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 223 of 286

1   are seeing with Mr. Wooden.

2   Q.   Why do you consider adjustment to prison something

3   that you can validly consider?

4   A.   Because you can count the frequency of how often has

5   he been ticketed for misconduct in prison.  And since he

6   has been at Butner he hasn't been ticketed at all.  If we

7   go back to --

8   Q.   What I am asking is, why does it matter?  Is there

9   some empirical data that suggests that adjustment to

10  incarceration is correlated with --

11  A.   No.  What I am getting at is, if we look at adjustment

12  to incarceration we can ask ourselves, is he exhibiting

13  evidence of antisocial personality disorder?  And for me

14  the answer is he is no longer exhibiting evidence of

15  antisocial personality disorder.  Did he qualify for that

16  diagnosis in the past?  Oh, yes, but not now.

17  Q.   All right.  I want to direct you to Exhibit [73] in

18  the notebook.

19  A.   Oh, I see.  Now, we're in the pink slips.  Okay.  And

20  this is number of infractions from 1975 through 2010.

21  Q.   Right.  And does that demonstrate when Mr. Wooden's

22  acting up in prison peaked?

23  A.   Yes.  For example, in 2002 he had one infraction; then

24  we have to go forward to 2006, he had two infractions;

25  2007, one infraction; 2008, one infraction; 2009, two

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 224 of 286

1  infractions; 2010, one infraction, compared to, for

2  example, in 1977 when he had ten infractions; in '78 he had

3  ten infractions; in 1984 he had eight infractions; 1985 he

4  had 12 infractions.  So we see evidence demonstrating that

5  this is not the defiant, acting out man in the 21st century

6  that he was in the 1970's and 1980's and even into the

7  1990's.

8  Q.   Another thing that has been talked about a lot is Mr.

9  Wooden's level of remorse.  Now, does remorse correlate or

10  lack of remorse correlate with increased recidivism?

11  A.   Absolutely not.  In the 1998 meta analysis and the

12  2005 meta analysis, Hanson reported data clearly

13  demonstrating that remorse is unrelated to sex offender

14  recidivism.

15  Q.   Nevertheless, have you noticed that Mr. Wooden does

16  show remorse?

17  A.   Yes, he does.  He expressed it with me, and he

18  expressed it in the course of his deposition with Mr.

19  James.

20  Q.   I think there has also been some question about

21  whether Mr. Wooden has any healthy interest in appropriate

22  partners.  Did you see any evidence of that with Mr.

23  Wooden?

24  A.   Yes.  He told me that he would like to find a lady

25  with whom he could have a relationship.  And he thinks

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 225 of 286

1    about what he lost as a result of his misconduct, and he

2    talked about, I don't have a family; I don't have kids; I

3    don't have a wife.  And those things are still important to

4    him.

5    Q.   Did you draw any conclusion about whether Mr. Wooden

6    molested a child in 2005, the allegation that led to his

7    incarceration?

8    A.   No.  I know there is evidence where one can argue,

9    yes, he did molest that child.  There is other equally

10   impressive evidence where one can argue, no, he did not

11   molest that child.  And my position is I am not a trier of

12   fact.  It is inappropriate for me to assume that position;

13   and, therefore, I will not.

14   Q.   What sort of evidence did you see that he did not

15   molest the child?

16   A.   What is most significant is the investigative

17   interview undertaken with the child by the Washington, D.C.

18   Metropolitan Police.  Now, we have relevant peer review

19   data reported by Ceci and Bruck -- London, Ceci and Bruck,

20   demonstrating, one, sexually abused children do not

21   spontaneously disclose their abuse.  They don't

22   spontaneously tell an adult, hey, I want to tell you what

23   this guy did to me.  It doesn't happen that way.  You have

24   to ask them.  What all the data also clearly demonstrates

25   that when directly asked if they have been sexually abused,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 226 of 286

1     more than 80 percent, about 85 percent, of sexually abused

2     children will promptly disclose their abuse and the level

3     of disclosure becomes even higher if the child is involved

4     in a formal, forensic interview, such as the child in this

5     case was.

6     Q.    Now, there were some other instruments that were used

7     by, I believe, Dr. Malinek and Dr. Ross in this case, the

8     MnSOST-R --

9     A.    Yes.

10    Q.    -- and the Static-2002R --

11    A.    Correct.

12    Q.    -- and the SVR-20, I believe.

13    A.    Again, correct.

14    Q.    Okay.  Let's just take those one at a time.  And would

15    you please explain to me why you did not use the MnSOST-R.

16    A.    The MnSOST-R is a totally and completely unvalidated

17    instrument.  There are no peer reviewed data whatsoever

18    available to support it.  To understand the problems with

19    the MsSOST-R we have to do a very brief history about the

20    Static-99.  The original Static-99 had a base rate of

21    recidivism of --

22        **THE COURT:**  I really don't need to learn all that.

23    A.    Okay.

24        **THE COURT:**  I mean your opinion that it is unreliable

25    is sufficient.

1    A.    Okay.

2          **MS. GRAVES:**  Thank you, Your Honor.

3    Q.    And what about the Static-2002R?

4    A.    Well, we can go back to page 38 of my report, and I

5    report Static-2002R data for Mr. Wooden.  The positive

6    predicted values for the Static-2002R range from .25 to

7    .38.  Therefore, if relying on the Static-2002R at a score

8    of nine (9) and you attempt to rule in recidivism risks for

9    Mr. Wooden, you are going to be right somewhere between 25

10   percent or 38 percent of the time.  That means you are

11   going to be wrong somewhere between 62 percent and 75

12   percent of the time when concluding that an offender such

13   as Mr. Wooden is going to sexually reoffend.  If you rule

14   out recidivism risk based on the Static-2002R score of nine

15   (9), ruling our recidivism risk you will be correct

16   somewhere between 80 percent and 95 percent of the time

17   when relying on the Static-2002R.

18   Q.    What about the SVR-20?

19   A.    The SVR-20 stands for Sexual Violence Risk-20.  There

20   is no systematic objective method for scoring the SVR-20;

21   and, therefore, I can give you, as you have seen, negative

22   predictive values and positive predictive values for the

23   Static-99R and the Static-2002R.  For the SVR-20 those data

24   are not even available.  Therefore, can we even begin to

25   know what is the margin of error when using the SVR-20?

1  No.  The SVR-20 should be used for treatment planning.  It

2  should not be used for assessing risk of sexual

3  reoffending.

4  Q.  Now, one other thing that we've talked about, in

5  addition to the dynamic risk factors, are protective

6  factors.  Did you look at whether there were any protective

7  factors present in this case?

8  A.  Yes, I did.  I spoke yesterday with Mr. Wooden's

9  sister, Addie Wooden.  If released Mr. Wooden would live

10  with his sister in Capitol Heights, Maryland, right outside

11  the District.  Ms. Wooden fully understands her brother's

12  offense history.  She knows that her brother has no

13  business being around young male children.  She and her

14  brother have a history of getting along well.  And one of

15  the things that Ms. Wooden said to me is, "Walter needs his

16  spiritual food.  He needs to get back to church.  And I

17  want him to do that."  So what I know is that Mr. Wooden

18  would return to a living environment characterized by high

19  levels of social support.  A situation in which he would

20  have the benefit of interacting with people who accept him,

21  encourage him, and understand him.

22      **MS. GRAVES:**  Your Honor, I believe those are all the

23  questions I have.

24      **THE COURT:**  I'll let you start -- here's what we're

25  going to do.  If we don't finish with this witness -- is

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 229 of 286

1  this your only witness?

2      **MS. GRAVES:**  Your Honor, we have some other witnesses

3  that we would like to call, but they were not able to be

4  here today.

5      **THE COURT:**  All right.  Today it's your only witness?

6      **MS. GRAVES:**  Yes, sir.

7      **THE COURT:**  Okay.  You know I have a jury at two.  So

8  here is what I would like to do.  Is go for a few more

9  minutes and take the lunch recess.  Pick the jury at two

10  and start that case in the morning.  And it will only take

11  me an hour to pick the jury at the most.  And then we can

12  return to finish this case either entirely or substantially

13  today so we won't have to come back in a week or so.

14      **MR. JAMES:**  Very well, Judge.  I know you're going to

15  have a number of jurors coming in that want to be selected

16  for --

17      **THE COURT:**  We're going to break by 12:30.

18      **MR. JAMES:**  Okay.  Very well.

19      **THE COURT:**  And then I think I'll have the jury picked

20  and have them come back at 9:30 tomorrow morning for the

21  criminal case.  And then we can finish this out.

22      **MR. JAMES:**  Yes, Your Honor.  Thank you.

23                           <u>CROSS-EXAMINATION</u>

24  **BY MR. JAMES:**

25  Q.  Good Morning, Dr. Campbell.

1   A.   Good Morning, Mr. James.

2   Q.   It's a pleasure to meet you.  We did your deposition

3   by video.

4   A.   Yes.

5   Q.   You can hear me clearly?

6   A.   I'm straining.  If you could move a little bit closer

7   to me, I would appreciate it very much.

8   Q.   All right.  Well you were able to hear Ms. Graves

9   clearly when she was at this monitor over here.

10  A.   All I heard was you refer to Ms. Graves.

11  Q.   Very well, okay.

12       **MR. JAMES:**  May I approach, Your Honor.

13       **THE COURT:**  Wherever.

14       (Mr. James moves closer to Dr. Campbell)

15  Q.   Dr. Campbell, if Walter Wooden, you believe this, if

16  Walter Wooden touched that boy, that seven-year-old boy in

17  2005, you believe that he should be civilly committed;

18  isn't that correct?

19  A.   Correct.

20  Q.   And you believe that he should be civilly committed

21  because you have compelling evidence of his losing control

22  of his behavior, acting impulsively, and acting out in a

23  sexually inappropriate manner within the last six years?

24  A.   Yes, yes, and yes.

25       **THE COURT:**  Mr. James, so his entire opinion, that is

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 231 of 286

1    reliant on the non-occurrence of that event?

2         **MR. JAMES:**  That is correct, Your Honor.

3         **THE COURT:**  Okay.

4         **MR. JAMES:**  And that is his testimony.

5         **THE COURT:**  We sort of boiled it down to its essence.

6         **MR. JAMES:**  I was trying to get to the nub as quickly

7    as I could.

8         **THE COURT:**  Didn't he have a revocation proceeding?

9         **MR. JAMES:**  He did, Your Honor.  He had a revocation

10   proceeding.

11        **THE COURT:**  And did he admit or deny the conduct?

12        **MR. JAMES:**  I believe he denied the conduct.  But they

13   found based on the evidence that it was supported.  And

14   that's what brought him before The Court.

15        **THE COURT:**  Are people represented at a parole

16   revocation?

17        **MR. JAMES:**  I think he did have counsel representing

18   him.  I believe he did have an attorney at the time.

19        **THE COURT:**  Okay.

20   Q.   Okay.  I'm standing over here.  Can you hear me?

21   A.   Yes.  You've increased the volume of your voice and

22   it's coming through, thank you.

23   Q.   I will increase volume and I will slow down, so you

24   can hear me.

25   A.   Thank you, very much.

1  Q.  All right.  You have testified that his relationship

2  with Dr. Weiner was a factor that you considered?

3  A.  Correct.

4  Q.  And just so that we're clear -- so that we are clear,

5  that type of factor is a factor that's not considered by

6  the actuarials?

7  A.  Again, correct.

8  Q.  That is like a dynamic factor?

9  A.  Oh, very much so.

10  Q.  And that relationship is what you called a positive

11  alliance; is that correct?

12  A.  Yes.

13  Q.  Well this positive ally of the Respondent, this was

14  his conclusion about the Respondent's risk of reoffending.

15  And you knew this because you had all these documents.

16      All right, looking at -- I've highlighted it so it's

17  easier for everyone to see.  This is from Dr. Weiner's

18  notes about his treatment in June.  And that was his last

19  treatment with Dr. Weiner; isn't that correct?

20  A.  Correct.

21  Q.  After being with Dr. Weiner from, I believe it was

22  December of 2002 when he began his treatment?

23  A.  Again, I think you're correct.

24  Q.  This is the last date.  Is client's progress in

25  compliance within projected treatment objectives?  No.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 233 of 286

1   A.   That's what Dr. Weiner indicated at that time.

2   Q.   Well, that's the last treatment he had with Dr.

3   Weiner, isn't that correct?

4   A.   Yes.  And that's what Dr. Weiner indicated at that

5   time.  Dr. Weiner had expressed other opinions about Mr.

6   Wooden's treatment progress.  Dr. Weiner had been so

7   impressed with Mr. Wooden's treatment progress around

8   December 2004 that he was about to terminate treatment.

9   Q.   All of that was before, according to Dr. Weiner, he

10  told Dr. Weiner he was with a little boy?

11  A.   Mr. Wooden would insist that he told Dr. Weiner that

12  he had had dreams about a little boy.

13  Q.   I didn't ask you what Mr. Wooden stated.  I'm asking,

14  according to Dr. Weiner's notes, what he told Dr. Weiner.

15  A.   As Dr. Weiner recalled it, understanding, and I'm a

16  voice of experience, treatment notes can be mistaken.  You

17  can get confused from one client to another if you're

18  seeing multiple clients in a given day.

19  Q.   You're speculating about that, are you not?

20  A.   No, I know for a fact the accuracy of treatment notes

21  is dependent upon the accuracy of therapist's recall.  And

22  the accuracy of therapist's recall is dependent upon how

23  many clients you see in a day, how many clients do you see

24  in a week.  The more clients you see the less accurate is

25  your recall.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 234 of 286

1      **THE COURT:**  Well, let's not talk about that.  Let's

2      talk about this.  Dr. Weiner presumably knew there were

3      profound and enduring consequences from reporting actual

4      conduct rather than a dream.  You would agree with that?

5      A.   Right.

6      **THE COURT:**  A dream is not going to precipitate any

7      sort of revocation.

8      A.   What Dr. Weiner reported as a mandated reporter, which

9      I have done, is he reported a reasonable suspicion.  If

10     you're a mandated reporter --

11     **THE COURT:**  He would not have had to report a dream,

12     would he?

13     A.   You can report reasonable suspicion on the basis of

14     the offender who has been around children.

15     **THE COURT:**  But the point is that he understood that

16     this report had consequences, that it wasn't an ideation or

17     a dream?

18     A.   No.  The correspondence is that Dr. Weiner regarded as

19     a reasonable suspicion.

20     **THE COURT:**  All right.  Let's take our lunch break now

21     and we'll come back, hopefully at three.

22          (Court recess in this case until 3:00 p.m.)

23     Q.   Good afternoon once again, Dr. Campbell.

24     A.   Good afternoon, Mr. James.

25     Q.   Can you hear me clearly?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 235 of 286

1    A.    Yes, I can.  Thank you for asking.

2    Q.    Looking once again on Dr. Weiner's notes, which are a

3    part of Government Exhibit Number -- Dr. Weiner's treatment

4    notes.  From the last session that he had with the

5    respondent, Walter Wooden, that was the Monthly Treatment

6    Report for June 2005.  This is contained in Government

7    Exhibit Number [30].

8    A.    Should I turn to number [30]?

9    Q.    Although we do have it on the board.

10   A.    Oh, okay.

11   Q.    Can you see that?

12   A.    Yeah, I can follow that fine.  I thought you were

13   going to a different document.  That's all.

14   Q.    Now you have provided testimony in which you stated

15   the productive treatment alliance between Dr. Weiner and

16   Walter Wooden was a dynamic factor; is that correct?

17   A.    Correct.

18   Q.    And you thought of that as a positive dynamic factor?

19   A.    Again, correct.

20   Q.    Now in fact what Dr. Weiner wrote in the treatment

21   note for June 2005, the last month in which there was

22   treatment between Dr. Weiner and the Respondent, Walter

23   Wooden, was that: one, is the client's progress in

24   compliance with projected treatment objectives?  His answer

25   was no.  Number two, client's overall attitude, behavior,

1    and commitment to refraining from sexually offending

2    behavior during this period.  His choice was poor.

3    A.    If you're asking me, correct, I see that.

4    Q.    Present risk to community.  That is his present risk

5    as of June 2005.  Despite treatment that was going on since

6    December 2002, his present risk before his parole was

7    revoked, according to Dr. Weiner, his treatment ally, was

8    high.  Do you still maintain treatment as a dynamic

9    positive factor in your analysis with regard to Walter

10   Wooden?

11   A.    Yes, it was -- were there some problems in treatment?

12   Yes.  Was treatment more of a positive experience for Mr.

13   Wooden than it was a negative experience?  Yes.

14   Q.    Also in Government Exhibit Number [30] there is a

15   note, treatment note, dated June 21, 2005.  Would you put

16   that on the ELMO?  In 2005, June 21, 2005.  You would

17   agree, would you not, that being truthful and honest with

18   the treatment provider is very important?

19   A.    I hear you.  I'm just waiting for a question.

20   Q.    I asked you, you would agree, would you not, that

21   being truthful and honest with the treatment provider, in

22   this case Dr. Weiner, was important?

23   A.    Was Mr. Wooden being entirely truthful and honest, no.

24   Like the vast majority of clients in counseling he was in

25   engaging in what we call impression management, attempting

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 237 of 286

1    to create and positive impression of himself.  And the

2    relevant peer review data demonstrates practically all

3    clients do it.

4    Q.   That was not my question, sir.  My question to you

5    was: You would agree, would you not, that being truthful

6    and honest to the treatment provider, that being Dr.

7    Weiner, was important?

8    A.   Yes, it was important.  Yes.

9    Q.   And in fact, based on the record, specifically Dr.

10   Weiner's record, as detailed in Dr. Weiner's treatment note

11   on June 21, 2005, Wooden admitted that he was not being

12   completely truthful and honest; is that correct?

13   A.   That's what it says in the note.

14   Q.   In Dr. Weiner's notes?

15   A.   Yes, thank you.  Yes, you're correct.

16   Q.   And you have no reason to doubt the accuracy of Dr.

17   Weiner's notes, do you?

18   A.   That particular note; no.

19   Q.   You relied heavily on Dr. Weiner's positive notations

20   in your report?

21   A.   Correct.

22   Q.   Another notation by Dr. Weiner, he states that Mr.

23   Wooden admitted that he was not being completely truthful

24   and honest about every sexual contact with a child.  He

25   reported that he did have thoughts about offending against

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 238 of 286

1    a young boy about 2-3 years ago and attempted to entice the
2    boy into the basement for sexual activity.  He reported
3    that he changed his mind and didn't go through with
4    offending against the boy.  Now, if it was 2-3 years ago --
5    if this was 2 or 3 years ago, this would then be occurring
6    during the period of time Dr. Weiner was writing a number
7    of positive reports about Walter Wooden?
8    A.   Correct.
9    Q.   Meaning that during the course of his treatment Walter
10   Wooden was not being honest with Dr. Weiner.
11   A.   He was not being entirely truthful and honest, not
12   completely truthful and honest.
13   Q.   Well, when he reports two to three years later that he
14   almost had a boy in the basement with him, and Walter
15   Wooden, as you know, is a repeated child molester, that is
16   not being honest in during the course of your treatment?
17   A.   Correct.  And I'm responding to Dr. Weiner's note.  He
18   was not being completely truthful and honest.
19   Q.   During the course of your testimony you represented to
20   The Court that Walter Wooden did not get disciplinary
21   infractions while he was at Butner.  Do you recall
22   testifying about that earlier today?
23   A.   Yes.  That's what I thought.  Correct.
24   Q.   Have you learned different?
25   A.   I was shown that list of infractions.  And I saw

1  either one infraction for 2010, or one infraction for 2011.

2  And one or both of those could have occurred at Butner.

3  Q.  And you realized that at the point when his counsel

4  showed you the actual documents, the time line?

5  A.  Correct, yes.

6  Q.  Why didn't you identify it to us as that point in

7  time?

8  A.  Because I wasn't asked a related question.

9  Q.  All right. Based upon the record, Walter Wooden on

10  September 5, 2006, he was cited for refusing to take an

11  alcohol test?

12  A.  I'm sorry, I didn't hear that.

13     **MR. JAMES:**  I'll approach again, with The Court's

14  permission.

15     **THE COURT:**  Yes.

16  Q.  On September 5, 2006, Walter Wooden was cited for

17  refusing to take an alcohol test?

18  A.  (Nod head up and down.)

19  Q.  For the record you're nodding your head yes? You were

20  nodding your head yes.

21  A.  I'm nodding my head yes to indicate that I'm clearly

22  hearing you.

23  Q.  Okay, all right. On August 28, 2007, Walter Wooden,

24  while at Butner was cited for being insolent to staff

25  members? On September 4, 2008, he was cited for possessing

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 240 of 286

1    unauthorized item.  On August 19, 2009, he was cited for

2    insolence towards staff.  Therefore, he is not incident

3    free while he has been at Butner.

4    A.    You are correcting my opinion.  You're right.

5    Q.    Now you testified during Direct Examination that you

6    spoke with Walter Wooden's sister, Addie.

7    A.    I testified during Direct Examination that I spoke

8    with Walter Wooden --

9    Q.    His sister.

10   A.    Yes.

11   Q.    Right?

12   A.    Correct.

13   Q.    And according to you his sister said that if Walter

14   Wooden is released he would stay with her in Maryland?

15   A.    Correct.

16   Q.    That he needs to get back to church?

17   A.    Specifically, he needs his spiritual food.

18   Q.    Spiritual food; right.  Now Walter Wooden -- you

19   reviewed the record in this case?

20   A.    Yes.

21   Q.    Quite an extensive record?

22   A.    Oh, yes.

23   Q.    And the record includes offenses that occurred in 1983

24   or '84?

25   A.    Again, correct.

1  Q.  And do you recall reading in that record that when he

2  committed the '83, '84 offenses he was working at a church?

3  A.  No, I did not recall that.

4  Q.  Do you recall that he was going to church?

5  A.  And I did not recall that.

6  Q.  Now with regard to the 2005 -- regarding the 2005

7  parole revocation matter, the reporting of the young boy,

8  during the course of your testimony you were casting doubt

9  on its accuracy; is that a fair statement?

10  A.  Correct.

11  Q.  And you testified about child victims?

12  A.  Again, correct.

13  Q.  Point number one, you're not certified as an expert

14  witness in this proceeding with regard to child reporting

15  of incidences; is that a fair statement?

16  A.  I'm not certified as an expert witness in this

17  proceeding regarding child --

18  Q.  A child's ability to recall and testify on offenses?

19  A.  No.  I've been recognized as an expert in that matter

20  in other proceedings, but not in this proceeding.

21  Q.  But not in this one.  Secondly, Walter Wooden, because

22  you have read his history in this case, you know that

23  Walter Wooden was sexually abused as a boy.

24  A.  Correct.

25  Q.  He was molested?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 242 of 286

1    A.    Correct.

2    Q.    He didn't report the molestation?

3    A.    I think eventually he reported it.

4    Q.    Dr. Campbell, you were present during the course of

5    his testimony, isn't that correct?

6    A.    All I heard was Dr. Campbell and is that correct.

7    Q.    You were present during Walter Wooden's testimony; is

8    that not correct?

9    A.    Yes.

10    Q.    Walter Wooden testified he did not tell his father;

11    isn't that correct?

12    A.    Correct.

13    Q.    Because he didn't want his father to go out and kill

14    someone and then go to jail?

15    A.    That's right.

16    Q.    Ms. Graves was talking to you at one point with regard

17    to Walter Wooden expressing remorse.  Do you recall her

18    questions about that?

19    A.    Some of them.

20    Q.    Specifically that Walter Wooden expressed remorse

21    about what he had done?

22    A.    I know he did, from reading his deposition.

23    Q.    Did you testify that he had expressed that remorse to

24    you as well when you did your three hour interview?

25    A.    Yes.

1   Q.   So he expressed remorse?

2   A.   To me, on June 23rd, yes.

3   Q.   Now, at first prior to Ms. Graves asking you about

4   Walter Wooden's remorse --

5   A.   At first?

6   Q.   Prior to Ms. Graves asking you about Walter Wooden's

7   expression of remorse, you testified about a number of

8   factors, like acceptance of responsibility, which are not

9   tied to recidivism?

10  A.   Again, correct.

11  Q.   Okay.  Do you believe that Walter Wooden's expression

12  of remorse here today before this Court should be

13  considered by the experienced Judge in deciding whether

14  Walter Wooden has changed?

15  A.   Yes and no.  And let me explain.  If the Judge wants

16  to consider expressions of remorse as reducing recidivism

17  risk, no, don't do that.  The data does not support it.  If

18  the Judge wants to consider expressions of remorse for

19  other purposes, other legal purposes, then that's within

20  the Judge's discretion.  And as a non-attorney I have no

21  business commenting on it.

22  Q.   You cannot point to a positive dynamic factor within

23  the last six years with regard to treatment for Walter

24  Wooden?

25  A.   Yes, I can.

1    Q.   Where did he have treatment?

2    A.   Let me answer the first question.  In your deposition

3    Mr. Wooden made it very clear that he would accept

4    treatment if it were available to him.  And he explained at

5    this time no treatment has been made available to him.

6    Q.   He stated that he has not been -- Walter Wooden stated

7    that he has not had sex offender treatment; isn't that

8    correct?

9    A.   Correct.  And he also stated he would like it, but

10   it's not available to him.

11   Q.   You place heavy credit on what Walter Wooden states;

12   isn't that correct?

13   A.   I attribute some credit to it, yes.

14   Q.   You attribute as much of Walter Wooden's statements as

15   you do any other documentary evidence, and any other

16   witness that has testified; would that be a fair statement?

17   A.   No.  No.

18   Q.   Okay.

19   A.   To me the single most important piece of evidence in

20   this case is the Static 99-R.  Possibly the Static 2002-R

21   is the second most important piece of evidence.  Third most

22   important piece of evidence are those portions of my report

23   demonstrating that you cannot use risk factors to rule in

24   recidivism risk.  All those considerations are much more

25   important than anything that Mr. Wooden told me.

1  Q.  Mr. Wooden's score on the Static 99-R was a 7?

2  A.  Correct.

3  Q.  According to the Static 99-R, which lists categories,

4  that is a high in the risk categories of the Static 99-R;

5  isn't that correct?

6  A.  If we want to rely on a poorly defined, ambiguous

7  verbal probability phrases, yes.

8  Q.  You rely on the Static 99-R?

9  A.  Yes.  But not the verbal probability phrases.  I rely

10  on the negative predictive values and positive predictive

11  values obtained from the Static 99-R.

12  Q.  His score on the Static 2002-R, that's also, according

13  to the Static 2002-R, a high score; isn't that correct?

14  A.  Again, relying on an ambiguous verbal probability

15  phrase, when peer reviewed literature advises us, don't do

16  that.  Those phrases create more confusion than they

17  clarify.

18  Q.  So you kind of pick and choose what you want to

19  consider in the actuarial, and what you don't?

20  A.  No.  I make quantitative data more important than

21  qualitative descriptions.  And I do it consistently.

22  Q.  And when you talk about quantitative data you're

23  talking about things such as the number of arrests?

24  A.  When you're talking about quantitative data you're

25  talking about things that are a number and I lost it.

1    Q.   When you're referring to quantitative data you are

2    referencing -- let's talk about the Static 99-R for

3    instance.  Things such as the number of, in this case,

4    prior sex convictions?

5    A.   Correct.

6    Q.   Isn't that correct?

7    A.   Correct.

8    Q.   So you would rely on that?  You do rely on that?

9    A.   Yes.

10   Q.   Right.

11   A.   And what I rely on more than anything is the total

12   Static 99-R score.

13   Q.   I understand that.  That part of the Static 99-R score

14   you do rely upon?

15   A.   Yes, that's correct.

16   Q.   Now you made reference to qualitative -- what's the

17   phrase you used; qualitative?

18   A.   Qualitative descriptions.

19   Q.   Descriptions.  Qualitative descriptions.  A

20   qualitative description would be such as whether the victim

21   was a male?

22   A.   No, there's nothing qualitative about it.

23   Q.   No?

24   A.   I mean you and I could look at some offenders offense

25   history and you and I would agree like that; does he have

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 247 of 286

1    male victims or does he not.

2    Q.    So what do you mean by qualitative?

3    A.    Can the information easily be transformed into a

4    number.

5    Q.    Can you break that down more easily for us?

6    A.    (No response.)

7    Q.    Can you break that down more easily for all of us?

8    A.    Yeah.  For example, consider your example of male

9    victim.  It's one of the items on the Static 99-R.  So here

10   the level of agreement between psychologists using the

11   Static 99-R would be very high when you're rating, does

12   this offender have a history of a male victim.  And if it's

13   yes, that is transformed into a score of one.  If it's no

14   it equals a score of zero.

15   Q.    During the deposition when we had question and answer

16   regarding qualitative --

17   A.    Distinctions.

18   Q.    -- distinctions.  You referenced whether the offender

19   used a firearm; is that correct?

20   A.    I know I referenced whether the offender used a

21   weapon.

22   Q.    Okay, whether the offender used a weapon?

23   A.    Right.

24   Q.    How is that different than if the offender offended

25   against a male?

1    A.    You know, if he offended against a male is not an

2    issue that can create differences of opinion.  If he used a

3    weapon in some circumstances it could create differences of

4    opinion.  And the bottom line is, if the offender has a

5    history of using a weapon and offending, that has nothing

6    to do with his recidivism risk in the future.

7    Q.    During the course of your three hour interview with

8    Walter Wooden, you did not ask him anything about the 1972

9    adjudication?

10   A.    Correct.

11   Q.    The 1973 adjudication?

12   A.    Correct.

13   Q.    The 1983 adjudication?

14   A.    Correct.

15   Q.    Now if the information from the 1972 adjudication was

16   somewhat sparse on the record.  The police report, that was

17   kind of sparse, was it not?

18   A.    Compared to the information from the subsequent

19   offenses, yes.

20   Q.    And you had before you when you prepared your report,

21   not when you interviewed him, but when you prepared your

22   report, you had his deposition testimony?

23   A.    I don't think I did.  Wait a minute.  No, I didn't.

24   If I had had the deposition transcript prior to preparing

25   my report, I would have identified it.  The report is dated

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 249 of 286

1 June 27, but I don't think at the time I completed this

2 report that I had seen the transcript of his deposition.

3 Q. Because you did not ask Walter Wooden whether he knew

4 the victims from the 1972 incidents, you don't know if

5 these victims were known to him or they were strangers?

6 A. I see what you're getting at.  As a result of reading

7 the deposition transcript I knew that all the victims

8 except one were known to him.  I might have also gotten

9 that information interviewing him, but what stands out in

10 my mind is reading it in the deposition transcript.

11 Q. You testified that you used the Barratt Impulsiveness

12 Scale test?

13 A. Correct.

14 Q. Now the majority of forensic sex offender evaluations

15 do not use that test to determine in sex offender forensic

16 examinations; isn't that correct?

17 A. I think that is correct.  It is being used more and

18 more frequently in terms of assessing violence risk in

19 general across the board, including but not confined to sex

20 offenders.  The Barratt Impulsiveness Scale is used very

21 commonly.  A peer reviewed article -- excuse me for one

22 moment -- peer reviewed article said that the Barratt

23 Impulsiveness Scale "is arguably the most commonly

24 administered self-report measure specifically designed for

25 the assessment of impulsiveness in both research and

1  clinical settings."

2  Q.   That is not commonly used by sex offender forensic

3  evaluators in determining civil commitment?

4  A.   It's being increasingly used.  All of the time more

5  and more evaluators are using it.  Now if you said, Dr.

6  Campbell, one year ago was the Barratt commonly used, I'd

7  say, no.  Now it's used with such frequency I would say now

8  it's commonly used.

9  Q.   That is a self-report test?

10  A.   Correct.

11  Q.   Do you take into account in a forensic setting in

12  which an individual facing civil commitment, they would

13  have a reason to be untruthful?

14  A.   Right.  The Barratt, however, is not transparent in

15  terms of what it assesses.  In other words, an individual

16  taking the Barratt cannot easily identify, oh, this

17  instrument is trying to identify if I'm an impulsive

18  person.  The items are more subtle than that.

19  Q.   During the course of your testimony there was some

20  questioning by The Court with regard to the respondent's

21  I.Q.  And you stated that his I.Q. score was a 48.

22  A.   No, I didn't say that.

23      **THE COURT:**  He said it was a 70.

24  A.   Correct.  Oh, 48 is the score on the Barratt

25  Impulsiveness Scale.  That's where you got it.

1   Q.   All right.  Now his I.Q. was found to be in the dull

2   normal range; isn't that correct?

3   A.   In all honesty I forget the distinctions.  They are in

4   DSM-IV.  If we have a DSM-IV here we can look at them.

5   But, again, those are quantitative descriptive terms.  So

6   is his I.Q. significantly less than average; yes.

7      **THE COURT:**  I don't know whether his I.Q. was taken

8   when he was a school child before he turned 22, or whether

9   it was taken after.  I do a tremendous number of Social

10   Security cases in which mental deficit is the disability.

11   And I'm not an academic expert, but I'm a very practical

12   expert on I.Q. stuff.  I think he's probably in the mid

13   60s.  I don't know what the verbal and full scale is.  Do

14   we have any of that information in the records?  No.

15   A.   Only that his I.Q. is 70.

16      **THE COURT:**  It would come from his schooling.  He was

17   tested sometime between five years old and 15 when he was

18   in school.

19   A.   The testing came from the Bureau of Prisons.  At

20   sometime from the Bureau of Prisons.

21      **THE COURT:**  But I'm telling you he was tested sometime

22   like every other kid who's in public school when they're

23   between the ages of five and 14.

24   A.   Correct.

25      **THE COURT:**  That would be the salient I.Q. test.  That

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 252 of 286

1    would be the one to have.

2    A.    No the more recent test would be the better one.

3         **THE COURT:**  I don't think so.

4         **MR. JAMES:**  May I approach the witness, Your Honor.

5         **THE COURT:**  Yes.

6         **THE COURT:**  I.Q.'s are going to be verbal, math and

7    full scale.

8    A.    I.Q.'s are going to be verbal, quantitative and then

9    the combination of verbal and quantitative.

10        **THE COURT:**  Yeah, all three numbers can be different?

11   A.    Oh, yes.

12   Q.    I will show you what is marked for identification as

13   --

14        **THE COURT:**  The Static 99-R, do you believe it can

15   ever predict recidivism?

16   A.    Yes.  But we've got to make more revisions.  We've got

17   to break it down so we look at type of offender and then we

18   look at change in dynamic variables over time.

19        **THE COURT:**  It's never going to show that it's more

20   than a 50 percent chance that you'll recidivate, is it?

21   A.    I think it could if we looked at type of offender.  In

22   other words not just child molester but child molester who

23   targets male children, child molester who targets female

24   children versus rapists.  And then we'd have to break it

25   down in terms of changes in dynamic variables over time,

1    specifically addressing over time is this offender's

2    prognosis improving or deteriorating?

3        **THE COURT:**  But the way it's scored now you would

4    agree that it can never predict recidivism?

5    A.  By virtue of confining itself to static variables and

6    static variables alone, is it going to be accurate for

7    ruling in recidivism risk?  No.  Can it be accurate for

8    ruling out recidivism risk?  Yes.

9        **THE COURT:**  Okay.

10   Q.  With regard to the question about his I.Q. records.

11   Seeing what is marked as Government's Exhibit Number [80],

12   this is a BOP report from FCI Petersburg, Virginia.  He was

13   21 years old.

14   A.  I got hung up on reading what's highlighted and I

15   didn't pay attention to you.

16   Q.  I'm showing you what is marked as Government Exhibit

17   Number [80].

18   A.  Okay.

19       **THE COURT:**  It doesn't have a score.  Just the dull

20   normal range; is that what it's saying?

21       **MR. JAMES:**  Yes, Your Honor, it does say that.

22       **THE COURT:**  It doesn't give a score though does it?

23       **MR. JAMES:**  No, it does not.

24   Q.  Now isn't, in fact, a dull normal range between 80 and

25   90?

1    A.    If you say so.  I don't have the categorical terms
2    memorized.
3         **THE COURT:**  80 to 90 is way too high for that dull
4    normal, in my opinion.
5    A.    All we've got to do is consult DSM-IV and it will tell
6    us.
7         **MR. JAMES:**  Your Honor, if you want some testimony
8    regarding that, we can call Dr. Malinek.
9    Q.    Now, Dr. Campbell, you view recidivism in the way the
10   Static 99-R does; is that correct?
11   A.    I use the Static 99-R to identify a recidivism rate?
12   Is that the question?
13   Q.    Do you view recidivism the way a Static 99-R does?
14   A.    Yes.
15   Q.    Now you have found that he does not suffer from
16   antisocial personality disorder; is that correct?
17   A.    I did not find a diagnosis for Mr. Wooden of
18   antisocial personality disorder at this time.  That is
19   correct.
20   Q.    And in fact you used a questionnaire?
21   A.    The Structured Clinical Interview for DSM-IV and also
22   relied upon a review of his misconduct history in the
23   Bureau of Prisons.
24   Q.    Now with regard to the Structured Clinical Interview
25   for DSM-IV, Government Exhibit Number [37], that's what you

1    used; is that correct?

2    A.   Correct.

3    Q.   Now during your deposition -- prior to the deposition

4    you had given a copy of this to Ms. Graves or her office?

5    A.   Again, correct.

6    Q.   And you may recall during the deposition we broke at

7    one point because we did not have it at the time?

8    A.   Yes, I recall that.  No, wait.  You did have it.  I

9    had faxed the material to Ms. Craven's office the day

10   before my deposition and you did have it.  Because I

11   remember you sitting in Raleigh holding up the DSM -- the

12   cover and showing it to me.

13   Q.   Well, let me make a correction.  We did not have the

14   full copy; do you recall that?

15   A.   I gave you all of the 119 yes/no items.  And I gave

16   you all of the pages where I had written notes.

17   Q.   You testified that there were portions that you did

18   not provide to us because Walter Wooden did not answer.  He

19   stated no.

20   A.   Correct.

21   Q.   And that was from pages 33-40.

22   A.   And that was because --

23   Q.   And that was pages 33-40?

24   A.   Correct.  There was nothing written on those pages

25   because Walter Wooden had not responded affirmatively to

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 256 of 286

1    lead me into asking those follow-up questions.

2    Q.   This is page 33; do you see that?

3    A.   Correct.

4    Q.   Moving up, these are your hand notes.  And the

5    question, 108, it reads, "You've said that before you were

6    15, you deliberately tortured someone or caused someone

7    physical pain and suffering."  And read your hand notes to

8    The Court.  Can you read that?

9    A.   Mr. James, I'm sorry.  When you're looking down at the

10    document I can't read your lips and I'm lost about what

11    you're saying.  Are you asking me to read what my note

12    says?

13    Q.   Yes.

14    A.   Sure.  "I had sex with someone."  And I asked, "Did it

15    cause pain or suffering."  And Mr. Wooden responded, "I

16    feel it was pain because they didn't want it."

17    Q.   Now the question, number 108, "You've said that before

18    you were 15, you deliberately tortured someone?"

19    A.   Correct.

20    Q.   And he gave that response?

21    A.   He read the item.  He answered affirmatively and then

22    I asked the follow-up question.

23    Q.   Now turning to page 34.  And there is nothing marked

24    there.  There is nothing marked there; is that correct?

25    A.   Correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 257 of 286

1    Q.    Turn to page 35.  Again, nothing marked?

2    A.    Again, correct.

3    Q.    Page 36, nothing marked?

4    A.    Also correct.

5    Q.    Page 37.

6    A.    There's nothing marked there.

7    Q.    Now the question on page 37 says, "Now since you were

8    15," meaning at least from the age of 15, "have you done

9    things that are against the law even if you weren't

10   caught?"  Then it gives a few examples.  Like stealing,

11   using or selling drugs, writing bad checks, or having sex

12   for money.  So in other words if you have done something

13   against the law since 15, this would be applicable; is that

14   correct?

15   A.    Correct.

16   Q.    You know, because you reviewed the records in this

17   case, that when he was at least 16 he committed rectal

18   sodomy on at least two children in 1972?

19   A.    Correct.

20   Q.    You know that in '73 he would have only been 15 and he

21   committed rectal sodomy on another boy?

22   A.    Also correct.

23   Q.    You know that he was 27 when he had attempted to

24   sexually molest a four-year-old boy?

25   A.    In what year?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 258 of 286

1    Q.    In 19 -- I'm sorry, 1974, there was a four-year-old
2    boy; is that correct?
3    A.    Yes.
4    Q.    You also know about when he was 27, in 1983, when he
5    had two different boys.  There was the eight-year-old and a
6    12-year-old?
7    A.    Correct.
8    Q.    Did he respond to you after you asked him now and
9    since you were 15 have you done things that are against the
10   law, even if you weren't caught, like stealing, using or
11   selling drugs, writing bad checks, or having sex for money.
12   He stated no.
13   A.    You see, those kinds of questions that you're
14   addressing now are not on the personality questionnaire.
15   They're to be used for follow-up questions if the clinician
16   in my position chooses to use them as follow-up questions.
17   But all of the questions on the personality questionnaire
18   refer to events that may have happened before age 15 or
19   before age 13.  In other words, Mr. Wooden never saw those
20   questions.  You can look at the personality questionnaire
21   yourself and see those questions are not on the personality
22   questionnaire.
23   Q.    I see.  So Mr. Wooden never saw those questions
24   because you chose not to ask him those questions?
25   A.    No, Mr. Wooden never saw those questions because

1    they're not on the personality questionnaire.

2    Q.   You're talking about whether or not he suffered from

3    antisocial personality disorder; isn't that correct?

4    A.   Not quite.  Almost.  The issue is does he now suffer

5    from antisocial personality disorder.  If the issue is did

6    he suffer from antisocial personality disorder in the past,

7    yes, he absolutely did.  But the relevant diagnostic

8    question is present tense not past tense.

9    Q.   You chose to ask Walter Wooden about events that may

10   have occurred before he was 15?

11   A.   Yes, because it's on the personality questionnaire.

12   Q.   And you chose not to ask him about events that

13   occurred after he was 15?

14   A.   Because those questions are not on the personality

15   questionnaire.

16   Q.   With regard to pedophilia now.  I believe you

17   testified in your deposition that you consulted the DSM-IV.

18   A.   I'm sorry.  All I heard was DSM-IV.

19   Q.   I believe you testified that you consulted the DSM-IV;

20   is that correct?  Isn't that correct?  You consulted the

21   DSM-IV?

22   A.   Oh, yes.

23   Q.   Now strictly looking at the DSM-IV, would you agree

24   that Walter Wooden would fit the diagnosis for pedophilia?

25   A.   No.  Not a here and now diagnosis, if we consider the

1  relevant research data in addition to DSM-IV.

2  Q.  Would you agree that in 1972 the diagnosis of

3  pedophilia was correct?

4  A.  Yes.

5  Q.  Would you agree in 1973 the diagnosis for pedophilia

6  would be correct?

7  A.  Yes.

8  Q.  Do you agree in 1974 the diagnosis for pedophilia

9  would be correct?

10  A.  Yes.

11  **THE COURT:**  Let me ask a question, please, if you

12  don't mind.  Are you saying that pedophilia is a transient

13  situation?

14  A.  If we look at the relevant data and we look at what

15  happens to the rape and sexual offending for child

16  molesters as they age.  The older the molesters get the

17  recidivism rate drops from about mid to high 20 percent

18  down to four percent for individuals between the ages of 50

19  and 59.

20  **THE COURT:**  So it's not a condition that endures for

21  all of life is your position?

22  A.  Correct.

23  **THE COURT:**  Is there any medical or psychiatric proof

24  of that?

25  A.  Yeah.  The data that I just cited published by

1    Wollert, Psychology of Public Policy and Law in either 2005

2    or 2006.

3        **THE COURT:**  Well, you're basically saying that the

4    entire scientific undercarriage for the Adam Walsh Act,

5    Congress was scientifically wrong because they're

6    attempting to civilly address something that may not be

7    there at all.  If a person was a pedophiliac when they did

8    the crime, you're saying at a point later in time after

9    they're punishment they're not?

10   A.   They may not be.  Correct.  Depending upon the

11   offender's age.

12       **THE COURT:**  So it's not like being left-handed.  You

13   won't be that way all your life?

14   A.   Correct.

15       **THE COURT:**  Is it like smoking?

16   A.   Yes.

17       **THE COURT:**  Is it like abusing alcohol?

18   A.   Yes.  And the treatment approaches are very very

19   similar.

20       **THE COURT:**  So a person who's an alcoholic can reach a

21   point in life where they're not an alcoholic?

22   A.   Yes.

23       **THE COURT:**  Or they're a recovered alcoholic?

24   A.   Okay.  Now, now it depends upon what phraseology you

25   want to use.  I would say if a former alcoholic is no

1  longer abusing alcohol he is no longer an alcoholic.

2      **THE COURT:**  Okay.

3  A.   And the treatment approaches for alcohol abuse and sex

4  offenders are very similar.  Relapse prevention is a phrase

5  commonly used when treating substance abuse, and we know

6  relapse prevention is a phrase and approach commonly used

7  when treating sex offenders.

8      **THE COURT:**  Okay.

9  Q.   Would you agree that sexual urges towards children is

10  stable over time?

11  A.   No.  It can change over time and especially as

12  offenders age, those urges dissipate.  I should say

13  diminish or dissipate.

14  Q.   Now the DSM-IV, which is a product of a number of

15  working groups, is that fair?

16  A.   A number of different committees.

17  Q.   Different committees or work groups?

18  A.   Yes.

19  Q.   The DSM-IV is relied upon at hospitals?

20  A.   Correct.

21  Q.   By courts?

22  A.   Correct.

23  Q.   According to the DSM-IV pedophilia is chronic and

24  usually lifelong; isn't that correct?

25  A.   That's what the DSM-IV says.  The relevant peer review

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 263 of 286

1    data say otherwise.  Indeed, that's why we saw the
2    development of the Static 99-R.  Static 99-R responds to
3    age in a much more sensitive manner than the Static 99 did.
4    Static 99-R makes distinctions between, is the offender
5    under age 25, is he over age 40, or is he over age 60.  The
6    original Static 99 just asked is he over or under age 25.
7    Q.   Your view with regard to pedophilia, whether it's
8    chronic or not, is a minority view?
9    A.   I don't think that's true if we identify what group
10   are we talking about.  Are we talking about a group of
11   board certified psychologists in forensic psychology like
12   myself?  No.  My view would be a majority view within that
13   group.
14   Q.   Dr. Weiner in his initial evaluation he found that
15   Walter Wooden was a pedophile or suffered from pedophilia?
16   A.   I wouldn't dispute -- I don't recall it, but I'm not
17   disputing you.  I think you're right.
18   Q.   You were asked during your deposition, if a person was
19   looking at the DSM-IV with regard to pedophilia do you
20   think that would be a justified finding based on Walter
21   Wooden's prior history, and with regard to what Dr. Weiner
22   stated about June 3rd, 2005, were there -- that would
23   justify a finding with regard to Walter Wooden?
24   A.   I heard you; I just didn't follow it.
25   Q.   All right.  When Walter Wooden told Dr. Weiner he was

1  having thoughts about offending against a boy, he had

2  thoughts about offending against a young boy about two or

3  three years ago; right?  That he intended to entice the boy

4  into the basement for sexual activity.  He in fact did

5  entice the boy into the basement, but he let the boy go.  A

6  little while ago I put that on the ELMO, the screen, that

7  record from June 21.

8  A.   Yeah.

9  Q.   And you were asked if that would qualify Walter

10  Wooden, under the DSM-IV, as a pedophile.

11  A.   Under DSM-IV that would qualify Walter Wooden as a

12  pedophile at that time.  If we want to consider alternate

13  definitions of pedophilia focusing on what an individual's

14  overt behavior is, what that individual does, then those

15  issues that you described would not qualify Mr. Wooden as a

16  pedophile.

17  Q.   How has Walter Wooden changed, from the time he has

18  gone in in 2005 to now, to cause you to believe he is not a

19  pedophile?

20  A.   How has Walter Wooden changed from now --

21  Q.   From the time he went in in 2005.

22  A.   How has Walter Wooden changed from 2005 to now?

23  Q.   Yes.  To cause you to believe he is not a pedophile.

24  A.   No evidence of any sexual misconduct in prison since

25  2005.  No evidence of a pornography collection.  No

1    evidence of collecting pictures of children that are not

2    explicit.  And with one exception no evidence of

3    corresponding with children outside the institution.

4    Q.   Okay.  Let's unpack that for a moment.  You've looked

5    at his total history based on the documents.  Nothing in

6    his history shows that Walter Wooden is a homosexual rapist

7    of grown men?

8    A.   Correct.

9    Q.   Nothing in his history shows that Walter Wooden is a

10   collector of pornography?

11   A.   In the past that has not been true; correct.

12   Q.   But based on those factors for which there is no

13   historical evidence, you now say that that's your finding

14   for why he does not qualify for pedophilia?

15   A.   Yes.  For example, based on my experience working at

16   the Maryland Penitentiary where we would have offenders

17   without any history of possessing pornography outside the

18   institution, they would develop their concealed stash of

19   pornography in the institution.

20       **THE COURT:**  I think Mr. James' point is, not putting

21   words in his mouth, he never did that in the past so the

22   fact that he doesn't do it in the present doesn't mean he's

23   recovered.  It's just irrelevant.

24   A.   And I would not agree.

25       **THE COURT:**  You don't agree?

1  A.   No.  Now, what issue do we want to talk about?  Do we

2  want to talk about possession of pornography?  And I can

3  tell you as a former prison psychologist you can frequently

4  encounter child molesters serving time who have no history

5  of pornography possession out in the street but they

6  acquire their own collection while they're behind bars

7  because it affords them some kind of gratification for

8  their sexual deviancy.

9      **THE COURT:**  Is there a comingling of passive and

10  active child molestation, like looking at child pornography

11  and actually doing the hands-on crime?  Or are they

12  separate behavioral domains?

13  A.   Well, yes and no.  There are some offenders who

14  collect pornography and they also engage in hands-on

15  offenses.

16      **THE COURT:**  And there are some who collect pornography

17  and never touch a person?

18  A.   Exactly.

19      **THE COURT:**  And there are some who touch people but

20  never look at pornography because they get no gratification

21  from that?

22  A.   Again, correct.

23      **THE COURT:**  And that's what he may be?

24  A.   That's what he may be.  Or it may be a situation where

25  he is effectively controlling his urges and as a result he

1   is not seeking out a collection of pornography or explicit

2   pictures of children.

3       **THE COURT:**  But there's no evidence that he ever

4   collected pornography from the time he was an adolescent

5   until his 50s?

6   A.   Correct.  However, I have known pedophiles who can be

7   diagnosed as pedophiles, in confinement who do collect

8   pornography, child pornography, despite never having

9   collected it when they were in the community.

10      **THE COURT:**  Well, but the empirical evidence is that

11  that's not him.  Because there are no incidents of him ever

12  viewing or collecting child pornography.

13  A.   Correct.  And he's not doing it now.  If he were doing

14  it now then I would revise my opinion about pedophilia

15  applying to him as a diagnosis now.

16      **THE COURT:**  Okay.

17  Q.   I just have a few more questions.  I just have a few

18  more questions and then I'm going to wrap up; okay?

19  A.   Do you know how many times I've heard attorneys say

20  that to me?

21  Q.   I'll try to be brief.  During the course of your

22  deposition you were asked about the places that you've --

23  courthouses you've testified in.  And there's one place you

24  said you didn't have on your record.  That's in the State

25  of New Hampshire?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 268 of 286

1   A.   Correct.  Now, the New Hampshire case is in the list

2   of cases I formally keep now separate from my CV because I

3   can update that continuously.

4   Q.   And that is the case of <u>State of New Hampshire versus</u>

5   <u>William Ploof</u>?

6   A.   Correct.

7   Q.   P-L-O-O-F.

8   A.   Correct.

9   Q.   And in that case there was a Daubert challenge to

10  Static-99?

11  A.   Correct.

12  Q.   And the Judge was Julian Abramson?

13  A.   Also correct.

14  Q.   And the Honorable Judge Julian Abramson with regard to

15  your testimony, she found that you were inconsistent and

16  biased?

17  A.   That was Judge Abramson's opinion.  Her opinion is a

18  minority opinion.

19  Q.   And she found that one of the books you had published

20  called Smoke and Mirrors, The Devastating Effect of False

21  Sexual Abuse Claims suggested your slant.  She found that

22  during the course of the trial you relied extensively on

23  one of your other books which you later conceded on cross-

24  examination contains several significant errors.

25  A.   One footnote error.

1    **MR. JAMES:**  I have no further questions, Your Honor.

2    **THE COURT:**  All right.  Do you have any redirect or

3    are you finished with this witness?

4    **MS. GRAVES:**  I'd just like to ask him a few questions.

5    **THE COURT:**  Really?

6    **MS. GRAVES:**  I promise.

7                    REDIRECT EXAMINATION

8    BY MS. GRAVES:

9    Q.   Dr. Campbell, is mood disorder a treatable condition?

10   A.   Is what?

11   Q.   Mood disorder a treatable condition?

12   A.   Oh, yes.  Absolutely, yes.

13   Q.   Is it treatable with medication?

14   A.   Treatable with medication and appropriate counseling.

15   And it probably responds better to those combined

16   treatments than any other clinical condition.

17   Q.   I believe the exhibit that Mr. James showed you

18   regarding Dr. Weiner's assessment of Mr. Wooden as

19   performing poorly in treatment was all in June of 2005?

20   A.   Correct.

21   Q.   Do you recall what significant event happened in June

22   of 2005?

23   A.   We had a situation where we know for sure that Mr.

24   Wooden had had -- at least one or two sessions with an

25   associate of Dr. Weiner whose name was Ms. Stamm.  Ms.

1     Stamm's treatment notes documented Mr. Wooden talking about
2     dreams.  Ms. Stamm said it seemed to her that Mr. Wooden
3     switched back and forth between saying it happened and he
4     only dreamed it.  Then in response to those circumstances
5     Dr. Weiner made his report to District of Columbia
6     officials, as a mandated reporter, of child abuse.
7     Q.  Mr. James also showed you an exhibit where I believe
8     Dr. Weiner mentioned that Mr. Wooden said he had had
9     thoughts about sexual involvement with children two to
10    three years earlier?
11    A.  Correct.
12    Q.  Now, what would have been the status of their
13    relationship, Mr. Wooden's and Dr. Weiner's, two to three
14    years prior to 2005?
15    A.  It was not as good as it was in 2005.  The levels of
16    Mr. Wooden's trust in response to Dr. Weiner progressively
17    increased over the course of treatment beginning in
18    December 2002.
19    Q.  What sort of treatment options -- never mind.  Let me
20    ask you this.
21        As to the Static 99-R, which you stated you consider
22    the most important part of your report, nothing about Mr.
23    Wooden's risk under the Static 99-R changes even if he
24    offended against that boy in 2005, does it?
25    A.  Correct.

1          **MS. GRAVES:**  That's all I have.

2          **THE COURT:**  Okay, thank you, Doctor.  You can go back

3     to wherever you want to sit.  If you want to sit up there,

4     that's fine.  Do you have any other witnesses?

5          **MR. GRAVES:**  Your Honor, we have a number of witnesses

6     who could not be here today.  We are trying to work out

7     with the Government so that we can provide Declarations

8     from those witnesses so that we can wrap up the

9     proceedings.

10          **THE COURT:**  All right.  We will see if we finish.  Are

11     you resting?

12          **MS. GRAVES:**  Yes, sir.

13          **THE COURT:**  Do you have rebuttal evidence?

14          **MR. JAMES:**  I do, Your Honor.

15          **THE COURT:**  Call it.

16          **MR. JAMES:**  At this time the Government recalls Dr. Hy

17     Malinek.

18          **THE COURT:**  You can come right to the stand.  You're

19     under oath.  We're just going to focus on -- I'm not

20     pushing you, I'm just saying that we've been through it all

21     once.

22          **MR. JAMES:**  I understand.

23                    **DR. HY MALINEK, REBUTTAL WITNESS**

24                         DIRECT EXAMINATION

25     **BY MR. JAMES:**

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO  Document 59  Filed 07/27/11  Page 272 of 286

1   Q.   Dr. Malinek, you've sat here through the course of the
2   testimony of Dr. Campbell as well as the Respondent, Mr.
3   Wooden.  First of all, we'll begin with the most recent
4   testimony, that of Dr. Campbell.  Can you tell the Court,
5   through the course of his testimony, what, if any
6   inaccuracies did Dr. Campbell state?
7   A.   He incorrectly quoted from the record regarding the
8   assessment of his intellectual ability as it appears in the
9   record.  It is not correct that he was assessed at having a
10  7O I.Q.  There was a number of other inconsistencies as
11  referenced in his treatment of the Static 99-R.
12  Q.   And specifically, what inconsistencies with regard to
13  the Static 99-R?
14  A.   It is not clear to me how he views the measure,
15  whether he regards it as important or not, whether he uses
16  the recidivism estimates or not.  His publications severely
17  criticize the measure as inaccurate as well as his
18  statements.  At the same time, he says that he uses the
19  measure, but does not use the recidivism estimates.  It is
20  not clear to me how he uses it.  Clearly not clear how he
21  used it in this particular case given the totality of the
22  information available about Mr. Wooden, as well as his own
23  testimony in deposition and in court.
24  Q.   With regard to the diagnosis of pedophilia and the
25  DSM-IV, is the DSM-IV universally accepted in the field of

1    forensic psychologists?

2    A.    It is.  Absolutely.

3    Q.    And with regard to whether pedophilia is a chronic

4    condition, what does the DSM-IV say about that?

5    A.    It is believed to be a chronic and lifelong condition.

6    It is.  The DSM-IV does not say that you turn this on and

7    off like a light switch everytime somebody offends against

8    a child.  It certainly is not consistent -- his description

9    of it is not consistent with the data base in this

10   particular case, and with his own statement, with Mr.

11   Wooden's own statements, over the years, to the polygrapher

12   and elsewhere.  So this condition is not like alcoholism.

13   It is believed to be a part of the person's hardwiring if

14   you want, sexual attractions.  And who people are sexually

15   interested in is not something that changes over time,

16   certainly not easily.  And it certainly has been the case

17   here that it has not changed over the years.  And Mr.

18   Wooden is on the record stating this.  And admitting to the

19   polygrapher in 2005 that he was sexually aroused around

20   children, in addition to his record decades long of

21   offending against children.  So I don't believe that you

22   can turn this diagnosis on and off.  And I have never read

23   it in any book that this is how the condition is regarded

24   or could be used.  There is no statement like this.  There

25   is no position of any authority on pedophilia or

1    paraphilias that this is how the condition is viewed,

2    developmentally or diagnostically.

3    Q.    In his report he made reference to pedophilia in

4    remission.  And that is not notated in the DSM-IV; is that

5    correct?

6    A.    There is no such qualifier in DSM-IV.  The answer is

7    no.

8    Q.    The DSM-IV is accepted by the entire forensic

9    community; is that correct?

10   A.    It is utilized worldwide.  Certainly used by

11   psychologists, in mental health setting, and by forensic

12   experts.  The answer is yes.

13   Q.    The use of the Barratt Impulsive Scale in assessing

14   forensic settings regarding recidivism in sex offenders, is

15   that a common practice at all?

16   A.    I have never heard about it, and I've never seen it

17   before in any report that I have reviewed or read about.

18   This is a self-report measure.  I don't see how it could

19   have any validity in a forensic setting where the stakes

20   are high and where the person understands what the

21   circumstance is.  You cannot use a self -- can't rely on a

22   self-report inventory without having some measure of the

23   veracity of their response and answers, whether we can

24   trust him or not.  He understands what the circumstance is.

25   There are psychological tests like the MMPI or others that

1    have a separate set of validity checks to help ascertain

2    the truthfulness of respondents.  I can't see how a self-

3    report measure of impulsivity could help us in this case.

4    And I don't believe that you could use it alone and

5    overlook a lifelong history of documented impulsivity in

6    Mr. Wooden to say that he's not impulsive, and just take

7    that piece, that questionnaire, that self-report as your

8    measure for impulsivity, especially in this case.

9    Q.   Now with regard to sex offenders -- let's say a sex

10   offender who is not impulsive, a sex offender who grooms

11   children such as by buying them ice cream.

12       **THE COURT:**  Making friends with their parent and

13   obtaining access to minor children, dating someone who

14   might have minor children in order to create a

15   facilitation.

16   Q.   That is correct.

17       **THE COURT:**  That's grooming.  We heard about that in

18   the last case.

19   Q.   That is correct.  Now Dr. Malinek, someone who grooms

20   children, and does that, isn't that a --

21       **THE COURT:**  Planned or anticipated behavior, rather

22   than impulsive behavior?

23   Q.   That is correct.  You've heard The Court's comments --

24   question with regard to that?

25   A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 276 of 286

1  **THE COURT:** So you don't have to have a high incidence

2 of impulsive behavior in order to be a predator?

3 A. Absolutely not, Your Honor.

4  **THE COURT:** It can actually be more effute in the more

5 reasoned and deliberate setting than in the impulsive

6 setting.

7 A. It often is, Your Honor. It often is. Indeed.

8  **THE COURT:** Those are two different domains though,

9 aren't they? Someone who might be only impulsive about it

10 or whose response might be an impulsive response, and

11 someone who's never impulsive but always careful,

12 calculating, deliberate and cautious about it?

13 A. There are sex offenders who act impulsively and,

14 again, there's a group of what we call predators, indeed,

15 who cultivate a relationship or groom their victims

16 purposefully and exclusively for the purpose of

17 victimization.

18  **THE COURT:** And the predators are more conscious of

19 punishment and deterrent and the social inhibitions that

20 are in place, whereas the impulsive person is more blind to

21 the social limitations?

22 A. May not be. May be, indeed.

23  **THE COURT:** I'm asking.

24 A. Sexual offenses are multi-factorial, Your Honor. We

25 see different types of patterns of conduct among sex

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 277 of 286

1   offenders.  My belief is that volitional impairment has
2   different manifestations in sexual offenses.  You do have
3   the sexual offenses or impulsive offenders who are
4   impulsive and touch a child in a situation or opportunistic
5   type of situation.  And you have those that you mentioned
6   who engage in deliberation and calculation and groom
7   victims by giving -- establishing a relationship with a
8   child, with the mother, all for the purpose of
9   victimization.  In both situations I believe that there is
10  obviously ineffective or defective control of sexual
11  impulses.
12  Q.   Now with respect to the testimony of Walter Wooden,
13  based on his testimony, has any of that changed your
14  opinion with regard to the diagnosis?
15  A.   It has not.  It confirmed my opinion.
16  Q.   And explain to The Court how it has confirmed your
17  opinion.
18  A.   It was my first opportunity to watch him testifying
19  yesterday and today, and look at his clinical presentation
20  and the statements he had made here in response to
21  questions.  I had accommodated my analysis of several
22  dynamic risk factors or need areas, because I had not had
23  the opportunity to evaluate him before because he did not
24  want to interview.  He made a number of statements that
25  corroborated, I believe, my findings and impressions.

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 278 of 286

1    For example, in the area of relationship issues or
2    what I discussed as intimacy deficits that could be a
3    dynamic risk factor for the offense, I believe he stated in
4    response to one of Mr. Gray's questions that he never had a
5    woman in my life.  Essentially corroborating the impression
6    that he really never had a significant relationship with an
7    appropriate partner.  It makes me think more that he
8    probably is an exclusive pedophile and not a non-exclusive
9    pedophile.  And that does not reduce the risk if the only
10   people he can have intimacy with are children.  And he
11   doesn't have any history of a meaningful relationship that
12   is appropriate.

13       And then I think another area that I had
14   discussed and was asked about yesterday was discussed as
15   cognitive or problem solving abilities in sexual offenders.
16   Another potential dynamic risk offender in individuals who
17   have cognitive limitations and are unable to learn from
18   experience, identify solutions to problems, learn from
19   detection.  It's pretty clear or it seems to be clear, as
20   has been discussed here, that he has significant cognitive
21   limitations.  And that his I.Q. probably falls below the
22   level that was identified in the 1978 evaluation as dull
23   normal.  One needs to administer an I.Q. test to obtain a
24   specific number and see where he falls now.  I think it's
25   clearly below the low average range.  What was called dull

1    normal in the past is now called the low average range.

2    And this refers to I.Q. between 80 and 90.  I think he's in

3    the 70s.

4         **THE COURT:**  I think he's in the 60s.  I think he

5    manifests signs of mild retardation.

6    A.   Possibly, mild.

7         **THE COURT:**  In the way he responds to stimulus here in

8    court.  Do you not think so?

9    A.   Quite possibly, Your Honor.  Yes.  I would need to

10   administer an I.Q. test.  Quite possibly mild mental

11   retardation.

12   Q.   And how would that be relevant with regard to your

13   determination of his -- well, how would it be relevant to

14   your determination?

15   A.   It is relevant to a risk assessment to the extent that

16   when someone has significant cognitive limitations then

17   their capacity to understand and learn from experience is

18   limited.  Here we have an individual who clearly has failed

19   repeatedly to learn from his experience, to learn from

20   treatment, to learn from detection and arrest and

21   incarceration over a period of years.  And who doesn't get

22   it.  He doesn't get it that sex with kids is not

23   appropriate, that children are not his friends.  And that

24   cognitively is hampered in more ways than one.  And so that

25   would augment the risk in this kind of a case that he will

1    do this again.

2         And, finally, I think one of the dynamic risk factors

3    that is discussed in the literature and that appeared, I

4    believe, both in the Hanson and Harris dynamic risk factor

5    study, and in the Mann and Thorton study, talks about

6    sexual offenders who offend against children who identify

7    with children, who see children as their friends, as their

8    special friends.  And who are in many ways children

9    themselves.  And I suspect that this is the case with Mr.

10   Wooden and I opined this in my report.  I believe today he

11   is on the record testifying that he sent a Christmas card

12   to James after he went to jail for the parole violation of

13   June 2005.  And he said I sent it because he was my friend.

14   So until today he believes that this was appropriate, that

15   a seven year old would be his friend.  And this is

16   supported by other statements made by him about his

17   relationship with children by his own behavior, giving ice

18   cream. giving money to children in the neighborhood and

19   also what we know about the way he enticed some of the

20   victims.  I'll give you a dollar and things like that.  And

21   so forth.  That is his view of children as friends, as

22   appropriate friends for him.  That is a dynamic risk factor

23   clearly present in this case and corroborated this morning

24   on the stand.

25   Q.   Lastly, is the serious disorder of pedophilia and

282

1    antisocial personality disorder together, separately or in
2    combination, that causes you to still believe that he would
3    have serious difficulty in refraining from engaging in, in
4    his case, child molestation?
5    A.    I think it's all of the above.  I think there is a
6    combination of mental disorders in this case.  It's become
7    increasingly apparent.  That combine to designate him as a
8    high risk individual.  There is an undeniable evidence of
9    pedophilia that's long lasting, that he acknowledges.
10   There's a record of behavior of acting out in a pedophilic
11   manner that's resistant to extinction.  There's a record of
12   multiple treatment efforts that have actually failed very
13   miserably since 2005.  There's a record of him statiing
14   that the kids came to me and that they were willing to have
15   sex, up until yesterday on the stand.  There is evidence as
16   recent as today of significant cognitive limitations
17   whereby he doesn't quite get it.  And so I don't see the
18   low risk factors in this case.  The sole risk factor you
19   can argue from a research perspective is that he is aging.
20   And the belief is that when people are in their 50s and
21   their 60s their risk goes down.  That is based on quite a
22   few age related studies that documented an inverse
23   relationship between age and recidivism.  That is not
24   something that is applied blindly.  And we see in many
25   pedophiles that acting out continues after they are 50 or

1  60 years old.  There are studies -- the testosterone

2  studies that show that the libido of a man in his 50s is

3  weaker than the libido of a man in his 20s.  I don't know

4  that that alone, if you look at the studies or some of the

5  other publications on age and recidivism or the

6  testosterone studies, I don't think that that alone in this

7  kind of case is an override to a risk continuation that is

8  otherwise high.

9       **MR. JAMES:**  That will be my questions, Your Honor.

10      **THE COURT:**  All right, any cross?

11      **MS. GRAVES:**  Just a little.

12                      CROSS-EXAMINATION

13  **BY MS. GRAVES:**

14  Q.   Dr. Malinek, I believe you agreed that Mr. Wooden's

15  I.Q. is perhaps in the 70s.  That would be your estimate

16  just on observing him?

17  A.   I would need to spend more time with him.  He had a

18  different presentation today than yesterday.  Yesterday I

19  thought he was clearly retarded based on how he presented,

20  was electively mute.  Today he was much more relevant and

21  focused.  He obviously is impaired.

22  Q.   How would that level of intelligence affect his

23  potential for improving with treatment?

24  A.   I think he clearly needs to be in a specialized sex

25  offender program that is designed for people with cognitive

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 283 of 286

1    limitations.  I can tell you in California this is handled
2    by the regional center that regulates specialized programs
3    for developmentally delayed or mentally retarded
4    individuals.  Or that in the California SVP program there
5    is a separate section for people who are slow.  He clearly
6    cannot be, in my opinion, in a sex offender treatment
7    program with people who have normal I.Q.
8    Q.   Are you aware of any such specialized program in the
9    Bureau of Prisons?
10   A.   I do not know about these programs within the federal
11   prison system at this point.  I do not.
12   Q.   In light of what you said about Mr. Wooden's low
13   intelligence, don't you think it's unlikely that he would
14   be able to manipulate a test such as the Barratt Impulsive
15   Scale?
16   A.   I don't know.  I have to look at the Barratt more
17   closely.  I did my research on this scale to look for
18   validity studies in correctional populations, and I haven't
19   found any.  So I don't know.  I'm not sure how Dr. Campbell
20   used the scale.  And even if he had a discrepant score how
21   you could reconcile it.  I would need to research the scale
22   further.
23   Q.   Have you determined whether or have you attempted to
24   determine whether Mr. Wooden would be subject to any
25   supervised release if he were released now?

1  A.   I do not know the answer to this question.

2       **MS. GRAVES:**  That's all I have.

3       **THE COURT:**  Is that all your witnesses?

4       **MR. JAMES:**  It is, Your Honor.

5       **THE COURT:**  All right.  Thank you.  Thank you, Doctor.

6       Well, that concludes this case, and I'll bring it to a

7  close and allow you to supplement the record with the

8  declarations that you want.  And I'll come down and speak

9  to counsel, but I thank you publicly for the way you tried

10 the case.  And these are very important cases and very

11 difficult cases.  I'm just so impressed with the way in

12 which both sides have marshaled their evidence and done an

13 outstandingly professional job.  I wish others could see

14 this in bringing these cases to trial.  They are very, very

15 hard cases to prepare for.  So I thank you.

16      Off the record.

17

18

19

20

21

22

23

24

25

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:10-hc-02151-BO   Document 59   Filed 07/27/11   Page 285 of 286

STATE OF NORTH CAROLINA      )
                            ) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS         )


      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Sandra A. Graham, CVR*        July 26, 2011
Sandra A. Graham, CVR        July 26, 2011
Court Reporter & Notary Public
Notary Public Number:  19940140086

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646